# Ex. 4



Neutral Citation Number: [2021] EWCA Civ 33

Case Nos: A4/2020/0097

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND & WALES**
**COMMERCIAL COURT (QBD)**
**MR JUSTICE TEARE**
**[2019] EWHC 3422 (Comm)**

Royal Courts of Justice,
Strand, London, WC2A 2LL

Date: 18/01/2021

**Before :**

**LORD JUSTICE DAVID RICHARDS**
**LORD JUSTICE HENDERSON**
and
**LORD JUSTICE POPPLEWELL**

- - - - - - - - - - - - - - - - - - - - -
**Between :**

**KAWASAKI KISEN KAISHA LTD**

*Appellant/ Second Defendant*

- and -

**JAMES KEMBALL LIMITED**

*Respondent/ Claimant*

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**James Collins QC** and **Richard Hoyle** (instructed by **MFB Solicitors**) for the **Appellant**
**Nigel Jacobs QC** and **Ruth Hosking** (instructed by **HFW LLP**) for the **Respondent**

Hearing date : 16 December 2020
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

**Covid-19 Protocol:** This judgment was handed down remotely by circulation to the parties' representatives by email, release to BAILII and publication on the Courts and Tribunals Judiciary website. The date and time for hand-down is deemed to be at 10.30 a.m. on 18 January 2021.

**Lord Justice Popplewell :**

**Introduction**

1. The issue in this appeal is whether the case of inducing breach of contract which the claimant ("JKL") has pleaded against the second defendant ("KKK"), or should be permitted to plead by amendment, has a real prospect of success. KKK appeals against a decision of Teare J in which he resolved that issue in JKL's favour in dismissing KKK's application to set aside an order granting JKL permission for the claim to be served out of the jurisdiction.

**Outline of facts**

2. KKK is head of a group of companies ("the K-Line group") which owns or operates a substantial fleet comprising over 500 vessels. These include car carriers, dry bulk carriers, tankers and container ships. This case concerns its container liner service which until April 2018 operated via many ports in dozens of countries worldwide.

3. Prior to 2016 the container liner business was conducted by the group as part of a consortium between KKK and a number of partners. On 31 October 2016 it was announced that KKK would merge the container liner business with that of two other Japanese container shipping companies, Mitsui O.S.L. Lines and Nippon Yusen Kabushiki Kaisha, through a joint venture under the name Ocean Network Express ("ONE"). ONE was to be established on 1 July 2017 and to begin business on 1 April 2018. The joint venture involved a new corporate structure with a Japanese holding company, of which KKK owned 31%; a Singapore company as the principal trading company; and regional subsidiaries including one for Europe. As a result, from 1 April 2018, the K-Line group ceased to operate its own container liner business, save for a short period of run-off in relation to voyages in progress.

4. The cessation of this aspect of the K-Line group's operations had an adverse effect on JKL, which carries on the business of arranging road haulage of containers within the UK to and from container ports. JKL's relevant contractual arrangements were with the first defendant ("K-Euro"), an English company based in the UK. K-Euro is wholly owned by K-Line Holding (Europe) Limited which in turn is a subsidiary of KKK. K-Euro was one of the K-Line group's overseas agents who made local arrangements in relation to the global shipping business. Its functions included, amongst other things, arranging for transport and ancillary services in respect of container traffic in the UK, pursuant to an agency agreement between it and KKK dated 1 January 2003, subsequently replaced by one dated 24 August 2016. Under those agency agreements K-Euro also had a variety of other responsibilities as far as container traffic was concerned, as well as functions in relation to the K Line group's non-container operations in the UK. In respect of the container business, the agency agreements impose no obligation on KKK to provide any particular or minimum volume of business to K-Euro.

5. JKL's contract with K-Euro was contained in a service agreement dated 22 April 2016 ("the Service Agreement"). JKL had previously been a sister company of K-Euro and another indirect subsidiary of KKK, being owned by K-Line (Holding) Europe Ltd. At the same time as the execution of the Service Agreement, JKL was sold to Uniserve Holdings Ltd ("Uniserve"), an entity independent of the K-Line

   group, by means of a sale and purchase agreement ("the SPA"). Pursuant to the Service Agreement between JKL and K-Euro, K-Euro was obliged to offer JKL a minimum number of haulage jobs over a period of three years, ending on 31 March 2019. The effect of the cessation by the K-Line group of its container liner operations, and rearrangement of that business through the ONE joint venture, was that the K-Line group had no haulage jobs to offer K-Euro, and consequently from 1 April 2018, K-Euro was unable to offer JKL the haulage jobs required under the Service Agreement.

6. JKL sues K-Euro for breach of contract in relation to such failure. The claim against KKK is framed in the tort of inducing breach of contract.

**The pleading**

7. The case pleaded against KKK alleges first, at paragraph 6, that KKK was at all material times aware of the Service Agreement having been involved in relation to its negotiation and conclusion. At paragraph 7 (iii) and paragraph 8 (ii) it is alleged that as part of the restructuring, ONE sought to streamline its operations and that the haulage operations which were the subject matter of the Service Agreement, formed part of the "Container Shipping Business" which was the subject matter of the joint venture agreement. Paragraphs 7 (iv) and 8 (iii) allege that the conclusion of the joint venture meant that K-Euro would no longer be able to perform the Service Agreement from its planned date of commencement, namely April 2018, because JKL's contractual services under the Service Agreement were to be carried out by ONE under the joint venture. Paragraph 10 repeats the allegation that K-Euro was unable to continue to perform the Service Agreement from 1 April 2018 because it was no longer the UK agent of KKK's container liner business.

8. Paragraphs 26 and 27 of the Particulars of Claim plead the inducement claim against KKK in the following terms:

> "26. In the premises [KKK] knowingly and intentionally procured and/or induced [K-Euro] to breach the Service Agreement (for Period 3) with [JKL] directly and/or indirectly in order to enable O.N.E. to take over the haulage operations which would otherwise have been performed by [JKL] for Period 3 under the Service Agreement:
> 
> (i) By reason of (*inter alia*) its relationship with [K-Euro] and its involvement in the conclusion of the SPA and Service Agreements, [KKK] must have been aware of the existence of the Service Agreement concluded between [JKL] and [K-Euro] and/or that [K-Euro] had agreed that [JKL] would provide haulage services for an extended period thereunder.
> 
> (ii) [KKK] was or must have been aware, or was at least sufficiently reckless in regard to, the probable consequences for the ability of [K-Euro] to continue to perform the Service Agreement with [JKL] following the establishment of O.N.E. as part of the joint venture. Under the joint venture O.N.E. would take over the haulage operations of the joint venture companies in the United Kingdom, thereby disabling [K-Euro] from performing its obligations under the Service Agreement with [JKL].
> 
> (iii) The establishment of O.N.E. and its take-over of [JKL's] and [K-

    Euro's] services in the United Kingdom thus meant that [K-Euro] was unable to perform the Service Agreement (as [K-Euro] repeatedly acknowledged in 2017 - 2018). The establishment of O.N.E. was inconsistent with the ability of [K-Euro] to perform the Service Agreement as [KKK] must have known.

    27. In these circumstances [KKK] directly or indirectly induced and/or procured [K-Euro] to breach the Service Agreement in order to enable O.N.E. to take over the import and export haulage operations conducted under the Service Agreement by [JKL]. By establishing the O.N.E subsidiary or group of subsidiaries in order to take over the haulage operations for Period 3 which were to be undertaken by [JKL] under the Service Agreement with [K-Euro], [KKK] knowingly and intentionally procured and/or induced [K-Euro] (whether directly or indirectly) to breach the Service Agreement with [JKL]."

9. JKL also pleaded a claim in conspiracy against KKK which has subsequently been abandoned.

10. Paragraph 29 then pleaded: "By reason of [KKK's] wrongful conduct as set out above, [JKL] has suffered loss and damage." The loss pleaded constituted the sums which JKL claimed it would have earnt both under the remaining period of the Service Agreement and for the subsequent two years.

11. Following the grant of permission to appeal, and in the light of the criticisms of the pleading by KKK in its skeleton argument in support of its application for permission to appeal, JKL has produced draft amended Particulars of Claim for which it seeks permission to amend from this court, if necessary to put forward an arguable claim. The relevant amendments are:

    (1) In paragraph 26 the allegation that KKK knowingly "procured and/or induced" K-Euro to breach the Service Agreement is expanded to one that KKK "procured and/or induced and/or encouraged and/or persuaded" K-Euro to breach the Service Agreement.

    (2) There are added two subparagraphs to paragraph 26 after subparagraph (i) in the following terms:

        <u>(ia) In order to enable [KKK] to carry out the O.N.E. joint venture and by reason of their close relationship, [KKK] encouraged and/or persuaded [K-Euro] to breach the Agreement. Further or alternatively it is reasonable to infer that [K-Euro] would have been unwilling to breach its Agreement with [JKL] in the absence of encouragement or persuasion and/or some form of protection from [KKK].</u>

        <u>(ib) Further or alternatively, the establishment and operation of the O.N.E. joint venture disabled [K-Euro] from performing the Agreement and constituted a transaction or arrangement which was inconsistent with the Agreement. This conduct in turn procured</u>

(3) There is added a new paragraph 26A under the heading "Intention" in the following terms:

> 26A. The Claimant will contend that the breach of the Agreement by [K-Euro] was a means by which [KKK] would ensure that O.N.E. was able to take over responsibility for the haulage operations which were the subject-matter of the Agreement. The O.N.E joint venture could not be performed without the breach of the Agreement. [KKK] was actively seeking to take over and obtain a direct economic benefit or advantage from the operation of the haulage business.

(4) There is added a new paragraph 27 under the heading "Causation" in the following terms:

> The establishment of O.N.E. by [KKK] and its take-over of the haulage operations under the Agreement were instrumental in causing or facilitating the breach of the Agreement by [K-Euro]. Further or alternatively in the event that [KKK] had not encouraged and/or persuaded [K-Euro] to breach the Agreement, [K-Euro] would or could have sought to maintain the Agreement with [JKL] rather than acting in breach of the Agreement. It is reasonable to infer that [K-Euro] would have been unwilling to breach its Agreement with [JKL] in the absence of encouragement or persuasion and/or some form of protection from [KKK].

**The Judgment**

12. The Judge, before whom there was no draft amendment, held that the pleading was just sufficient to cover the case advanced by counsel for JKL which was that the relevant conduct which constituted inducing or procuring a breach of contract was "encouragement". He held that given the connection between KKK and K-Euro, both as parent and indirect subsidiary, and with some common senior management, the alleged inference of encouragement was not fanciful or without substance. He rejected the submission of counsel for KKK that even if there was an arguable case on encouragement, the case could not succeed on causation because whatever was said the ONE joint venture would have disabled K-Euro from performing. He did so on the grounds that "causation is very much a factual matter and it would, I think, be premature to make such a finding at this stage. An event can have more than one cause.". The Judge also recorded the submission of counsel for KKK that JKL had not pleaded and could not sustain an arguable case on intention. The Judge did not deal with the argument in terms, although it is implicit in his conclusion that he rejected it.

13. JKL made a further and alternative submission before the Judge that the tort was made out where the defendant, with knowledge of the contract, has dealings with the contract breaker which are inconsistent with performance of the contract; and that conclusion of the ONE venture constituted such inconsistent dealings in this case. The Judge held that it was unnecessary to deal with this alternative way of putting the

case which he observed "appears to be in conflict with Lord Nicholls' clear statement in *OBG v Allan* that mere prevention is not enough."

**The arguments**

14.  On this appeal, Mr Collins QC submitted on behalf of KKK that permission to amend the Particulars of Claim in accordance with the draft amendments should be refused. In his skeleton argument he included a submission that it was wrong for this court to consider the grant of permission, but he focussed his oral argument on the alternative submission that the amendment should be refused because the amended case had no real prospect of success. His principal argument was that, whether on the basis of the original pleaded case or the draft amendments, JKL's case has no real prospect of success in establishing any of three of the necessary ingredients of the tort, namely inducement, intention and causation.

15.  On behalf of JKL, Mr Jacobs QC argued that there was a properly pleaded case with a real prospect of success that each of the ingredients of the tort was made out. The inducement consisted of either or both of (i) encouragement or persuasion and (ii) inconsistent dealings. Intention was established because breach of the Service Agreement was intended as a means by which KKK would ensure that ONE was able to take over responsibility for the haulage operations which were the subject matter of the Service Agreement, and KKK was actively seeking a direct economic advantage from the operation of that haulage business. Causation was established by the inducements resulting in the breach of the Service Agreement.

**The merits test**

16.  It was common ground that on an application to serve a claim on a defendant out of the jurisdiction, a claimant needs to establish a serious issue to be tried, which means a case which has a real as opposed to fanciful prospect of success, the same test as applies to applications for summary judgment: *Altimo Holdings and Investment Ltd v Kyrgyz Mobil Tel Ltd* [2102] 1 WLR 1804 per Lord Collins JSC.

17.  The Court will apply the same test when considering an application to amend a statement of case, and will also refuse permission to amend to raise a case which does not have a real prospect of success.

18.  In both these contexts:

    (1)  It is not enough that the claim is merely arguable; it must carry some degree of conviction: *ED & F Man Liquid Products Ltd v Patel* [2003] EWCA Civ 472 at paragraph 8; *Global Asset Capital Inc. v Aabar Block SARL* [2017] 4 WLR 164 at paragraph 27(1).

    (2)  The pleading must be coherent and properly particularised: *Elite Property Holdings Ltd v Barclays Bank Plc* [2019] EWCA Civ 204 at paragraph 42.

    (3)  The pleading must be supported by evidence which establishes a factual basis which meets the merits test; it is not sufficient simply to plead allegations which if true would establish a claim; there must be evidential material which

establishes a sufficiently arguable case that the allegations are correct: *Elite Property* at paragraph 41.

**The law governing the tort of inducing breach of contract**

19. The tort of inducing a breach of contract was established by the well-known case of *Lumley v Gye* (1853) 2 E & B 216. In *D.C Thomson & Co Ltd v Deakin* [1952] Ch 646, this court treated it as a subcategory of a unitary tort of interfering with contractual relations, which formed an exception to the general principle, expressed by Lord Evershed MR at p 676, "if a man, acting lawfully and in all respects within his rights, causes, as a result of what he does, loss to another, that other has no remedy, though the loss he suffers is the necessary and inevitable consequence of the acts of the first person.". In *OBG v Allan* [2008] 1 AC 1, which is now the leading modern authority on the tort, the House of Lords rejected the unifying theory advanced in *Thomson v Deakin* and disaggregated the torts of inducing breach of contract and causing injury by unlawful means. In this case we are concerned only with the former.

20. In *Global Resources Group v Mackay* [2008] SLT 104, Lord Hodge, then sitting in the Outer House, articulated the tort (or delict in Scotland) in these terms at paragraph 11: "A commits the delict or tort of inducing a breach of contract where B and C are contracting parties and A, knowing of the terms of their contract and without lawful justification induces B to break that contract."

21. He went on in the following paragraphs to identify the five ingredients of the tort as being:

    (1) there must be a breach of contract by B;

    (2) A must induce B to break his contract with C by persuading, encouraging or assisting him to do so;

    (3) A must know of the contract and know his conduct will have that effect;

    (4) A must intend to procure the breach of contract either as an end in itself or as the means by which he achieves some further end;

    (5) if A has a lawful justification for inducing B to break his contract with C, that may provide a defence against liability.

22. KKK accepts that there is a sufficiently arguable case that K-Euro breached the Service Agreement, that such was the consequence of the establishment of the ONE joint venture, and that it knew that establishment of the joint venture would have that consequence. In this case the dispute focusses on the second and fourth of the ingredients, namely inducement and intention. As formulated by Lord Hodge the second ingredient, of inducement, encompasses both the conduct which constitutes an inducement and the causative effect it has on B breaching the contract. Before us and the Judge below, these were to some extent treated as separate ingredients, comprising inducement and causation, but I would respectfully agree with Lord Hodge's treatment of them as a single ingredient because, as appears from the discussion

Case 8:24-cv-01248-KKM-AAS   Document 106-6   Filed 10/11/24   Page 9 of 18 PageID 561

Judgment Approved by the court for handing down.                                    KKK v JKL

below, it is of the essence of conduct by A which can amount to inducement that it should have some causative effect on B breaking the contract.

*Inducement*

23. The leading speeches in *OBG v Allan* were given by Lord Hoffmann and Lord Nicholls. Although expressed in different terms, there is no difference in approach to the question of inducement, as Arden LJ and Toulson LJ both observed in *Meretz Investments NV v ACP Ltd* [2008] Ch 244 at paragraphs 136 and 177 respectively. Both Lord Hoffmann and Lord Nicholls in *OBG v Allan* regarded it as fundamental that liability for inducement was an accessory liability: see per Lord Hoffmann at paragraphs 3, 8 and 20 and per Lord Nicholls at paragraphs 86, 172, 176, and 178. A commits a tort and attracts liability to C because he does something which joins in with the conduct of B in a way which makes him an accessory to the breaking of the contract by B.

24. Lord Hoffmann described the conduct which attracted such accessory liability at paragraph 20 in these terms:

> "20. ……liability under *Lumley v Gye* 2 E & B 216 requires only the degree of participation in the breach of contract which satisfies the general requirements of accessory liability for the wrongful act of another person: for the relevant principles see *CBS Songs Ltd v Amstrad Consumer Electronics plc* [1988] AC 1013 and *Unilever plc v Chefaro Proprietaries Ltd* [1994] FSR 135."

25. Lord Hoffman went on to refer to the necessary conduct at paragraph 36 when rejecting the distinction drawn in previous authorities between direct and indirect inducement:

> "36. This treats the distinction as turning simply upon whether there was communication, directly or through an agent, between the defendant and the contract-breaker. But, like Lord Denning in the Daily Mirror case, I cannot see why this should make a difference. If that is what the distinction between "direct" and "indirect" means, it conceals the real question which has to be asked in relation to *Lumley v Gye* 2 E & B 216: did the defendant's acts of encouragement, threat, persuasion and so forth have a sufficient causal connection with the breach by the contracting party to attract accessory liability? The court in *Lumley v Gye* made it clear that the principle upon which a person is liable for the act of another in breaking his contract is the same as that on which he is liable for the act of another in committing a tort. It follows, as I have said, that the relevant principles are to be found in cases such as *CBS Songs Ltd v Amstrad Consumer Electronics plc* [1988] AC 1013 and *Unilever plc v Chefaro Proprietaries Ltd* [1994] FSR 135."

26. *CBS Songs v Amstrad* involved a claim against Amstrad for manufacturing and selling hi-fi systems with facilities for recording songs, on the basis that such conduct attracted accessory liability for the breaches of copyright committed by customers when they made such recordings. The House of Lords upheld the decision of the Court of Appeal that Amstrad's conduct did not attract accessory liability. Lord Templeman, with whom all other members of the Judicial Committee agreed, said at

p1058E that "a defendant may procure an infringement by inducement, incitement or persuasion" and went on to distinguish such conduct from merely facilitating the doing of an act, which was not sufficient to attract accessory liability.

27.  In *OBG v Allan* Lord Nicholls said:

> "178. With hindsight it is evident that application of the *Lumley v Gye* tort to a 'prevention' case was unfortunate. There is a crucial difference between cases where the defendant induces a contracting party not to perform his contractual obligations and cases where the defendant prevents a contracting party from carrying out his contractual obligations. In inducement cases the very act of joining with the contracting party and inducing him to break his contract is sufficient to found liability as an accessory. In prevention cases the defendant does not join with the contracting party in a wrong (breach of contract) committed by the latter. There is no question of accessory liability. In prevention cases the defendant acts independently of the contracting party. The defendant's liability is a "stand-alone" liability. Consistently with this, tortious liability does not arise in prevention cases unless, as was the position in *GWK*, the preventative means used were independently unlawful."
>
> ….
>
> 180 Given this difference between prevention and inducement, it is confusing and misleading to treat prevention cases as part and parcel of the same tort as inducement cases. The rationale is not the same, nor are the ingredients. But the rationale and ingredients of liability in prevention cases are the same as those of the tort of interference with a business by unlawful means. Prevention cases should be recognised for what they are: straightforward examples of the latter tort, rather than as exemplifying a wider version of *Lumley v Gye* labelled "interference with contractual relations"."

28.  In *Meretz*, Toulson LJ said at paragraph 177:

> "However, to prevent performance of a contractual obligation is not the same thing as inducing its breach. The former may give rise to the tort of causing loss by unlawful means. The latter requires the defendant's conduct to have operated on the will of the contracting party: see Lord Nicholls' speech in the *OBG* case [2008] 1 AC 1 paras 174-180."

*Intention*

29.  In *OBG v Allan* Lord Hoffmann said:

> "42.   The next question is what counts as an intention to procure a breach of contract. It is necessary for this purpose to distinguish between ends, means and consequences. If someone

> knowingly causes a breach of contract, it does not normally matter that it is the means by which he intends to achieve some further end or even that he would rather have been able to achieve that end without causing a breach. Mr Gye would very likely have preferred to be able to obtain Miss Wagner's services without her having to break her contract. But that did not matter. Again, people seldom knowingly cause loss by unlawful means out of simple disinterested malice. It is usually to achieve the further end of securing an economic advantage to themselves. As I said earlier, the Dunlop employees who took off the tyres in *GWK Ltd v Dunlop Rubber Co Ltd* 42 TLR 376 intended to advance the interests of the Dunlop company.
>
> 43. On the other hand, if the breach of contract is neither an end in itself nor a means to an end, but merely a foreseeable consequence, then in my opinion it cannot for this purpose be said to have been intended. That, I think, is what judges and writers mean when they say that the claimant must have been "targeted" or "aimed at". In my opinion the majority of the Court of Appeal was wrong to have allowed the action in *Millar v Bassey* [1994] EMLR 44 to proceed. Miss Bassey had broken her contract to perform for the recording company and it was a foreseeable consequence that the recording company would have to break its contracts with the accompanying musicians, but those breaches of contract were neither an end desired by Miss Bassey nor a means of achieving that end."

30. Lord Nicholls said:

> "191. I turn next to the mental ingredient of the *Lumley v Gye* tort. The mental ingredient is an intention by the defendant to procure or persuade ("induce") the third party to break his contract with the claimant. The defendant is made responsible for the third party's breach because of his intentional causative participation in that breach. Causative participation is not enough. A stranger to a contract may know nothing of the contract. Quite unknowingly and unintentionally he may procure a breach of the contract by offering an inconsistent deal to a contracting party which persuades the latter to default on his contractual obligations. The stranger is not liable in such a case. Nor is he liable if he acts carelessly. He owes no duty of care to the victim of the breach of contract. Negligent interference is not actionable."

31. I would emphasise three aspects of these statements of principle in relation to inducement and intention which are of importance in this case.

32. First, they make clear that conduct cannot qualify as inducement if it constitutes no more than preventing B from performing the contract with C as one of its consequences. There must be some conduct by A amounting to persuasion, encouragement or assistance of B to break the contract with C.

33. Secondly, this participation by A in B's breach, must, in Lord Hoffmann's words, have "a sufficient causal connection with the breach by the contracting party to attract accessory liability" or, in Lord Nicholls' words, so as to amount to "causative participation". It is because of the causative requirement that "inducement requires the defendant's conduct to have operated on the will of the contracting party" in the words of Toulson LJ. If A's conduct is not capable of influencing a choice by B whether or not to breach the contract, it is not capable of amounting to inducement; it cannot operate on the mind or will of B so as qualify as causative participation as an accessory to his breach.

34. Thirdly, the mental element of the tort requires that there must be an intention that the breach of the contract must at least be the means to an end, rather than simply the foreseen or intended consequence of the tortious conduct.

**Application of the law to the facts of this case**

*Inducement: encouragement or persuasion*

35. As currently pleaded, JKL's case falls foul of the prevention principle articulated by Lord Nicholls. It avers that the inducement occurred by reason of the establishment of the joint venture by KKK and the only relevant fact pleaded as constituting inducement is that the establishment had the consequence that K-Euro breached its contract with JKL. KKK's conduct was not unlawful in itself: it owed no obligations under its agency agreement with K-Euro to provide any business to K-Euro. It is not made unlawful under the rubric of the tort of inducing breach of contract merely by virtue of the fact that breach of the Service Agreement was the inevitable result of such conduct.

36. By the draft amended pleading, JKL avers that KKK encouraged or persuaded K-Euro to breach the Service Agreement. That is sufficient to amount to inducement as a matter of averment. There is no evidential basis, however, which supports such an averment and carries a degree of conviction so as to make it a case with a real prospect of success. On the contrary, as Mr Collins correctly submitted, JKL's own evidence in support of its existing pleading was that the breach of the Service Agreement was the inevitable consequence of the establishment of the joint venture. As Mr Jacobs put it, the effect of the formation of the ONE joint venture was to pull the rug from under the feet of the Services Agreement. Such evidence leaves no room for any coherent factual case that something KKK said or did in the preparations for the joint venture involved some form of encouragement or persuasion which was capable of influencing K-Euro about whether or not it breached the Service Agreement. K-Euro simply had no choice in the matter. Nothing which KKK said or did was capable of operating on the mind or will of K-Euro; the latter was wholly dependent for its performance or non-performance of the Service Agreement on what KKK chose lawfully to do in its own business interests. Conversely, KKK had no reason to indulge in any encouragement or persuasion. It could participate in the joint venture arrangements without breaching any of its own obligations and did not need any cooperation from K-Euro in relation to the Service Agreement in order to do so. Breach of the Service Agreement by K-Euro was simply a consequence of what KKK was free to do in its own commercial interests.

Case 8:24-cv-01248-KKM-AAS   Document 106-6   Filed 10/11/24   Page 13 of 18 PageID 565

Judgment Approved by the court for handing down.                                          KKK v JKL

37. Mr Jacobs submitted that there was a sufficiently arguable case of encouragement or persuasion, for which there was sufficient evidential support to the relevant merits threshold, by reason of the following. KKK and K-Euro had a relationship of indirect parent and subsidiary, and common senior management, and it is common ground that there is a sufficiently arguable case that KKK knew of the terms of the Service Agreement and that the ONE joint venture would put K-Euro in breach of it. They are therefore likely to have discussed in advance such potential effect. K-Euro would have been reluctant to breach the Service Agreement, not only out of an innate desire to perform its contractual obligations, but also because of the adverse financial consequences of doing so, and additionally through a sense of commercial obligation in the light of the recent sale of JKL to Uniserve under the SPA, the benefit of which sale was the remaining contractual entitlement of JKL under the Service Agreement. Accordingly, it is realistic to posit that K-Euro would have sought to dissuade KKK from entering into the joint venture, or at least to postpone it or to exclude the UK haulage services which JKL was to perform from its scope. It is therefore also realistic to posit that KKK would have offered some financial comfort to K-Euro, whether by way of indemnity against the financial consequences or at least assurance as to future funding. That would be sufficient encouragement of K-Euro to amount to inducement of K-Euro to breach the Service Agreement.

38. The argument does not surmount the obstacle that in reality K-Euro had no choice whether or not to breach the Service Agreement, because that was the inevitable consequence of the joint venture. Be it supposed that KKK was asked to provide, and did provide, the posited financial comfort to K-Euro. That could not amount to inducement for the purposes of the tort because K-Euro would be in the same position of having to break its contract with JKL whether or not the financial comfort was provided or withheld. What caused K-Euro to breach the contract with JKL was the cessation of KKK's liner container business and its integration into the joint venture. Any attempts by K-Euro to dissuade KKK from doing that, or to persuade KKK to do it in a way which avoided breach of the Service Agreement, cannot amount to a relevant inducement: that is conduct by K-Euro towards KKK, not conduct by KKK. In order for KKK to have done something which could constitute inducement, it must be something which was capable of influencing whether or not K-Euro breached the Service Agreement so as to operate on its mind and will. However, nothing which it is realistically to be inferred that KKK might have done towards K-Euro can have had that effect: K-Euro had no choice whether to breach the Service Agreement; it was entirely dependent in that respect on what KKK chose to do in respect of the joint venture.

39. The flaw in JKL's case is pointed up by the wording in the second sentence of the plea at paragraph 26 (ia) that "it is reasonable to infer that [K-Euro] would have been unwilling to breach its Agreement with [JKL] in the absence of encouragement or persuasion and/or some form of protection from [KKK]." That is not a reasonable or available inference because in the absence of the suggested inducement K-Euro would have simply been unable to perform the agreement, whether or not it would have been willing to or unwilling to do so. The effect of the pleaded conduct is the breach of a contract as a necessary consequence, not a breach involving the conduct operating on the mind or will of the contract breaker.

*Inducement: inconsistent dealing*

40. Mr Jacobs argues in the alternative that KKK was engaged in inconsistent dealings and that this was sufficient to amount to the conduct necessary to constitute inducement. The conduct relied on for this purpose in the draft amendment at paragraph 26 (ib) is that the inconsistent dealings comprised the establishment and operation of the joint venture. At the hearing Mr Jacobs conceded that these could not amount to inducement because what was required was some dealing between the tortfeasor and the contract breaker. The argument advanced orally was that the relevant conduct was KKK's withdrawal of supply of container haulage business to K-Euro.

41. Quite apart from the fact that this is not pleaded, even by way of draft amendment, it faces two insuperable difficulties.

42. First, inconsistent dealings are not some form of inducement which are detached from the principles articulated in *OBG v Allan*. On the contrary, they are simply an example of conduct which may be capable of fulfilling those criteria because they may constitute a form of persuasion, encouragement or assistance. This is how they were treated in Lord Hodge's summary of the ingredients in *Global Resources v Mackay* at paragraph 13:

> "[13] Fourthly, A must induce B to break his contract with C by persuading, encouraging or assisting him to do so. In *Delictual Liability* (3rd ed) at p 39, Professor Joe Thomson states that the inducement must be directed at B, the person in the contractual relationship with the victim, C, and refers to *Middlebrook Mushrooms Ltd v Transport and General Workers' Union*. In that case a trade union carried on a campaign against an employer by distributing leaflets to shoppers outside supermarkets to which the employer supplied its mushrooms, urging the shoppers to boycott the employer's produce. The Court of Appeal held that the trade union had not committed the tort of inducing a breach of contract as the defendant's members directed their persuasion to the purchasing public and not the (allegedly) contract breaking supermarket. See also *Calor Gas Ltd v Express Fuels (Scotland) Ltd*, Lord Malcolm at 2008 SLT, p 135, para 47. It is clear from *BMTA v Salvadori* and *BMTA v Gray* that the tort or delict is not confined to circumstances where A has to persuade B to break his contract but can also be committed where A has dealings with B which A knows are inconsistent with the contract between B and C. In either event A induces or assists B to do something (or to refrain from doing something) which involves B breaking his contract with C."

43. This way of framing the case therefore founders for the same reasons as the case of encouragement or persuasion. The conduct concerned was not capable of operating on the mind or will of K-Euro in relation to breaching the Service Agreement: K-Euro had no choice in the matter. It could not amount to causative participation. Breach of the Service Agreement was merely the foreseeable consequence of KKK's failure to supply haulage business to K-Euro. The case advanced falls foul of the prevention principle.

44. Mr Jacobs relied on a passage in the judgment of Jenkins LJ in *Thomson v Deakin* at p.694 in the following terms:

    "Again, so far from persuading or inducing or procuring one of the parties to the contract to break it, the third party may commit an actionable interference with the contract, against the will of both, and without the knowledge of either, if, with knowledge of the contract, he does an act which, if done by one of the parties to it, would have been a breach. Of this type of interference the case of *G.W.K v Dunlop Rubber Co Ltd* 42 TLR 376 affords a striking example."

45. This passage cannot survive the judgments in *OBG v Allan*, and the explanation in the latter case that *GWK* was an example of the separate tort of causing injury by unlawful means, not the tort of inducing breach of contract. The suggestion that the third party can commit an actionable interference with the contract without the knowledge of the contract breaker is inconsistent with liability being accessory in character, and the requirement of a degree of participation in the breach or joining with the contract breaker which was explained in *OBG v Allan* to be necessary for liability. The principle expressed by Jenkins LJ in this passage is also inconsistent with Lord Nicholls' exposition of the difference between the two torts, and in particular his explanation that it does not apply to prevention cases.

46. Mr Jacobs also relied on a passage in Jenkins LJ's judgment, also at p 694, where he said:

    "But the contract breaker may himself be a willing party and there seems to be no doubt that if a third party, with knowledge of a contract between the contract breaker and another, has dealings with the contract breaker which the third party knows to be inconsistent with the contract, he has committed an actionable interference……"

47. That passage too must be read in the light of the subsequent judgments in *OBG v Allan*. The conduct so described *may* constitute the tort, but will not do so if the inconsistent dealings do not also have the character of causative participation required for accessory liability.

48. Mr Jacobs also relied on the decision of David Richards J, as he then was, in *Lictor Anstalt v Mir Steel* [2011] EWHC 3310 (Ch). That was a case in which Lictor Anstalt had a contract for the supply of equipment with Alphasteel. Alphasteel went into administration, and the administrators arranged a sale of the equipment and other assets of the business to Libala. Alphasteel, acting by its administrators, and Libala agreed that the sale should be effected by a hive down of assets to a company formed by the administrators, Mir Steel, followed by a sale of that company to Libala. Mir Steel applied for summary judgment on the claim brought against it by Lictor Anstalt for the tort of inducing breach of contract, on the grounds, amongst others, that the participation by Mir Steel in the hive down was not sufficient to constitute the act of procuring or inducing breach of contract because it did not involve actual persuasion or encouragement. In dismissing the application, David Richards J accepted that the case was sufficiently arguable to defeat the application for summary judgment. That case does not assist Mr Jacob's argument on inconsistent dealings, and does not cast any doubt on the proposition that inconsistent dealings can be a form of inducement if, but only if, they meet the accessory liability and causative participation criteria

articulated in *OBG v Allan*. It is an example of a case which fits within such principles, and within Lord Hodge's formulation in paragraph 13 of *Global Resources v Mackay*, because it involves conduct which attracts accessory liability in the form of assistance rather than persuasion. Mir Steel's involvement in the hive down arrangement was a participation in Alphasteel's breach of contract because it was a necessary part of the arrangements with the administrators, and Mir Steel's participation was necessary in order to enable Alphasteel to breach its contract as it wished to.

49. The second insuperable difficulty with Mr Jacobs' inconsistent dealings argument is that there were no "dealings". On the contrary the complaint is that there were non-dealings in that KKK provided no business. KKK was under no legal or other obligation to do so. Its agency agreement with K-Euro imposed no such obligation and it would not have been in breach of such agreement had it decided, for example, to restructure its operations not through a joint venture but by reorganisation which reduced or eliminated the inclusion of UK ports in its container liner service. I do not understand how a mere failure to act, when there is no obligation to do so, can constitute an inconsistent dealing which attracts accessory liability. Mr Jacobs was unable to identify any authority in which it had, and it seems to me that it would be contrary to principle that it should. Such lawful inactivity is not conduct which can properly be described as participation in the breach of contract, or joining with the contract breaker, in the way which is described as necessary to incur accessory liability. Moreover, it would be an unjustified incursion into the general principle that a party is not to be held liable for the foreseeable consequences of his lawful actions. To impose such liability would be to require a person to do something he is not obliged to do in order to avoid incurring liability for inducing breach of contract. It would in substance impose an obligation where none existed. It could have far reaching adverse consequences, for example in relation to a parent company's decision whether to fund its subsidiary so as to enable the latter to fulfil its contractual obligations.

50. Mr Jacobs relied in this connection on what was said by HHJ Russen QC in paragraph 361 of *Palmer Birch v Lloyd* [2018] BLR 722:

> "361. If the fine dividing line in this case between prevention and inducement turns upon the ability to categorise Michael's actions as a *diversion* of funds away from HHL then, on the particular facts of this case and even in the absence of any unperformed contractual obligation to fund HHL, he was guilty of that. Although those funds did not reach HHL's bank account, they could and should have done so. Whereas a simple finding that Michael *could* have made the funds available to HHL, but simply chose not to, might arguably leave PB on the wrong side of that fine line, my further conclusion that he *should* in the circumstances have done so sustains their claim under para 10.2 of the RAPOC."

51. The passage does not assist JKL's argument because HHJ Russen QC states that a failure to do something which the alleged tortfeasor *could* do is insufficient and that what is required is something the tortfeasor *should* do. I have not found it easy to identify the nature of the obligation which the judge identified in that case as giving

Page 15

Case 8:24-cv-01248-KKM-AAS   Document 106-6   Filed 10/11/24   Page 17 of 18 PageID 569

Judgment Approved by the court for handing down.                                      KKK v JKL

rise to the "should", but it appears to be that the diversion of funds was itself unlawful because it involved an "abuse of corporate personality": see paragraph 360. If and insofar as HHJ Russen was suggesting that a lawful omission to act, in the absence of anything less than a legal obligation to act, can constitute inconsistent dealings sufficient for the tort (and it is far from clear that he was), I would not lend my approval to it.

*Intention*

52. Moreover, whichever way the conduct amounting to the alleged inducement is framed, JKL fails to meet the necessary merits threshold for the ingredient of intention. The breach of the Service Agreement was obviously not the end being pursued by KKK in setting up the joint venture arrangements. JKL was just one of many haulage contractors in numerous jurisdictions who might be affected, and the joint venture was obviously driven from KKK's perspective by what it perceived to be the commercial and economic benefits worldwide of such a restructuring of the relevant part of its business. Mr Jacobs did not suggest otherwise. Nor can it be said that breach of the Service Agreement with JKL was intended as a means to that end, as distinct from merely being the foreseen or intended consequence. The joint venture was in no sense "aimed at" the Service Agreement or "targeting" it. In *Millar v Bassey* [1994] EMLR 44 the foreseeable consequence of Ms Bassey's breach of contract with the recording company was that the recording company would have to break its contracts with the accompanying musicians, but those breaches of contract were neither an end desired by Ms Bassey nor a means of achieving that end. KKK is in an equivalent position. KKK was able to set up the joint venture whatever the wishes of K-Euro and JKL. The breach of the Service Agreement was merely the consequence of it doing so, not an end or a means to that end.

53. Mr Jacobs sought to meet this difficulty by suggesting that KKK's intention and aim was to acquire the economic benefit of the Service Agreement by "taking over responsibility for the haulage operations which were the subject matter of the agreement" and that KKK "was thereby actively seeking to take over and maintain a direct economic benefit from the operation of the haulage business" (as pleaded at paragraph 26A of the draft amendment). It appears from this formulation that the benefit here being referred to as that which would be derived from "the operation of the business" is the profit which JKL would otherwise derive from its haulage operations. There is an obvious difficulty that any operations would not be conducted by KKK after the implementation of the joint venture. But even if the allegation can be stretched to encompass KKK's economic interest as a joint venture participant in an indirect share of profits, there is simply no evidential support for it. The evidence is that after the joint venture was established, haulage services in the UK were subcontracted and the relevant ONE subsidiary conducted an open tender in which approximately 50 hauliers were invited to bid, including JKL. ONE has not carried out haulage services itself but has engaged around 30 haulage services to do so. There is no basis for suggesting that when the joint venture was established any different structure was intended, or that profit on the haulage operations was intended to be obtained by taking them in hand.

54. An alternative possibility discussed in argument, although not pleaded, is that the benefit intended comprised obtaining the haulage services previously provided by JKL more cheaply than at the rates charged by JKL under the Service Agreement.

Again there is, however, no arguable evidential basis to support such an intention on KKK's part. Under the joint venture arrangements, it would be ONE, not KKK, who would contract for haulage services in the UK, and therefore there is no relevant comparison to be drawn. ONE will pay the haulage rates it can negotiate irrespective of what JKL would have charged under the Services Agreement. They may be higher or lower than JKL's charges, but if lower, ONE is not thereby gaining a benefit from breach of the Services Agreement. ONE would be, and was, free to do this irrespective of such breach.

55. Insofar as it is alleged that lower UK haulage rates would serve KKK's economic interests as a result of its beneficial interest in the ONE holding company, the allegation still rests on the hypothesis that KKK entered into the joint venture arrangements with the specific intention of breaching the Service Agreement in order to obtain cheaper haulage services in the UK as a means towards its wider ends of economic advantage in restructuring its liner container operations worldwide. There is simply no coherent basis for such a speculative assertion, which is inherently improbable. The evidence of KKK, which is uncontradicted and evidenced by the public pronouncements at the time of the joint venture, is that it was motivated by a perceived need to maintain cooperation with other liner operations in the face of adverse market conditions and thereby to maintain economies of scale by membership of a global alliance. There is no reason to doubt this. The evidence is also that KKK and its subsidiaries had many individual contracts relating to its container business all over the world when its merger discussions began, and the individual contracts were not specifically considered in the course of the negotiations. The Service Agreement was "simply not part of the picture". Again there is no reason to doubt this. Significantly, it would always have been open to KKK at any time not to use K-Euro to arrange its UK haulage business and to engage other hauliers, without setting up a joint venture, had it wished and been able to do so on the grounds that it would save money. That it did not do so reinforces the unreality of the suggestion that gaining cheaper UK haulage rates constituted a specific intention of the joint venture arrangements. In short, the suggestion that in establishing the joint venture, KKK was targeting the Service Agreement with the specific intention of getting cheaper haulage rates in the UK is fanciful.

### Conclusion

56. In the light of these conclusions, it is not necessary to address the other arguments advanced by Mr Collins. The result is that I would allow the appeal and set aside the order granting permission to serve the claim on KKK out of the jurisdiction.

**Lord Justice Henderson :**

57. I agree.

**Lord Justice David Richards :**

58. I also agree.