# Ex. 5

HOUSE OF LORDS

SESSION 2006–07
**[2007] UKHL 21**

*on appeal from:[2005] EWCA Civ 106*
*[2005] EWCA Civ 595, [2005] EWCA Civ 861*

# OPINIONS

## OF THE LORDS OF APPEAL

## FOR JUDGMENT IN THE CAUSE

**OBG Limited and others (Appellants) *v.* Allan and others (Respondents)**
**Douglas and another and others (Appellants) *v.* Hello! Limited and others (Respondents)**
**Mainstream Properties Limited (Appellants) *v.* Young and others and another (Respondents)**

**Appellate Committee**
**Lord Hoffmann**
**Lord Nicholls of Birkenhead**
**Lord Walker of Gestingthorpe**
**Baroness Hale of Richmond**
**Lord Brown of Eaton-under-Heywood**

**Counsel**

| *Appellants*: | *Respondents*: |
|---|---|
| *OBG Ltd and others v. Allan and others* | *OBG v. Allan* |
| John Randall QC | Gregory Mitchell QC |
| Alistair Wyvill | Paul Greenwood |
| Marc Brown | (Instructed by Reynolds Porter Chamberlain LLP) |
| (Instructed by Hammonds) | *Douglas and another and others v. Hello! Ltd* |
| *Douglas and another and others v. Hello! Ltd* | James Price QC |
| Richard Millett QC | Giles Fernando |
| Richard Slowe | (Instructed by M Law) |
| Paul Stanley | *Mainstream Properties Ltd v. Young and others and* |
| (Instructed by S J Berwin LLP) | *another* |
| *Mainstream Properties Ltd v Young and others and* | Gordon Pollock QC |
| *another* | Barry Isaacs |
| John Randall QC | (Instructed by Leigh Davis) |
| John de Waal | |
| (Instructed by The Smith Partnership) | |

*Hearing dates:*
13, 14, 15, 16, 20, 21, 22, 23, 27 and 28 November 2006

ON

WEDNESDAY 2 MAY 2007

# HOUSE OF LORDS

## OPINIONS OF THE LORDS OF APPEAL FOR JUDGMENT
## IN THE CAUSE

**OBG Limited and others (Appellants) *v.* Allan and others (Respondents)**
**Douglas and another and others (Appellants) *v.* Hello! Limited and others**
**(Respondents)**
**Mainstream Properties Limited (Appellants) *v.* Young and others and**
**another (Respondents)**

## [2007] UKHL 21

## LORD HOFFMANN

My Lords,

*The three appeals*

1.     These three appeals are principally concerned with claims in tort for economic loss caused by intentional acts

(a)     In *OBG Ltd v Allan* [2005] QB 762 the defendants were receivers purportedly appointed under a floating charge which is admitted to have been invalid.  Acting in good faith, they took control of the claimant company's assets and undertaking. The claimant says that this was not only a trespass to its land and a conversion of its chattels but also the tort of unlawful interference with its contractual relations.  It claims that the defendants are liable in damages for the value of the assets and undertaking, including the value of the contractual claims, as at the date of their appointment. Alternatively, it says the defendants are liable for the same damages in conversion.

(b)     In *Douglas v Hello! Ltd* the magazine *OK!* [2006] QB 125 contracted for the exclusive right to publish photographs of a celebrity wedding at which all other photography would be forbidden.  The rival magazine *Hello!* published photographs which it knew to have been surreptitiously taken by an unauthorised photographer pretending to be a waiter or guest.  OK! says that this was interference by unlawful means with its contractual or business relations or a breach of its equitable right to confidentiality in photographic images of the wedding.

(c)     In *Mainstream Properties Ltd v Young* [2005] IRLR 964 two employees of a property company, in breach of their contracts, diverted

a development opportunity to a joint venture in which they were interested. The defendant, knowing of their duties but wrongly thinking that they would not be in breach, facilitated the acquisition by providing finance. The company says that he is liable for the tort of wrongfully inducing breach of contract.

2.     It will therefore be seen that the claimants in these three appeals rely upon at least five different wrongs, or alleged wrongs, which they say provide them with causes of action for economic loss: inducing breach of contract (*Mainstream*), causing loss by unlawful means (*Hello!*) interference with contractual relations (*OBG*); breach of confidence (*Hello!*) and conversion (*OBG*). I shall put aside the last two until I come to deal with the facts of the cases in which they arise. But I propose to start with some general observations on the first three torts.

*Inducing breach of contract*

3.     Liability for inducing breach of contract was established by the famous case of *Lumley v Gye* (1853) 2 E & B 216. The court based its decision on the general principle that a person who procures another to commit a wrong incurs liability as an accessory. As Erle J put it (at p 232):

> "It is clear that the procurement of the violation of a right is a cause of action in all instances where the violation is an actionable wrong, as in violations of a right to property, whether real or personal, or to personal security: he who procures the wrong is a joint wrongdoer, and may be sued, either alone or jointly with the agent, in the appropriate action for the wrong complained of."

4.     For a court in 1853, the difficulty about applying this principle to procuring a breach of contract was that the appropriate action for the wrong committed by the contracting party lay in contract but no such action would lie against the procurer. Only a party to the contract could be sued for breach of contract. The answer, said the court, was to allow the procurer to be sued in tort, by an action on the case. There was a precedent for this mixing and matching of the forms of action in the old action on the case for enticing away someone else's servant: see Gareth Jones "Per Quod Servitium Amisit" (1958) 74 LQR 39. Some lawyers regarded that action as a quaint anomaly, but the court in *Lumley v Gye* treated it as a remedy of general application.

5.     The forms of action no longer trouble us. But the important point to bear in mind about *Lumley v Gye* is that the person procuring the breach of contract was held liable as accessory to the liability of the contracting party.

Liability depended upon the contracting party having committed an actionable wrong. Wightman J made this clear when he said (at p 238):

> "It was undoubtedly prima facie an unlawful act on the part of Miss Wagner to break her contract, and therefore a tortious act of the defendant maliciously to procure her to do so…"

*Causing loss by unlawful means*

6.      The tort of causing loss by unlawful means has a different history.  It starts with cases like *Garret v Taylor* (1620)  Cro Jac 567, in which the defendant was held liable because he drove away customers of Headington Quarry by threatening them with mayhem and vexatious suits. Likewise, in *Tarleton v M'Gawley* (1790)  1 Peake NPC 270 Lord Kenyon held the master of the *Othello*, anchored off the coast of West Africa, liable in tort for depriving a rival British ship of trade by the expedient of using his cannon to drive away a canoe which was approaching from the shore.  In such cases, there is no other wrong for which the defendant is liable as accessory. Although the immediate cause of the loss is the decision of the potential customer or trader to submit to the threat and not buy stones or sell palm oil, he thereby commits no wrong.  The defendant's liability is primary, for intentionally causing the plaintiff loss by unlawfully interfering with the liberty of others.

7.      These old cases were examined at some length by the House of Lords in *Allen v Flood* [1898]  AC 1 and their general principle approved.  Because they all involved the use of unlawful threats to intimidate potential customers, *Salmond* 1st ed (1907) classified them under the heading of "Intimidation" and the existence of a tort of this name was confirmed by the House of Lords in *Rookes v Barnard* [1964]  AC 1129. But an interference with the liberty of others by unlawful means does not require threats. If, for example, the master of the *Othello* in *Tarleton v M'Gawley* had deprived the plaintiff of trade by simply sinking the approaching vessel with its cargo of palm oil, it is unlikely that Lord Kenyon would have regarded this as making any difference. Salmond's tort of intimidation is therefore only one variant of a broader tort, usually called for short "causing loss by unlawful means", which was recognised by Lord Reid in  *J T Stratford & Son Ltd v Lindley*  [1965]  AC 269, 324:

> "the respondent's action [in calling a strike] made it practically impossible for the appellants to do any new business with the barge hirers. It was not disputed that such interference with business is tortious if any unlawful means are employed."

8.      The tort of causing loss by unlawful means differs from the *Lumley v Gye* principle, as originally formulated, in at least four respects. First, unlawful means is a tort of primary liability, not requiring a wrongful act by anyone else, while *Lumley v Gye* created accessory liability, dependent upon the primary wrongful act of the contracting party.  Secondly, unlawful means requires the use of means which are unlawful under some other rule ("independently unlawful") whereas liability under *Lumley v Gye* 2 E & B 216 requires only the degree of participation in the breach of contract which satisfies the general requirements of accessory liability for the wrongful act of another person: for the relevant principles see *CBS Songs Ltd v Amstrad Consumer Electronics plc* [1988]  AC 1013 and *Unilever v Chefaro* [1994] FSR 135.  Thirdly, liability for unlawful means does not depend upon the existence of contractual relations. It is sufficient that the intended consequence of the wrongful act is damage in any form; for example, to the claimant's economic expectations. If the African canoeists had been delivering palm oil under a concluded contract of which notice had been given to the master of the *Othello*, Lord Kenyon would no doubt have considered that an a fortiori reason for granting relief but not as making a difference of principle.  Under *Lumley v Gye*, on the other hand, the breach of contract is of the essence. If there is no primary liability, there can be no accessory liability. Fourthly, although both are described as torts of intention (the pleader in *Lumley v Gye* used the word 'maliciously', but the court construed this as meaning only that the defendant intended to procure a breach of contract), the *results* which the defendant must have intended are different.  In unlawful means the defendant must have intended to cause damage to the claimant (although usually this will be, as in *Tarleton v M'Gawley* 1 Peake NPC 270, a means of enhancing his own economic position). Because damage to economic expectations is sufficient to found a claim, there need not have been any intention to cause a breach of contract or interfere with contractual rights. Under *Lumley v Gye*, on the other hand, an intention to cause a breach of contract is both necessary and sufficient.  Necessary, because this is essential for liability as accessory to the breach. Sufficient, because the fact that the defendant did not intend to cause damage, or even thought that the breach of contract would make the claimant better off, is irrelevant. In *South Wales Miners' Federation v Glamorgan Coal Co Ltd*  [1905]  AC 239 the miners' union said that their intention in calling a strike (inducing miners to break their contracts of employment) was, OPEC-like, to restrict production of coal and thereby raise its price. So far from wishing to cause the mine owners loss, they intended to make both owners and miners better off. The House of Lords said that this made no difference. It was sufficient that the union intended the employment contracts to be broken. It was no defence, as Lord Macnaghten put it (at p 246), that "if the masters had only known their own interest they would have welcomed the interference of the federation".


*Allen v Flood: the torts kept separate*


9.      The Law Lords who formed the majority in *Allen v Flood* [1898]  AC 1 showed a clear recognition that *Lumley v Gye* 2 E & B 216 and causing loss

by unlawful means are separate torts, each with its own conditions for liability. The difficulty for the plaintiffs in *Allen v Flood* was that, although the jury found that the defendants had acted "maliciously" in procuring the shipyard not to employ them, the defendants had neither used unlawful means nor procured any breach of contract. In the Court of Appeal the plaintiffs had argued successfully that the essence of *Lumley v Gye* was that the defendant had acted maliciously. A breach of contract was not essential. But the majority in the House of Lords said that liability had been as accessory to the breach of contract.  Lord Watson quoted from the judgments in the Court of Queen's Bench and said (at p 106) that they embodied "an intelligible and a salutary principle":

> "He who wilfully induces another to do an unlawful act which, but for his persuasion, would or might never have been committed, is rightly held to be responsible for the wrong he has procured." (p 107)

10.    Likewise Lord Herschell said (at p 123) that he was satisfied that —

> "the procuring [of] what was described as an unlawful act – namely, a breach of contract, was regarded as the gist of the action."

11.    Lord Macnaghten reserved his opinion on whether *Lumley v Gye* had been rightly decided but there can be  no doubt about what principle he thought it laid down (see pp 151-152):

> "[W]here the act itself to which the loss is traceable involves some breach of contract or some breach of duty, and amounts to an interference with legal rights…the immediate agent is liable, and it may well be that the person in the background who pulls the strings is liable too, though it is not necessary in the present case to express any opinion on that point."

12.    When the case was argued before the House of Lords (see Lord Herschell at p. 132), the weight of the plaintiffs' argument was shifted to the *Garret v Taylor* Cro Jac 567 and *Tarleton v M'Gawley* 1 Peake NPC 270 line of authority, which were said to support the proposition that any unjustified interference with trade or employment was actionable.  But the majority said that it was essential to liability in those cases that the defendant had injured the plaintiff by using unlawful means against a third party.  Lord Watson (at p. 104) described them as "cases in which an act detrimental to others, but

affording no remedy against the immediate actor, had been procured by illegal means."  Lord Herschell said (at p 137):

> "In all of them the act complained of was in its nature wrongful; violence, menaces of violence, false statements."

13.    Thus the facts of *Allen v Flood* did not fall within *Lumley v Gye* because no breach of contract or other unlawful act had been procured and did not fall within the unlawful means tort because no unlawful means had been used.  The majority did not accept that there was any other basis for liability. In particular, the fact that the defendant deliberately caused damage "maliciously" in the sense of having a bad or improper motive was rejected as a ground for imposing liability. As Lord Watson (whose, views, said Lord Macnaghten in *Quinn v Leathem* [1901]  AC 495, 509 "represent the views of the majority better far than any other single judgment delivered in the case") summed up at p 96:

> "There are, in my opinion, two grounds only upon which a person who procures the act of another can be made legally responsible for its consequences. In the first place, he will incur liability if he knowingly and for his own ends induces that other person to commit an actionable wrong. In the second place, when the act induced is within the right of the immediate actor, and is therefore not wrongful in so far as he is concerned, it may yet be to the detriment of a third party; and in that case according to the law laid down by the majority in *Lumley v Gye*, the inducer may be held liable if he can be shewn to have procured his object by the use of illegal means directed against that third party."

(Like Lord Macnaghten in *Quinn v Leathem* (at p 510), I think that the reference to *Lumley v Gye* in support of the second cause of action is a slip – "a rare occurrence in a judgment of Lord Watson's" – because it obviously applies to the first cause of action).

14.    Some writers regret the failure of English law to accept bad motive as a ground for liability, as it is in the United States and Germany: see for example Dyson Heydon, *Economic Torts* 2nd ed (1978) p 28.  But I agree with Tony Weir's opinion, forcibly expressed in his Clarendon Law Lectures on *Economic Torts* (OUP 1997) that we are better off without it. It seems to have created a good deal of uncertainty in the countries which have adopted such a principle. Furthermore, the rarity of actions for conspiracy (in which a bad motive can, exceptionally, found liability) suggests that it would not have made much practical difference.

6

*Quinn v Leathem: the seeds of confusion*

15.    *Quinn v Leathem* [1901]  AC 495 is nowadays regarded as a case on lawful means conspiracy, which established that an improper motive can anomalously found a cause of action which, under the principle in *Allen v Flood*, would not lie against an individual.  But this was by no means clear at the time and the case contains some discussion of both  *Lumley v Gye* and causing loss by unlawful means.  Lord Macnaghten, in a well-known passage (at p. 510), considered the basis of *Lumley v Gye*:

> "I have no hesitation in saying that I think the decision was right, not on the ground of malicious intention – that was not, I think, the gist of the action – but on the ground that a violation of a legal right committed knowingly is a cause of action, and that it is a violation of legal right to interfere with contractual relations recognised by law if there be no sufficient justification for the interference."

16.    I rather doubt whether Lord Macnaghten's view of what *Lumley v Gye* decided had altered since his opinion in *Allen v Flood* three years earlier.  But the *Quinn v Leathem* formulation is open to the construction that there can be liability for "interfering" with contractual relations without being accessory to any breach of contract.  Of course if this is done by unlawful means with the intention of causing damage, it will fall within the unlawful means tort.  But Lord Macnaghten made no mention of unlawful means and in any case, under that tort, interference with contractual relations is not a necessary part of the cause of action.  Any intentionally inflicted damage will do.  The dictum was therefore capable of giving rise to confusion.

17.    Lord Lindley went even further and said, at p 535, that the *Lumley v Gye* tort was an example of causing loss by unlawful means:

> "If the above reasoning is correct, *Lumley v. Gye* was rightly decided, as I am of opinion it clearly was. Further, the principle involved in it cannot be confined to inducements to break contracts of service, or indeed to inducements to break any contracts. The principle which underlies the decision reaches all wrongful acts done intentionally to damage a particular individual and actually damaging him."

18.    There are two objections to this analysis.  First, it reflects neither the reasoning of the court in *Lumley v Gye* nor the analysis of the case in *Allen v Flood*.  Secondly, to say that the defendant in *Lumley v Gye* did a wrongful act is circular.  It was only wrongful because the court in *Lumley v Gye* said that

inducing a breach of contract was tortious. It is circular then to say that it was tortious because it involved a wrongful act.

19.     One reason, I think, why it seemed to Lord Lindley and others that *Lumley v Gye* and the unlawful means tort were illustrations of the same principle was that quite often, particularly in cases of torts committed in the course of commercial competition or industrial disputes, both could be regarded as unlawful ways of carrying on the competition or the dispute. That was how it appeared to Bowen LJ in *Mogul Steamship Co Ltd v McGregor, Gow & Co* (1889) 23 QBD 598, 614:

> "No man, whether trader or not, can, however, justify damaging another in his commercial business by fraud or misrepresentation. Intimidation, obstruction, and molestation are forbidden; so is the intentional procurement of a violation of individual rights, contractual or other, assuming always that there is no just cause for it.  The intentional driving away of customers by shew of violence: *Tarleton v. M'Gawley* 1 Peake NPC 270; the obstruction of actors on the stage by preconcerted hissing: *Clifford v. Brandon* 2 Camp 358; *Gregory v. Brunswick* 6 Man & G 205; the disturbance of wild fowl in decoys by the firing of guns: *Carrington v. Taylor* 1 East 571, and *Keeble v. Hickeringill* 11 East 574n; the impeding or threatening servants or workmen: *Garret v. Taylor* Cro Jac 567; the inducing persons under personal contracts to break their contracts: *Bowen v. Hall* 6 QBD 333; *Lumley v. Gye* 2 E & B 216; all are instances of such forbidden acts."

20.     These are, it is true, all instances of unlawful ways of causing economic damage. But that does not mean (and I do not think that Bowen LJ meant) that there is a single principle which makes them all unlawful. Disturbing the wild fowl may have been unlawful because it constituted a nuisance (compare *Hollywood Silver Fox Farm Ltd v Emmett* [1936] 2 KB 468); the people who hissed in the theatre may have been liable for malicious *Quinn v Leathem* conspiracy; *Lumley v Gye* was accessory liability and *Tarleton v. M'Gawley* was true primary unlawful means liability.

21.     Furthermore, there is no reason why the same facts should not give rise to both accessory liability under *Lumley v Gye* and primary liability for using unlawful means.  If A, intending to cause loss to B, threatens C with assault unless he breaks his contract with B, he is liable as accessory to C's breach of contract under *Lumley v Gye* and he commits the tort of causing loss to B by unlawful means. The areas of liability under the two torts may be intersecting circles which cover common ground. This often happened in 20th century industrial disputes, where, for example, a union would use unlawful means (inducing members to break their contracts of employment) to put pressure

upon the employer to break his contract with someone else who was the union's real target. Leaving aside statutory defences, this would make the union liable both under *Lumley v Gye* as accessory to the employer's breach of contract and for causing loss to the target by unlawful means. That does not make *Lumley v Gye* and unlawful means the same tort.  But the close proximity of the circumstances in which they could be committed, particularly in industrial disputes, may explain why they were often thought to be manifestations of the same principle.

*Muddle:  GWK Ltd v Dunlop Rubber Co Ltd*

22.     Muddle set in with the influential case of *GWK Ltd v Dunlop Rubber Co Ltd* (1926)  42 TLR 376.  The GWK company made motor cars and the ARM company made tyres. GWK contracted to fit all their new cars with ARM tyres and to show them with ARM tyres at trade exhibitions. On the night before a motor show in Glasgow, Dunlop employees removed the ARM tyres from two GWK cars on the exhibition and substituted Dunlop tyres. The evidence showed that Dunlop knew of ARM's contractual right to have their tyres displayed.

23.     Lord Hewart CJ held Dunlop liable. He referred to the dicta of Lords Macnaghten and Lindley in  *Quinn v Leathem* [1901] AC 495, which I have already cited, and said, at p 377:

> "In [my] opinion the defendants…knowingly committed a violation of the ARM company's legal rights by interfering, without any justification whatever, with the contractual relations existing between them and the GWK company and [I think] that the defendants so interfered with the intention of damaging the ARM company and that the company [has] been thereby damnified."

24.     The case is a good example of intentionally causing loss by unlawful means.  There was a finding of an intention to damage the ARM company (as a means of advancing the interests of the Dunlop company, but more of that later) and although there is no express reference to unlawful means in the passage I have cited, it is implied both by the reference to Lord Lindley's statement of principle and the separate finding of trespass to the goods of the GWK company.

25.     Lord Hewart, however, made no reference to the tort of causing loss by unlawful means, possibly because the only form in which it was then recognised in the text books was Salmond's tort of intimidation. *GWK Ltd v Dunlop Rubber Co Ltd* was clearly not a case of intimidation.  Dunlop had not

threatened anyone but had achieved its ends more directly by a trespass against the property of the GWK company. It had nevertheless interfered with the freedom of the ARM company to fit its vehicles with tyres in accordance with its agreement with GWK.  Nowadays we would not regard the fact that this was achieved by direct action rather than threats as making any difference: in both cases, intended loss is caused by unlawful means used against a third party.  But Lord Hewart looked for a different pigeon hole and the way he formulated his reasons ("committed a violation of the ARM company's legal rights by interfering…with the contractual relations existing between them and the GWK company") shows that he found it in Lord Lindley's extended definition of the *Lumley v Gye* tort. As Sir Jeremy Lever QC pointed out in an elegant essay written nearly 50 years ago, before *Rookes v. Barnard* and *Stratford v. Lindley*, this analysis is unsatisfactory because it "ignores the importance of the means employed and over-emphasises the interest of the victim which is affected": see *Means, Motives and Interests in the Law of Torts*, in *Oxford Essays in Jurisprudence* (ed Guest (1961) at p 53).

*Adoption of the unified theory: DC Thomson & Co Ltd v Deakin*

26.    The law was analysed in great depth by the Court of Appeal in *DC Thomson & Co Ltd v Deakin* [1952]  Ch 646, in which argument by eminent counsel extended over nine days. The judgment of Jenkins LJ in particular has directed the course of the law ever since.  He fully adopted the theory, originating with Lord Lindley in *Quinn v Leathem* and supported (possibly unintentionally) by Lord Macnaghten's dictum in the same case, that the principle of *Lumley v Gye* extended to all interference with contractual relations by unlawful means. "Direct persuasion or procurement or inducement applied by the third party to the contract breaker" was "regarded as a wrongful act in itself" and constituted the "primary form" of the tort: see p 694.  But other forms of interference with contracts by unlawful means, such as *GWK Ltd v Dunlop Rubber Co Ltd* (1926)  42 TLR 376 ("a striking example") came within the same tort.  From the dicta of Lord Macnaghten and Lord Lindley in *Quinn v Leathem* Jenkins LJ (at p 693) deduced two propositions:

> "First…there may…be an actionable interference with contractual rights where other means of interference than persuasion or procurement or inducement, in the sense of influence of one kind or another brought to bear on the mind of the contract breaker to cause him to break his contract, are used by the interferer; but, secondly, that (apart from conspiracy to injure, which, as I have said, is not in question so far as this motion is concerned) acts of a third party lawful in themselves do not constitute an actionable interference with contractual rights merely because they bring about a breach of contract, even if they were done with the object and intention of bringing about such breach."

10

27.     The unified theory thus treated procuring breach of contract, the old *Lumley v Gye* tort, as one species of a more general tort of actionable interference with contractual rights.

28.     My Lords, I think that one reason why the Court of Appeal in *DC Thomson & Co Ltd v Deakin* [1952]  Ch 646 adopted the unified theory was that there was an inadequate appreciation at that time of the scope, possibly even the existence, of the tort of causing loss by unlawful means.  The reasoning of the Court of Appeal proceeded on the footing that no such tort existed.  On that assumption, there was clearly a compelling case for creating a cause of action to cover cases in which the defendant used unlawful means to cause damage by interfering with the performance of a contract without any voluntary or even compelled participation on the part of the contracting party.  As Evershed MR put it (at pp 677-678):

> "It was suggested in the course of argument by Sir Frank Soskice and by Mr. Lindner, that the tort must still be properly confined to such direct intervention, that is, to cases where the intervener or persuader uses by personal intervention persuasion on the mind of one of the parties to the contract so as to procure that party to break it. I am unable to agree that any such limitation is logical, rational or part of our law. In such cases where the intervener (if I may call him such) does so directly act upon the mind of a party to the contract as to cause him to break it, the result is, for practical purposes, as though in substance he, the intervener, is breaking the contract, although he in not a party to it…At any rate, it is clear that, when there is such a direct intervention by the intervener, the intervention itself is thereby considered wrongful. I cannot think that the result is any different if the intervener, instead of so acting upon the mind of the contracting party himself, by some other act, tortious in itself, prevents the contracting party from performing the bargain. A simple case is where the intervener, for example, physically detains the contracting party so that the contracting party is rendered unable by the detention to perform the contract."

29.     The Court of Appeal thought that the only way to give a remedy in such cases was by an extension of *Lumley v Gye* along the lines proposed by Lord Lindley. Today one can see that an alternative analysis was available: that the person who physically detained the contracting party would indeed incur liability, but not accessory liability under the principle in *Lumley v Gye*. It would be primary liability for intentionally causing loss by unlawfully interfering with the liberty of a third party, under the principle derived from *Garret v Taylor* and *Tarleton v M'Gawley*.

30.     My Lords, I do not wish to exaggerate the difficulties which have arisen from the adoption of the unified theory.  To some extent it is a matter of nomenclature. If, as Jenkins LJ made clear, liability outside the primary form of the tort requires the use of unlawful means, does it matter whether the tort is classified as causing loss by unlawful means or an extension of *Lumley v Gye*? In most cases, the question of taxonomy will make no difference.  It is not easy to point to cases which were wrongly decided because the court had adopted the unified theory rather than the two-tort analysis of *Allen v Flood.*

31.     Is there something to be said in principle for a unified theory?  Tony Weir, in the Clarendon Law Lectures to which I have referred, makes a bravura case for one.  Not, it is true, the version adopted in *DC Thomson v Deakin*, which he thinks paid too much attention to the contractual nature of the claimant's rights.  Weir would prefer *Lumley v Gye* to be swallowed up by the tort of intentionally causing loss by unlawful means, treating the "seduction" of the contracting party as a species of unlawful means and not distinguishing between interference with contractual rights and damage to economic expectations. The example of what Lord Atkin achieved for negligence in *Donogue v Stevenson* [1932] AC 562 always beckons (see Weir at p. 25). But this too is a form of seduction which may lure writers onto the rocks.

32.     In my opinion the principle of accessory liability for breach of contract, the first of Lord Watson's principles of liability for the act of another in *Allen v Flood*, cannot be subsumed in the tort of causing loss by unlawful means (the second of Lord Watson's principles in *Allen v Flood*) simply by classifying "seduction" as unlawful means.  That only adds a pejorative description to a circular argument: see paragraph 18 above. To induce a breach of contract is unlawful means when the breach is used to cause loss to a third party, as in *Stratford v Lindley* [1965] AC 269, but it makes no sense to say that the breach of contract itself has been caused by unlawful means. Philip Sales and Daniel Stilitz, in their illuminating article "Intentional Infliction of Harm by Unlawful Means" (1999) 115 LQR 411-437, make it clear at p. 433 that *Lumley v Gye* was "founded on a different principle of liability than the intentional harm tort".  It treats contractual rights as a species of property which deserve special protection, not only by giving a right of action against the party who breaks his contract but by imposing secondary liability on a person who procures him to do so.  In this respect it is quite distinct from the unlawful means principle, which is concerned only with intention and wrongfulness and is indifferent as to the nature of the interest which is damaged.  I therefore do not think that the two causes of action can be brought within a unified theory and agree with Professor Peter Cane (*Mens Rea in Tort Law* (2000) 20 Oxford JLS 533, 552, that —

> "The search for 'general principles of liability' based on types of conduct is at best a waste of time and at worst a potential source of serious confusion; and the broader the principle, the

more is this so. Tort law is a complex interaction between protected interests, sanctioned conduct, and sanctions; and although there *are* what might be called 'principles of tort liability', by and large, they are not very 'general'. More importantly, they cannot be stated solely in terms of the sorts of conduct which will attract tort liability. Each principle must refer, as well, to some interest protected by tort law and some sanction provided by tort law."

33.     That said, I would not expect your Lordships to reject the unified theory adopted in *DC Thomson & Co Ltd v Deakin* [1952] Ch 646 unless it had serious practical disadvantages.   After all, in *Merkur Island Shipping Corpn v Laughton* [1983] 2 AC 570, 607, Lord Diplock said that for 30 years the judgment of Jenkins LJ had been regarded as authoritative and that no benefit was gained by "raking over once again the previous decisions", as I must confess to have done.   But I do think that it has been a source of confusion in more than one respect and that it would therefore be better to abandon it and return to the two torts identified by Lord Watson in *Allen v Flood* [1898] AC 1.  To these problems created by the unified theory I now turn.

*Direct and indirect interference*

34.     The distinction between the original *Lumley v Gye* tort and its extension in *DC Thomson & Co Ltd v Deakin* has been described in later cases as a distinction between "direct" and "indirect" interference.   The latter species requires the use of independently unlawful means while the former requires no more than inducement or persuasion. But the use of these terms seems to me to distract attention from the true questions which have to be asked in each case. For example, in *Daily Mirror Newspapers Ltd v Gardner* [1968] 2 QB 762 the Federation of Retail Newsagents resolved to boycott the Daily Mirror for a week to put pressure on the publishers to allow its members higher margins. The Federation advised their members to stop buying the paper from wholesalers. The publishers claimed an injunction on the ground that the Federation was procuring a breach of the wholesalers' running contracts with the publishers to take a given number of copies each day. Counsel for the Federation (see the judgment of Lord Denning MR at p 781) said that it was a case of indirect inducement because the Federation "did not exert directly any pressure or inducement on the wholesalers: but at most they only did it indirectly by recommending the retailers to give stop orders." Lord Denning said that it did not matter whether one procured a breach of contract "by direct approach to the one who breaks his contract or by indirect influence through others".   There seems to me much sense in this observation, although whether it leads to the conclusion that the defendant should be liable in both cases or neither is another matter.

35.     In *Torquay Hotel Co Ltd v Cousins* [1969] 2 Ch 106, 138-139, Lord Denning changed his mind. He said that there was a distinction between "direct persuasion", which was "unlawful in itself", and bringing about a breach by indirect methods, which had to involve independently unlawful means. On reconsideration of the *Daily Mirror* case he thought the Federation had "interfered directly by getting the retailers as their agents to approach the wholesalers."

36.     This treats the distinction as turning simply upon whether there was communication, directly or through an agent, between the defendant and the contract-breaker. But, like Lord Denning in the *Daily Mirror* case, I cannot see why this should make a difference. If that is what the distinction between "direct" and "indirect" means, it conceals the real question which has to be asked in relation to *Lumley v Gye*: did the defendant's acts of encouragement, threat, persuasion and so forth have a sufficient causal connection with the breach by the contracting party to attract accessory liability? The court in *Lumley v Gye* made it clear that the principle upon which a person is liable for the act of another in breaking his contract is the same as that on which he is liable for the act of another in committing a tort. It follows, as I have said, that the relevant principles are to be found in cases such as *CBS Songs Ltd v Amstrad Consumer Electronics plc* [1988] AC 1013 and *Unilever v Chefaro* [1994] FSR 135. By the test laid down in these cases, the Federation could not have incurred any liability. They were not encouraging or assisting the wholesalers in breaking their contracts. They were simply advising their members to exercise their own freedom to buy whatever newspapers they liked. The wholesalers had no right to the co-operation of the retailers in enabling them to perform their contracts. Liability could not depend upon the accident of whether the Federation had communicated (directly or through an intermediary) with the wholesalers. The distinction between direct and indirect interference was therefore irrelevant and misleading.

37.     The distinction between direct and indirect interference has the further disadvantage that it suggests that the "primary form" of the *Lumley v Gye* tort and the extension of the tort are mutually exclusive. Interference cannot be both direct and indirect. But, as I have said earlier, there is no reason why the same act should not create both accessory liability for procuring a breach of contract and primary liability for causing loss by unlawful means.

38.     In my opinion, therefore, the distinction between direct and indirect interference is unsatisfactory and it is time for the unnatural union between the *Lumley v Gye* tort and the tort of causing loss by unlawful means to be dissolved. They should be restored to the independence which they enjoyed at the time of *Allen v Flood*. I shall therefore proceed to discuss separately the essential elements of each.

*Inducing breach of contract: elements of the* Lumley v Gye *tort.*

39.     To be liable for inducing breach of contract, you must know that you are inducing a breach of contract. It is not enough that you know that you are procuring an act which, as a matter of law or construction of the contract, is a breach.  You must actually realize that it will have this effect. Nor does it matter that you ought reasonably to have done so.  This proposition is most strikingly illustrated by the decision of this House in *British Industrial Plastics Ltd v Ferguson* [1940]  1 All ER 479, in which the plaintiff's former employee offered the defendant information about one of the plaintiff's secret processes which he, as an employee, had invented. The defendant knew that the employee had a contractual obligation not to reveal trade secrets but held the eccentric opinion that if the process was patentable, it would be the exclusive property of the employee. He took the information in the honest belief that the employee would not be in breach of contract. In the Court of Appeal McKinnon LJ observed tartly ([1938] 4 All ER 504, 513) that in accepting this evidence the judge had "vindicated [his] honesty…at the expense of his intelligence" but he and the House of Lords agreed that he could not be held liable for inducing a breach of contract.

40.     The question of what counts as knowledge for the purposes of liability for inducing a breach of contract has also been the subject of a consistent line of decisions. In *Emerald Construction Co Ltd v Lowthian* [1966] 1 WLR 691, union officials threatened a building contractor with a strike unless he terminated a sub-contract for the supply of labour.  The defendants obviously knew that there was a contract – they wanted it terminated – but the court found that they did not know its terms and, in particular, how soon it could be terminated.  Lord Denning MR said (at pp; 700-701)

> "Even if they did not know the actual terms of the contract, but had the means of knowledge – which they deliberately disregarded – that would be enough.  Like the man who turns a blind eye. So here, if the officers deliberately sought to get this contract terminated, heedless of its terms, regardless whether it was terminated by breach or not, they would do wrong. For it is unlawful for a third person to procure a breach of contract knowingly, or recklessly, indifferent whether it is a breach or not."

41.     This statement of the law has since been followed in many cases and, so far as I am aware, has not given rise to any difficulty. It is in accordance with the general principle of law that a conscious decision not to inquire into the existence of a fact is in many cases treated as equivalent to knowledge of that fact (see *Manifest Shipping Co Ltd v Uni-Polaris Insurance Co Ltd* [2003] 1 AC 469). It is not the same as negligence or even gross negligence: in *British Industrial Plastics Ltd v Ferguson* [1940]  1 All ER 479, for example,

Mr Ferguson did not deliberately abstain from inquiry into whether disclosure of the secret process would be a breach of contract.  He negligently made the wrong inquiry, but that is an altogether different state of mind.

42.     The next question is what counts as an intention to procure a breach of contract.  It is necessary for this purpose to distinguish between ends, means and consequences.  If someone knowingly causes a breach of contract, it does not normally matter that it is the means by which he intends to achieve some further end or even that he would rather have been able to achieve that end without causing a breach. Mr Gye would very likely have preferred to be able to obtain Miss Wagner's services without her having to break her contract. But that did not matter. Again, people seldom knowingly cause loss by unlawful means out of simple disinterested malice.  It is usually to achieve the further end of securing an economic advantage to themselves.  As I said earlier, the Dunlop employees who took off the tyres in *GWK Ltd v Dunlop Rubber Co Ltd* (1926)   42 TLR 376 intended to advance the interests of the Dunlop company.

43.     On the other hand, if the breach of contract is neither an end in itself nor a means to an end, but merely a foreseeable consequence, then in my opinion it cannot for this purpose be said to have been intended. That, I think, is what judges and writers mean when they say that the claimant must have been "targeted" or "aimed at".  In my opinion the majority of the Court of Appeal was wrong to have allowed the action in *Millar v Bassey* [1994] EMLR 44 to proceed. Miss Bassey had broken her contract to perform for the recording company and it was a foreseeable consequence that the recording company would have to break its contracts with the accompanying musicians, but those breaches of contract were neither an end desired by Miss Bassey nor a means of achieving that end.

44.     Finally, what counts as a breach of contract?  In *Torquay Hotel Co Ltd v Cousins* [1969]   2 Ch 106, 138 Lord Denning said that there could be liability for preventing or hindering performance of the contract on the same principle as liability for procuring a breach.  This dictum was approved by Lord Diplock in *Merkur Island Shipping Corporation* [1983]  2 AC 570, 607-608. One could therefore have liability for interference with contractual relations even though the contracting party committed no breach. But these remarks were made in the context of the unified theory which treated procuring a breach as part of the same tort as causing loss by unlawful means. If the torts are to be separated, then I think that one cannot be liable for inducing a breach unless there has been a breach. No secondary liability without primary liability. Cases in which interference with contractual relations have been treated as coming within the *Lumley v Gye* tort (like *Dimbleby & Sons v National Union of Journalists* [1984]  1 WLR 67 and 427) are really cases of causing loss by unlawful means.

*Causing loss by unlawful means: elements of the tort*

45.     The most important question concerning this tort is what should count as unlawful means.  It will be recalled that in *Allen v Flood* [1898]  AC 1, 96, Lord Watson described the tort thus—

> "when the act induced is within the right of the immediate actor, and is therefore not wrongful in so far as he is concerned, it may yet be to the detriment of a third party; and in that case…the inducer may be held liable if he can be shewn to have procured his object by the use of illegal means directed against that third party.

46.     The rationale of the tort was described by Lord Lindley in  *Quinn v Leathem* [1901]  AC 495, 534-535:

> "a person's liberty or right to deal with others is nugatory, unless they are at liberty to deal with him if they choose to do so.  Any interference with their liberty to deal with him affects him. If such interference is justifiable in point of law, he has no redress. Again, if such interference is wrongful, the only person who can sue in respect of it is, as a rule, the person immediately affected by it; another who suffers by it has usually no redress; the damage to him is too remote, and it would be obviously practically impossible and highly inconvenient to give legal redress to all who suffer from such wrongs. But if the interference is wrongful and is intended to damage a third person, and he is damaged in fact  – in other words, if he is wrongfully and intentionally struck at through others, and is thereby damnified – the whole aspect of the case is changed: the wrong done to others reaches him, his rights are infringed although indirectly, and damage to him is not remote or unforeseen, but is the direct consequence of what has been done."

47.     The essence of the tort therefore appears to be (a) a wrongful interference with the actions of a third party in which the claimant has an economic interest and (b) an intention thereby to cause loss to the claimant. The old cases of interference with potential customers by threats of unlawful acts clearly fell within this description.  So, for the reasons I have given, did *GWK Ltd v Dunlop Rubber Co Ltd* (1926)  42 TLR 376.  Recent cases in which the tort has been discussed have also concerned wrongful threats or actions against employers with the intention of causing loss to an employee (as in *Rookes v Barnard* [1964] AC 1129) or another employer (as in *J T Stratford & Son Ltd v Lindley*  [1965]  AC 269). In the former case, the defendants

conspired to threaten the employer that unless the employee was dismissed, there would be an unlawful strike.  In the latter, the union committed the *Lumley v Gye* tort of inducing breaches of the contracts of the employees of barge hirers to prevent them from hiring the plaintiff's barges.

48.     In *Stratford*, at pp 329-330, Viscount Radcliffe expressed some disquiet about using the question of whether the actual or threatened strike was or would have been in breach of contract as the touchstone of whether the union or its officers were liable for causing loss by secondary action.  These remarks were made in the context of industrial relations, where the use of secondary action has since been comprehensively regulated by statute. In principle, the cases establish that intentionally causing someone loss by interfering with the liberty of action of a third party in breach of a contract with him is unlawful.

49.     In my opinion, and subject to one qualification, acts against a third party count as unlawful means only if they are actionable by that third party. The qualification is that they will also be unlawful means if the only reason why they are not actionable is because the third party has suffered no loss.  In the case of intimidation, for example, the threat will usually give rise to no cause of action by the third party because he will have suffered no loss.  If he submits to the threat, then, as the defendant intended, the claimant will have suffered loss instead. It is nevertheless unlawful means. But the threat must be to do something which *would* have been actionable if the third party had suffered loss.   Likewise, in *National Phonograph Co Ltd v Edison-Bell Consolidated Phonograph Co Ltd* [1908]  1 Ch 335 the defendant intentionally caused loss to the plaintiff by fraudulently inducing a third party to act to the plaintiff's detriment.  The fraud was unlawful means because it would have been actionable if the third party had suffered any loss, even though in the event it was the plaintiff who suffered.  In this respect, procuring the actions of a third party by fraud (*dolus*) is obviously very similar to procuring them by intimidation (*metus*).

50.     *Lonrho plc* v *Fayed* [1990] 2 QB 479 was arguably within the same principle as the *National Phonograph Co* case. The plaintiff said that the defendant had intentionally caused it loss by making fraudulent statements to the directors of the company which owned Harrods, and to the Secretary of State for Trade and Industry, which induced the directors to accept his bid for Harrods and the Secretary of State not to refer the bid to the Monopolies Commission.  The defendant was thereby able to gain control of Harrods to the detriment of the plaintiff, who wanted to buy it instead.  In the Court of Appeal, Dillon LJ (at p 489) referred to the *National Phonograph* case as authority for rejecting an argument that the means used to cause loss to the plaintiff could not be unlawful because neither the directors nor the Secretary of State had suffered any loss.  That seems to me correct.  The allegations were of fraudulent representations made to third parties, which would have been actionable by them if they had suffered loss, but which were intended to

18

induce the third parties to act in a way which caused loss to the plaintiff. The Court of Appeal therefore refused to strike out the claim as unarguable and their decision was upheld by the House of Lords: see [1992] 1 AC 448.

51.     Unlawful means therefore consists of acts intended to cause loss to the claimant by interfering with the freedom of a third party in a way which is unlawful as against that third party and which is intended to cause loss to the claimant.  It does not in my opinion include acts which may be unlawful against a third party but which do not affect his freedom to deal with the claimant.

52.     Thus in *RCA Corporation v Pollard* [1983] Ch 135 the plaintiff had the exclusive right to exploit records made by Elvis Presley.  The defendant was selling bootleg records made at Elvis Presley concerts without his consent.  This was an infringement of section 1 of the Dramatic and Musical Performers' Protection Act 1958, which made bootlegging a criminal offence and, being enacted for the protection of performers, would have given Elvis Presley a cause of action: see Lord Diplock in *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173, 187). The Court of Appeal held that the infringement of the Act did not give RCA a cause of action.  The defendant was not interfering with the liberty of the Presley estate to perform the exclusive recording contract which, as Oliver LJ noted (at p 149) was "no more than an undertaking that he will not give consent to a recording by anyone else." Nor did it prevent the Presley estate from doing any other act affecting the plaintiffs.  The bootlegger's conduct, said Oliver LJ (at p 153):

> "merely potentially reduces the profits which [the plaintiffs] make as the result of the performance by Mr Presley's executors of their contractual obligations."

53.     It is true that there was no allegation that the defendant intended to cause loss to the plaintiff, although, given that the defendant was selling records in competition with the plaintiff, such an allegation would have been easy to make.  But I do not think that it would have made any difference. The wrongful act did not interfere with the estate's liberty of action in relation to the plaintiff.

54.     Likewise in *Isaac Oren v Red Box Toy Factory Ltd* [1999] FSR 785, one of the claimants was the exclusive licensee of a registered design.  The defendant sold articles alleged to infringe the design right. The registered owner had a statutory right to sue for infringement. But the question was whether the licensee could sue.  In the case of some intellectual property rights, an exclusive licensee has a statutory right of action: see, for example, section 67(1) of the Patents Act 1977.  But the exclusive licensee of a registered design has no such right.  So the licensee claimed that the defendant

was intentionally causing him loss by the unlawful means of infringing the rights of the registered owner.  Jacob J rejected the claim on the principle of *RCA v Pollard*.  The defendant was doing nothing which affected the relations between the owner and licensee.  The exclusive licence meant that the licensee was entitled to exploit the design and that the owner contracted not to authorise anyone else to do so.  As Jacob J said, at p 798, para 33:

> "It is true that the exploitation of the licence may not have been so successful commercially by reason of the infringement, but the contractual relations and their performance remain completely unaffected."

55.    *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982]  AC 173 was an attempt to found a cause of action simply on the fact that the conduct alleged to have caused loss was contrary to law. The defendant's conduct was alleged to be a criminal offence but not actionable by anyone. In this respect it was unlike *RCA v Pollard* and *Isaac Oren v Red Box Toy Factory Ltd*, in which it could at least be said that the conduct was a wrong against someone in contractual relations with the claimant.  Lonrho owned and operated a refinery in Rhodesia supplied by a pipeline from the port of Beira. When Rhodesia declared independence in 1965, the UK imposed sanctions which made it unlawful for anyone to supply the country with oil.  As a result, the refinery and pipeline stood idle until the independence regime came to an end. Lonrho alleged that Shell had prolonged the regime by unlawfully supplying Rhodesia with oil through other routes and thereby caused it loss. The House of Lords decided that the alleged illegality gave rise to no cause of action on which Lonrho could rely.  Again, there was no allegation that Shell had intended to cause loss to Lonrho, but I cannot see how that would have made any difference. Shell did not interfere with any third party's dealings with Lonrho and even if it had done so, its acts were not wrongful in the sense of being actionable by such third party.

56.    Your Lordships were not referred to any authority in which the tort of causing loss by unlawful means has been extended beyond the description given  by Lord Watson in *Allen v Flood* [1898]  AC 1, 96 and Lord Lindley in *Quinn v Leathem* [1901]   AC 495, 535.  Nor do I think it should be.  The common law has traditionally been reluctant to become involved in devising rules of fair competition, as is vividly illustrated by *Mogul Steamship Co Ltd v McGregor, Gow & Co* [1892]  AC 25. It has largely left such rules to be laid down by Parliament. In my opinion the courts should be similarly cautious in extending a tort which was designed only to enforce basic standards of civilised behaviour in economic competition, between traders or between employers and labour.  Otherwise there is a danger that it will provide a cause of action based on acts which are wrongful only in the irrelevant sense that a third party has a right to complain if he chooses to do so.  As Jacob J said in *Isaac Oren v Red Box Toy Factory Ltd* [1999]  FSR 785, 800:

> "the right to sue under intellectual property rights created and governed by statute [is] inherently governed by the statute concerned. Parliament in various intellectual property statutes has, in some cases, created a right to sue and in others not. In the case of the 1988 Act it expressly re-conferred the right on a copyright exclusive licensee, conferred the right on an exclusive licensee under the new form of property called an unregistered design right (see section 234) but did not create an independent right to sue on a registered design exclusive licensee. It is not for the courts to invent that which Parliament did not create."

57.    Likewise, as it seems to me, in a case like *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173, it is not for the courts to create a cause of action out of a regulatory or criminal statute which Parliament did not intend to be actionable in private law.

58.    It is not, I think, sufficient to say that there must be a causal connection between the wrongful nature of the conduct and the loss which has been caused. If a trader secures a competitive advantage over another trader by marketing a product which infringes someone else's patent, there is a causal relationship between the wrongful act and the loss which the rival has suffered. But there is surely no doubt that such conduct is actionable only by the patentee.

59.    Sales and Stilitz, "Intentional Infliction of Harm by Unlawful Means" (1999) 115 LQR 411-437, take a very wide view of what can count as unlawful means, arguing that any action which involves a civil wrong against another person or breach of a criminal statute ("any act that the defendant is not at liberty to commit") should be sufficient. In their opinion, a requirement of a specific intention to "target" the claimant should keep the tort within reasonable bounds. Tony Weir in the Clarendon Law Lectures "Economic Torts" is of much the same opinion. But other writers consider that it would be arbitrary and illogical to make liability depend upon whether the defendant has done something which is wrongful for reasons which have nothing to do with the damage inflicted on the claimant: see Roderick Bagshaw's review of Weir in (1998) 18 Oxford JLS 729-739 at p. 732. I agree.

60.    I do not think that the width of the concept of "unlawful means" can be counteracted by insisting upon a highly specific intention, which "targets" the plaintiff. That, as it seems to me, places too much of a strain on the concept of intention. In cases in which there is obviously no reason why a claimant should be entitled to rely on the infringement of a third party's rights, courts are driven to refusing relief on the basis of an artificially narrow meaning of intention which causes trouble in later cases in which the defendant really has

21

used unlawful means. This, as I shall in due course explain, is what may have happened in the *Hello!* case.

61.     I would only add one footnote to this discussion of unlawful means.  In defining the tort of causing loss by unlawful means as a tort which requires interference with the actions of a third party in relation to the plaintiff, I do not intend to say anything about the question of whether a claimant who has been compelled by unlawful intimidation to act to his own detriment, can sue for his loss. Such a case of "two party intimidation" raises altogether different issues.

62.     Finally, there is the question of intention.  In the *Lumley v Gye* tort, there must be an intention to procure a breach of contract. In the unlawful means tort, there must be an intention to cause loss.  The ends which must have been intended are different. *South Wales Miners' Federation v Glamorgan Coal Co Ltd*  [1905]  AC 239 shows that one may intend to procure a breach of contract without intending to cause loss.  Likewise, one may intend to cause loss without intending to procure a breach of contract. But the concept of intention is in both cases the same.  In both cases it is necessary to distinguish between ends, means and consequences. One intends to cause loss even though it is the means by which one achieved the end of enriching oneself. On the other hand, one is not liable for loss which is neither a desired end nor a means of attaining it but merely a foreseeable consequence of one's actions.

63.     The master of the *Othello* in *Tarleton v M'Gawley* may have had nothing against the other trader. If he had gone off to make his fortune in other waters, he would have wished him well. He simply wanted a monopoly of the local trade for himself.  But he nevertheless intended to cause him loss.  This, I think, is all that  Woolf LJ was intending to say in a passage in *Lonrho plc v Fayed* [1990]  2 QB 479, 494 which has proved controversial:

> "Albeit that he may have no desire to bring about that consequence in order to achieve what he regards as his ultimate ends, from the point of view of the plaintiff, whatever the motive of the defendant, the damage which he suffers will be the same."

64.     On the other hand, I think that Henry J was right in *Barretts & Baird (Wholesale) Ltd v Institution of Professional Civil Servants* [1987]  IRLR 3 when he decided a strike by civil servants in the Ministry of Agriculture in support of a pay claim was not intended to cause damage to an abattoir which was unable to obtain the certificates necessary for exporting meat and claiming subsidies.  The damage to the abattoir was neither the purpose of the strike nor the means of achieving that purpose, which was to put pressure on the government.

*Back to the three appeals*

65.    My Lords, after this somewhat lengthy clearing of the ground I can come to the three appeals before the House.  In arriving at these statements of general principle, I have derived great assistance from many who have written on the subject in addition to those whom I have specifically cited and in particular, if what I have said does anything to clarify what has been described as an extremely obscure branch of the law, much is owing to Hazel Carty's book *An Analysis of the Economic Torts* (2001).

*Mainstream Properties Ltd v Young*

66.    I shall start with the *Mainstream* case, because it is the easiest and provides a useful stepping stone to the other two.  Mainstream was a development company owned and controlled by Mr Moriarty.  He engaged Mr Young as a working director and Mr Broad as a manager and left the business to them.  In 2000 they diverted the purchase of development land at Findern in Derbyshire to a joint venture consisting of themselves and the respondent Mr De Winter, who financed the project. Judge Norris QC, in a detailed and lucid judgment, found that this was a breach of their contractual and fiduciary duties to obtain the property for Mainstream.

67.    There is no challenge to these findings but the question in this appeal is whether Mr De Winter is liable in tort for inducing Mr Young and Mr Broad to break their contracts. The cause of action is therefore the original *Lumley v Gye* tort, based on accessory liability. The judge found that Mr Young and Mr Broad could not have acquired the property without Mr De Winter's financial assistance.  His participation was therefore causative. He also knew that they were employed by Mainstream and that there was an obvious potential conflict between their duties to Mainstream and their participation in the joint venture. But the judge found that Mr De Winter was a cautious man who had raised the question of conflict of interest with Mr Young and Mr Broad and had received an assurance that there was no conflict because Mainstream had been offered the site but refused it. This was untrue but Mr Winter genuinely believed it. He had been given a similar (and more truthful) assurance concerning another project which Mr Young and Mr Broad had brought to him in the previous year and that, said the judge, "was now proceeding smoothly without objection".

68.    On these findings of fact the judge found that Mr Winter did not intend to procure a breach of the contracts of employment or otherwise interfere with their performance.  The claim against him was therefore dismissed.  This finding was upheld by the Court of Appeal (Sedley and Arden LJJ and Aikens J).

69.    In my opinion this case comes squarely within *British Industrial Plastics Ltd v Ferguson* [1940] 1 All ER 479. On the finding of the judge, Mr De Winter honestly believed that assisting Mr Young and Mr Broad with the joint venture would not involve them in the commission of breaches of contract. Nor can Mr De Winter to be said to have been indifferent to whether there was a breach of contract or not, as in *Emerald Construction Co Ltd v Lowthian* [1966] 1 WLR 691, or made a conscious decision not to inquire in case he discovered a disagreeable truth. He therefore did not intend to cause a breach of contract and the conditions for accessory liability under the *Lumley v Gye* tort are not satisfied. Nor is there any question of his having caused loss by unlawful means. He neither intended to cause loss to Mainstream nor used any unlawful means.

70.    Your Lordships were referred by Mr Randall QC, who appeared for Mainstream, to a number of authorities. But they concerned different questions and none of them cast any doubt upon the proposition that one cannot be liable for inducing a breach of contract unless one intended to cause a breach. For example, in *Smithies v National Association of Operative Plasterers* [1909] 1 KB 310 the union undoubtedly intended to cause a breach of the workmen's contracts of service. But they claimed to be entitled to do so because the employer had not adhered to a collective agreement. The Court of Appeal rejected this defence but the case has nothing to do with the requirements of knowledge and intention. In *Greig v Insole* [1978] 1 WLR 302 the International Cricket Conference knew that the cricketers were contracted to play for Mr Kerry Packer's company but put pressure upon them to withdraw, indifferent as to whether this would cause breaches of contract or not. As Slade J observed, the case fell within the principle of *Emerald Construction Co Ltd v Lowthian* [1966] 1 WLR 691. This case clearly does not. The other cases cited by Mr Randall were similarly concerned with indifference, conscious decision not to inquire or different torts.

71.    Finally, Mr Randall said that even if the judge's findings exonerated Mr De Winter from the charge of inducing a breach of the obligation of good faith which required Mr Young and Mr Broad to make the Findern property available to Mainstream, it did not provide any answer to a claim that he had induced a breach of their obligation to give their full time and attention to Mainstream's business. Mr De Winter did not say he had inquired into whether they had asked Mr Moriarty for permission to participate in the joint venture; the evidence was that they had not asked and that if they had, permission would not have been given.

72.    This is a point which appeared for the first time in supplemental submissions to the Court of Appeal. The Court of Appeal did not deal with it. There had been no suggestion at the trial that Mainstream was making a separate claim for loss of the services of Mr Young and Mr Broad while they were working for the joint venture. Nothing was put to Mr De Winter about whether he thought they were free to do so. No attempt was made to assess

24

what might have been the damage flowing from such a breach. In my opinion it is not open to Mainstream now to reformulate its case in this way.  I would dismiss the Mainstream appeal.

*OBG Ltd v Allan*

73.     OBG Ltd and OBG (Plant and Transport Hire) Ltd (which I shall refer to together as OBG as if they were one company, which for practical purposes they were) carried on business laying and maintaining underground pipes. OBG's main customer was North West Water Ltd ("NWW"), with whom it had a profitable running contract in Civil Engineers Conditions of Contract form for laying and maintaining water pipes, under which it was paid monthly against Engineer's certificates. There were also other customers. OBG employed a specialist sub-contractor called Raymond Centriline Ltd ("Centriline") to line pipes with mortar mix or epoxy resin.

74.     In the spring of 1992 OBG had the misfortune to fall out with NWW, which took the view that recent work had been substandard and that it had been overcharged. There was an investigation as a result of which the Engineer "decertified" substantial past payments. NWW set off the decertified sums against money due on current certificates and withheld further orders. The result was that OBG's cash flow dried up and it became insolvent in the sense of being unable to pay its debts as they fell due.

75.     OBG attempted to obtain financial support from Centriline, which had an interest in its future not only as a sub-contractor but also as a creditor to the tune of over £1m.  In the course of these negotiations Centriline took an assignment from Royal Bank of Scotland of an all-monies debenture secured by the floating charge over OBG's assets and undertaking. The negotiations fell through and on 9 June 1992 Centriline appointed the defendants, Mr Allan and Mr Stevenson, as administrative receivers under the floating charge.

76.     Unfortunately OBG had owed nothing to the bank and no secured debt was assigned with the debenture.  Centriline was advised by its solicitors that it could tack its own unsecured debt onto the empty debenture.  This advice is admitted to have been wrong; indeed, negligent.  Centriline was therefore not entitled to appoint receivers.  But it and the receivers believed in good faith that the appointment was valid.

77.     The receivers went into possession of the premises and chattels owned by OBG and took control of its affairs.  NWW elected to treat the insolvency of OBG as an event of default and terminated its contracts. The receivers arranged for the completion of the contracts with other customers.  There followed lengthy negotiations with NWW, with the receivers claiming that

OBG was owed money under the contracts and NWW asserting cross-claims. Eventually, in November 1993, the receivers agreed in principle to accept £400,000 in full and final settlement.

78.     By this time it was clear that OBG was challenging the validity of the appointment of the receivers.  The company had gone into creditors' voluntary liquidation on 19 June 1992, ten days after the appointment of the receivers. The liquidator had taken advice on the validity of the appointment.  NWW was reluctant to conclude a settlement with the receivers unless the liquidator also became a party. On 19 October 1995 OBG, acting by the liquidator, issued these proceedings, claiming a declaration that the appointment had been invalid and damages.  On 15 August 1997 the settlement with NWW was finally executed, with the liquidator concurring.

79.     Judge Maddocks QC tried the case in stages.  After hearing argument on the validity of the appointment, he made a declaration on 31 January 2001 that it had been invalid.  There is no challenge to this ruling.  He adjourned the question of what damages, if any, OBG could in consequence claim.

80.     There followed some interlocutory hearings and pleadings in which OBG was asked to state the basis on which it made its claim. This was put in various ways, but I need not concern myself with the claims that it would have survived to become profitable or that its assets would have been realised more advantageously in administration, because the judge found on the facts that neither of these things would have happened.   Insolvent liquidation was inevitable.

81.     OBG's case, as it emerged, was that by taking control of OBG's assets and undertaking on 9 June 1992, the receivers became liable in damages for their value on that date. Liability was alleged to be strict. The cause of action giving rise to this liability was, as to the land and chattels, trespass and conversion, and as to the contractual claims, wrongful interference with contractual relations. The defendants admitted liability for trespass to the land and conversion of the chattels, but denied that they had unlawfully interfered with the contractual rights. OBG's alternative case was that the receivers had converted the entire assets and undertaking, including the contractual claims. The answer of the receivers was that conversion is a tort against chattels and not against contractual claims.

82.     The judge dealt with the case on the basis that if he found that either of these causes of action was well-founded, he was concerned only to value the company's assets and undertaking on 9 June 1992 and then to give credit for the sums for which the receivers had accounted to the liquidator.  The rest was damages. He assessed this figure at £1,854,000, most of which was attributable to the difference between the value which he put on the claims

against NWW as at 9 June 1992 and the £400,000 for which the company had agreed to settle them five years later.

83.     There was no allegation that the receivers had been negligent. Nor was it regarded as necessary to ask whether the assumption of control by the receivers had caused the disparity between the value at that date and the amount subsequently realised – whether, for example, the value of the assets had fallen for a reason which had nothing to do with who was in control of them.  The receivers were alleged to be strictly liable, on one basis or the other, for the value of the assets on the day they were appointed.  Nothing that happened after that date, or would have happened if they had not been appointed, was regarded as relevant.

84.     The judge found that OBG had a cause of action for interference with contractual relations.  He referred to Lord Macnaghten's dictum in *Quinn v Leathem* [1901] AC 495 and *Greig v Insole* [1978] 1 WLR 302.  It was true that the receivers had not interfered with performance of the contracts, still less caused them to be breached.  They had conducted negotiations in the bona fide belief that they were entitled to act on behalf of OBG. But, he said, "that factor serves only to create the interference more directly."  He rejected the alternative claim for conversion of contractual rights.

85.     The Court of Appeal (Peter Gibson, Mance and Carnwath LJJ) unanimously upheld the judge's rejection of the conversion claim but by a majority (Mance LJ dissenting) allowed the appeal against the finding of wrongful interference with contractual rights.  OBG pursued both causes of action in the appeal to your Lordships' House and I shall deal with them in turn.

*Interference with contractual relations*

86.     The present case amply illustrates the dangers of a broad reading of Lord Macnaghten's reference to "interference" in *Lumley v Gye* and the promiscuous application of cases on accessory liability (such as *Greig v Insole* [1978] 1 WLR 302) to a case which, on any view, can only be a case of primary liability.  There are only two possible causes of action: procuring a breach of contract in a way which creates accessory liability under *Lumley v Gye* or causing loss by unlawful means.  It is, I think, plain and obvious that the requirements for liability under neither of these torts were satisfied. There was no breach or non-performance of any contract and therefore no wrong to which accessory liability could attach. And the receivers neither employed unlawful means nor intended to cause OBG any loss.

27

87.     I must, however, advert to the grounds upon which Mance LJ dissented on this point. He said, at para 86, that a "central question" was —

> "whether the tort of interference in the execution of a contract is capable of covering the situation of an unauthorised agent, who takes over the handling of a contract with a view to its performance by settlement of mutual contractual rights and obligations but with the result that the 'principal' suffers a loss which he would not otherwise have suffered.  The generality of the phrase 'interference in the execution of a contract' has so far only been held to extend to the 'procurement of a breach' or the 'prevention' or 'hindrance' of 'performance'.  The tort is not, however, limited to protecting contractual interests, and it must in my view extend to some situations where a person's pre-existing legal position is adversely affected in a more general manner than falls directly within any of the latter phrases."

88.     I would first observe that there was no finding that as a *result* of the unauthorized taking over of the handling of the contracts by the receivers, OBG suffered a loss which it would not otherwise have suffered.  As the claim was formulated by OBG, this question of causation was treated as irrelevant.  The judge simply held the receivers liable for the value of the contracts on 9 June 1992.

89.     Secondly, if there had been an investigation of this question, it is doubtful whether a causal connection between the assumption of control and the putative loss could have been established.  Mance LJ suggested that the acts of the receivers might have been binding upon OBG, and thereby committed it to a disadvantageous settlement, by virtue of section 232 of the Insolvency Act 1986:

> "The acts of an individual as administrator, administrative receiver, liquidator or provisional liquidator of a company are valid notwithstanding any defect in his appointment, nomination or qualifications."

90.     For my part, I rather doubt, as the judge did, whether this section would have applied to the administrative receivers in this case.  In *Morris v Kanssen* [1946]  AC 460, 471 this House considered the effect of a similar provision relating to the acts of directors, which was then contained in section 143 of the Companies Act 1929.  Lord Simonds said:

> "There is, as it appears to me, a vital distinction between (*a.*) an appointment in which there is a defect or, in other words, a defective appointment, and (*b.*) no appointment at all. In the first case it is implied that some act is done which purports to be an appointment but is by reason of some defect inadequate for the purpose; in the second case there is not a defect, there is no act at all. The section does not say that the acts of a person acting as director shall be valid notwithstanding that it is afterwards discovered that he was not appointed a director. Even if it did, it might well be contended that at least a purported appointment was postulated. But it does not do so, and it would, I think, be doing violence to plain language to construe the section as covering a case in which there has been no genuine attempt to appoint at all. These observations apply equally where the term of office of a director has expired, but he nevertheless continues to act as a director, and where the office has been from the outset usurped without the colour of authority."

91.     In this case there was no colour of authority for the appointment of the receivers.  Although it is unnecessary to express a concluded view, I think that it follows from *Morris v Kanssen* that section 232 would have had no application.  If it had, it would have operated for the benefit of the receivers as well as anyone who dealt with them.  There is nothing in its language to suggest that its application is in any way restricted. (One may compare the explicit language of many other provisions for the protection of outside parties, such as section 14(6) of the Insolvency Act 1986.)

92.     That does not mean that a contract made by a person dealing in good faith with someone purporting to be a receiver, as in this case, can be repudiated by the company.  As Lord Simonds went on to point out in *Morris v Kanssen* [1946]  AC 460, such a person can rely on the principle of ostensible authority which in company law goes under the name of the rule in *Royal British Bank v Turquand* (1856)  6 E & B 327. In this case, however, it was unnecessary to invoke either that rule or section 232, because NWW refused to rely upon the ostensible authority of the receivers.  They insisted upon the liquidator joining in the settlement.  The liquidator was at liberty to refuse, but he did so.  In order to establish a causal connection between the conduct of negotiations by the receivers and a loss which the company would not otherwise have suffered, it would be necessary to show that those negotiations somehow prejudiced the position of the company in a way which the liquidator could not repair by insisting that the deal be renegotiated.

93.     Be all that as it may, the question remains as to whether there is a tort of the breadth contemplated by Mance LJ, by which a purported agent can be strictly liable for causing the principal loss by making him liable, by virtue of ostensible authority, under a disadvantageous contract. In my opinion, there is

not the slightest authority for such a tort.  It may be that, in some of the examples of unauthorized agency postulated by Mance LJ, there will be an implied contract which makes him liable for exceeding his actual authority, just as the agent gives an implied warranty of authority to the third party with whom he deals.  But there is, in my opinion, no such liability outside contract. Mance LJ says (at [2005] QB 762, 789, para 90) "the tort protects from interference legal interests beyond the merely contractual".  If that is a reference to the tort of causing loss by unlawful means, then so it does.  But it requires unlawful means and an intention to cause loss, neither of which were present in this case.

*Conversion*

94.     The case in conversion was unanimously rejected by all the judges who heard the *OBG* case and it might therefore be sufficient to say that I agree with them.  But the claim was given considerable prominence in argument, with a good deal of reference to North American authorities, and I shall therefore deal with it at greater length.

95.     Everyone agrees that conversion is historically a tort against a person's interest in a chattel, being derived from the action for trover, which included a fictitious allegation that the plaintiff had lost the chattel and that the defendant had found it. Secondly, and consistently with its ancient origin, conversion is a tort of strict liability.  Anyone who converts a chattel, that is to say, does an act inconsistent with the rights of the owner, however innocent he may be, is liable for the loss caused which, if the chattel has not been recovered by the owner, will usually be the value of the goods. *Fowler v Hollins* (1872)  LR 7 QB 616 was a claim for conversion of bales of cotton bought in good faith through a broker in Liverpool.  The purchasers were nevertheless held strictly liable. Cleasby J said robustly, at p 639, that:

> "the liability under it is founded upon what has been regarded as a salutary rule for the protection of property, namely, that persons deal with the property in chattels or exercise acts of ownership over them at their peril."

96.     Advising the House of Lords on appeal from this decision, Blackburn J was more sympathetic. He said *(Hollins v Fowler* (1875)  LR 7 HL 757, 765) that the result was hard on the innocent purchasers but added:

> "If, as is quite possible, the changes in the course of business since the principles of law were established make them cause great hardships or inconvenience, it is the province of the Legislature to alter the law."

97.     Parliament has responded with legislation such as the Factors Act 1889, section 4 of the Cheques Act 1957 (which protects a collecting bank against liability for conversion of a cheque to which its customer had no title) and section 234(3) of the Insolvency Act, which, in the absence of negligence, protects an administrative receiver who "seizes or disposes of any property which is not property of the company" against liability. But there are no such protective provisions in relation to anything other than chattels.  Why not? Obviously because Parliament thought them to be unnecessary. It would never have occurred to Parliament that strict liability for conversion could exist for anything other than chattels. The whole of the statutory modification of the law of conversion has been on the assumption that it applies only to chattels. There has been no discussion of the question of whether an extension of conversion to choses in action would require a corresponding or even greater degree of protection for people acting in good faith.

98.     Mr Randall, who appeared for OBG, drew attention to paragraphs 829 and 830 of the Report of the Review Committee on Insolvency Law and Practice (the Cork Committee) (1982) Cmnd 8558, which endorsed a recommendation of the Jenkins Committee that the court should be given power to relieve an invalidly appointed receiver from liability for acts which would have been lawful if the appointment had been valid.  Parliament has not given effect to this recommendation.  He suggested that this omission should be regarded as somehow justifying a drastic *extension* of the liability of such receivers for conversion. The fallacy in this reasoning does not need to be underlined.

99.     By contrast with the approving attitude of Cleasby J to the protection of rights of property in chattels, it is a commonplace that the law has always been very wary of imposing any kind of liability for purely economic loss. The economic torts which I have discussed at length are highly restricted in their application by the requirement of an intention to procure a breach of contract or to cause loss by unlawful means. Even liability for causing economic loss by negligence is very limited. Against this background, I suggest to your Lordships that it would be an extraordinary step suddenly to extend the old tort of conversion to impose strict liability for pure economic loss on receivers who were appointed and acted in good faith.  Furthermore, the effects of such a change in the law would of course not stop there. *Hunter v Canary Wharf Ltd* [1997]  AC 655, 694 contains a warning from Lord Goff of Chieveley (and other of their Lordships) against making fundamental changes to the law of tort in order to provide remedies which, if they are to exist at all, are properly the function of other parts of the law.

100.    As to authority for such a change, it hardly needs to be said that in English law there is none. I need go no further than Halsbury's Laws of England, 4th ed reissue (1999) vol 45(2), para 547, which says "The subject matter of conversion or trover must be specific personal property, whether goods or chattels." The Law Revision Committee was invited, in 1967, to

consider "whether any changes are desirable in the law relating to conversion and detinue." In its 18th Report in 1971 (Cmnd 4774) the Committee treated them both as confined to wrongful interference with chattels. They made various recommendations for changes in the law but none for the extension of conversion to intangible choses in action. On the contrary, the Torts (Interference with Goods) Act 1977, which was passed as a result of their recommendations, defined "wrongful interference with goods" to include "conversion of goods" (section 1) and defined "goods" in section 14(1) to include "all chattels personal other than things in action and money."

101.    Mr Randall relied upon authorities in Canada and the United States. I can find no discussion in the Canadian cases of whether a claim for conversion can be made in respect of a chose in action. These cases are analysed by Peter Gibson LJ in his judgment in the Court of Appeal ([2005] QB at pp. 777-778) and I do not think that I should lengthen this judgment by adding to his comments. For the reasons which he gives, I derive no assistance from them. There are certainly cases in the United States which support Mr Randall's submission and which form part of the profligate extension of tort law which has occurred in that country. Perhaps the most remarkable is the decision of the Federal Court of Appeals (9th Circuit) in *Kremen v Online Classifieds Inc* (2003) 337 F 3rd 1024, in which it was held that a publicly-funded company which provided gratuitous registration of internet domain names could be liable in conversion, on a footing of strict liability, for transferring a registered name to a third party, having acted in good faith on the authority of a forged letter. The court held that the domain name was intangible property which could be converted in the same way as a chattel and that the registration company could be liable for its value. I have no difficulty with the proposition that a domain name may be intangible property, like a copyright or trade mark, but the notion that a registrar of such property can be strictly liable for the common law tort of conversion is, I think, foreign to English law.

102.    The American cases make a good deal of the line of authority, which in England goes back to the beginning of the 19th century or earlier, by which a person who misappropriates a document which constitutes or evidences title to a debt can be liable in conversion for the face value of the document. Surely, it was said, in such cases the action is in substance for conversion of the debt, a chose in action, and if that is right, then why not have conversion of any chose in action?

103.    But the document cases have been recognised to be an anomaly created by the judges to solve a particular problem, namely that a person who wrongfully secures payment of money due to another cannot be sued by the true creditor for money had and received to his use. That is because the creditor is not the owner of the money. The wrongful payment was treated as a matter between the paying party and the recipient which did not affect the creditor's position. Thus in *Rogers v Kelly* (1809) 2 Camp 123 a bank had

mistakenly paid the defendant some money which the plaintiff had deposited. Lord Ellenborough said:

> "There is no privity between the parties to this suit. The plaintiff's claim is on the bankers, and they must seek their remedy against the defendant the best way they can."

104.    But in cases in which the title to the debt was evidenced by a negotiable instrument, or even in some cases where it was not negotiable, the wrongful misappropriation of the document could cause actual loss to the true creditor, who might not be able to recover the debt. That left a gap in the law. The judges filled it by treating the misappropriation as a conversion of a chattel equal in value to the debt which it evidenced.  In *Morison v London County and Westminster Bank Ltd* [1914]  3 KB 356, 379 Phillimore LJ was not altogether confident about explaining the basis of the rule:

> "The defendant bank was the holder of the cheques…and …collected the proceeds in its own right…  Therefore the defendant bank converted the cheques.  That the damages for such conversion are (at any rate where the drawer has sufficient funds to his credit and the drawee bank is solvent) the face value of the cheques is established in a series of cases: … so well established that it is not necessary to inquire into the principle which may underlie the authority.  But the principle probably is that, though the plaintiff might at any moment destroy the cheques while they remained in his possession, they are potential instruments whereby the sums which they represent may be drawn from his bankers, and, if they get into other hands than his, he will be the loser to the extent of the sums which they represent.  It may also be that anyone who has obtained its value by presenting a cheque is estopped from asserting that it has only a nominal value."

105.    In *Lloyds Bank Ltd v The Chartered Bank of India, Australia and China* [1929]  1 KB 40, 55-56, Scrutton LJ recognised the anomalous and limited nature of the principle:

> "Conversion primarily is conversion of chattels, and the relation of bank to customer is that of debtor and creditor.  As no specific coins in a bank are the property of any specific customer there might appear to be some difficulty in holding that a bank, which paid part of what it owed its customer to some other person not authorised to receive it, had converted its customer's chattels; but a series of decisions binding on this

Court, culminating in *Morison's* case and *Underwood's* case [[1924] 1 KB 775] have surmounted the difficulty by treating the conversion as of the chattel, the piece of paper, the cheque under which the money was collected, and the value of the chattel converted as the money received under it: see the explanation of Phillimore LJ in *Morison's* case [cited above]"

106.    There do not appear to be any judicial statements offering a better explanation.   It is in my opinion an insecure base on which to erect a comprehensive system of strict liability for interference with choses in action.

107.    The only point on which I would differ from Peter Gibson LJ in his admirable judgment in the Court of Appeal is in his expression of regret (in paragraph 58) that the liquidator had no cause of action.  This is not a case in which a wrongful appointment of receivers caused damage to a solvent company.   The judge found that the company was inevitably headed for insolvent liquidation. The liquidator sought immediate advice on the legality of the appointment of the receivers and then stood back for over three years, leaving the receivers to negotiate with NWW.  The receivers acted in good faith throughout and the liquidator concurred in the settlement they reached. The liquidator then put his case on the basis of an allegation of strict liability which precluded any investigation into his own conduct or whether he could have produced a better result.  I can see no reason why such a claim should have succeeded. I would therefore dismiss the liquidator's appeal.

*Douglas v Hello! Ltd.*

108.    Northern & Shell plc publishes *OK!* magazine and I shall refer to it as *OK!*. In November 2000 *OK!* entered into a contract with Michael Douglas and Catherine Zeta-Jones, whom I shall call "the Douglases", for the exclusive right to publish photographs of their forthcoming wedding on 18 November 2000 at the Plaza Hotel, New  York. The Douglases dealt with *OK!*, who paid them £1m for the rights, in preference to the rival magazine *Hello!*, published by the respondent. The Douglases agreed to engage a photographer and to supply *OK!* with pictures they had chosen. By clause 6 of the agreement they agreed to use their best efforts to ensure that no one else would take any photographs.

109.    The Douglases went to some lengths to comply with this obligation and no criticism is made of their security precautions, but a freelance photographer named Rupert Thorpe infiltrated the wedding and took photographs which he sold to *Hello!*.   *OK!* obtained an ex parte injunction restraining publication by *Hello!* but on 23 November 2000 the injunction was discharged by the Court of Appeal and the photographs were published on the following day.  A few hours earlier on the same day  *OK!* published its own

34

photographs, having brought forward its date of publication on account of what it knew to be the imminent publication by *Hello!* Also on the same day, some of the unauthorized pictures were, without objection by *Hello!*, published in national daily newspapers.

110.    *OK!* sued *Hello!* for breach of confidence and for the tort of causing loss by unlawful means. (The Douglases brought separate proceedings against *Hello!* and recovered modest damages, but these are not in issue in this appeal, to which the Douglases are not parties.)

111.    Lindsay J held *Hello!* liable for breach of confidence. He applied the well-known criteria summarized by Megarry J in *Coco v AN Clark (Engineers) Ltd* [1969] RPC 41, 47:

> "First, the information itself…must 'have the necessary quality of confidence about it. Secondly, that information must have been imparted in circumstances importing an obligation of confidence. Thirdly, there must be an unauthorised use of that information to the detriment of the party communicating it."

112.    For this purpose the judge identified the information as being photographic images of the wedding.  Not information about the wedding generally; anyone was free to communicate the information that the Douglases had been married, describe what the bride wore and so forth.  The claim was only that there had been a breach of an obligation of confidence in respect of photographic images.

113.    Lindsay J held that the three conditions were satisfied.  As for the first, photographs of the wedding were confidential information in the sense that none were publicly available.  As to the second, the Douglases had made it clear that anyone admitted to the wedding was not to make or communicate photographic images. They allowed people to witness their marriage, but only on the basis that the information which the spectators thereby obtained was not communicated in the form of a photographic image. The judge said (at para 197):

> "the very facts that *Hello!* and *OK!* competed for exclusivity as they did and that each was ready to pay so much for it points to the commercial confidentiality of coverage of the event. The event was private in character and the elaborate steps to exclude the uninvited, to include only the invited, to preclude unauthorized photography, to control the authorized photography and to have had the claimants' intentions in that regard made clear all conduce to that conclusion. Such images

as were, so to speak, radiated by the event were imparted to those present, including Mr Thorpe and his camera, in circumstances importing an obligation of confidence. Everyone there knew that was so."

114.    Furthermore, everyone knew that the obligation of confidence was imposed for the benefit of *OK!* as well as the Douglases. To no one could this have been clearer than to Mr Thorpe. The judge then went on to make findings about the circumstances in which *Hello!* had acquired his photographs:

> "198.   As for the *Hello!* defendants, their consciences were, in my view, tainted; they were not acting in good faith nor by way of fair dealing. Whilst their position might have been worse had I held that the taking of unauthorised pictures for use by them had been truly commissioned in advance, even without that there is in my view enough to afflict their conscience. They knew that *OK!* had an exclusive contract; as persons long engaged in the relevant trade, they knew what sort of provisions any such contract would include and that it would include provisions intended to preclude intrusion and unauthorised photography. Particularly would that be so where, as they knew, a very considerable sum would have had to have been paid for the exclusive rights which had been obtained. … The surrounding facts were such that a duty of confidence should be inferred from them. The *Hello!* defendants had indicated to paparazzi in advance that they would pay well for photographs and they knew the reputation of the paparazzi for being able to intrude. The unauthorised pictures themselves plainly indicated they were taken surreptitiously. Yet these defendants firmly kept their eyes shut lest they might see what they undeniably knew would have become apparent to them."

115.    The obligation of confidence was therefore binding upon *Hello!* and the third *Coco* requirement of use to the detriment of *OK!* was plainly satisfied. Lindsay J therefore decided that *Hello!* was liable to *OK!* for the loss caused by the publication, which he later assessed at £1,033,156.

116.    The Court of Appeal (Lord Phillips of Worth Matravers MR, Clarke and Neuberger LJJ) reversed the judge's decision on the ground that the obligation of confidence for the benefit of *OK!* attached only to the photographs which the Douglases authorized them to publish.  They did not have the benefit of an obligation of confidence in respect of any other photographs.  Their publication may have invaded a residual right of privacy retained by the Douglases but did not infringe any right of *OK!*

117.    In my opinion Lindsay J was right.  The point of which one should never lose sight is that OK! had paid £1m for the benefit of the obligation of confidence imposed upon all those present at the wedding in respect of *any* photographs of the wedding.  That was quite clear.  Unless there is some conceptual or policy reason why they should not have the benefit of that obligation, I cannot see why they were not entitled to enforce it.  And in my opinion there are no such reasons.  Provided that one keeps one's eye firmly on the money and why it was paid, the case is, as Lindsay J held, quite straightforward.

118.    It is first necessary to avoid being distracted by the concepts of privacy and personal information.  In recent years, English law has adapted the action for breach of confidence to provide a remedy for the unauthorized disclosure of personal information: see *Campbell v MGN Ltd* [2004]  2 AC 457. This development has been mediated by the analogy of the right to privacy conferred by article 8 of the European Convention on Human Rights and has required a balancing of that right against the right to freedom of expression conferred by article 10. But this appeal is not concerned with the protection of privacy.  Whatever may have been the position of the Douglases, who, as I mentioned, recovered damages for an invasion of their privacy, *OK!'s* claim is to protect commercially confidential information and nothing more. So your Lordships need not be concerned with Convention rights. *OK!* has no claim to privacy under article 8 nor can it make a claim which is parasitic upon the Douglases' right to privacy. The fact that the information happens to have been about the personal life of the Douglases is irrelevant.  It could have been information about anything that a newspaper was willing to pay for. What matters is that the Douglases, by the way they arranged their wedding, were in a position to impose an obligation of confidence.  They were in control of the information.

119.    Is there any conceptual problem about the fact that the obligation of confidence was imposed only in respect of a particular form of information, namely, photographic images?  I do not see why there should be.  If *OK!* was willing to pay for the right to be the only source of that particular form of information and did not mind that others were free to communicate other forms of information about the wedding, then I think the Douglases should be able to impose a suitably limited obligation of confidence.

120.    My noble and learned friends, Lord Nicholls of Birkenhead and Lord Walker of Gestingthorpe, are troubled by the fact that the information in the photographic images was not intended to be kept secret but to be published to the world by *OK!* and was so published at much the same time as the unauthorised photographs in *Hello!.*  But I see no reason why there should not be an obligation of confidence for the purpose of enabling someone to be the only source of publication if that is something worth paying for. Why should a newspaper not be entitled to impose confidentiality on its journalists, sub-editors and so forth to whom it communicates information about some scoop

which it intends to publish next day? That does not of course prevent publication by someone who receives the information otherwise than under an obligation of confidence. And I say nothing about cases in which there is a public interest in communicating the information to others or the public at large. But otherwise it is simply information of commercial value.

121.   My noble and learned friend, Lord Nicholls, is also of opinion that once the approved photographs were published, the publication of the unauthorised photographs was not a breach of confidence. I cannot understand this. Mr Thorpe was subject to an obligation of confidence in respect of the pictures which he took. *Hello!*, by reason of the circumstances in which they acquired the pictures, were subject to the same obligation. How could it be destroyed by *OK!'s* publication of other photographs a few hours earlier? He says that the differences between the photographs were "insufficiently significant to call for legal protection"; "the unapproved pictures contained nothing not included in the approved pictures".

122.   My Lords, it is certainly the case that once information gets into the public domain, it can no longer be the subject of confidence. Whatever the circumstances in which it was obtained, there is no point in the law providing protection. But whether this is the case or not depends on the nature of the information. Whether there is still a point in enforcing the obligation of confidence depends on the facts. If the purpose of publishing the pictures was simply to convey the information that the Douglases had married, the bride wore a wedding dress and so forth, then the publication of any photographs would have put that information in the public domain. So would a description of the event. In this case, however, the point of the transaction was that each picture would be treated as a separate piece of information which *OK!* would have the exclusive right to publish. The pictures published by *OK!* were put into the public domain and it would have had to rely on the law of copyright, not the law of confidence, to prevent their reproduction. But no other pictures were in the public domain and they did not enter the public domain merely because they resembled other pictures which had. Why was *Hello!* willing to pay Mr Thorpe so much money for information which was already in the public domain? Why did the judge find that the publication of information which did not, in Lord Nicholls's words, "call for legal protection", had caused substantial financial loss to *OK!*? My Lords, this seems to me a point on which theory is in danger of losing touch with reality.

123.   The Court of Appeal's analysis, which treats the obligation of confidence as having been imposed in favour of *OK!* only in respect of the photographs with which it was supplied by the Douglases, also seems to me to make no commercial sense. The essential purpose of the security arrangements and the prohibition of unauthorised photography were to impose an obligation of confidence in respect of *any* pictures of the wedding. Only in that way could the commercial interests of *OK!* be protected. And it was clear to everyone, Mr Thorpe and Senor Sanchez Junco in particular, that this

obligation was imposed for the benefit of *OK!* as well as the Douglases.  As the Court of Appeal put it when stating OK's argument, ([2006] QB at para 138) "the photographs published by *Hello!* fell within a generic class of commercially confidential information…which *OK!* were entitled to protect".

124.    Is there any reason of public policy why the law of confidence should not protect information of this form and subject-matter?  There is in my opinion no question of creating an "image right" or any other unorthodox form of intellectual property.  The information in this case was capable of being protected, not because it concerned the Douglases' image any more than because it concerned their private life, but simply because it was information of commercial value over which the Douglases had sufficient control to enable them to impose an obligation of confidence.  Some may view with distaste a world in which information about the events of a wedding, which Warren and Brandeis in their famous article on privacy in (1890) 4 Harvard LR 193 regarded as a paradigm private occasion, should be sold in the market in the same way as information about how to make a better mousetrap.  But being a celebrity or publishing a celebrity magazine are lawful trades and I see no reason why they should be outlawed from such protection as the law of confidence may offer.

125.    I therefore think that the Court of Appeal was wrong to reverse the judge on this point. Mr Price QC, who appeared for *Hello!*, also relied upon two other arguments.  First, he said that to hold that participants in a "celebrity event" can impose a duty of confidence upon those who attend would give rise to inconsistency with the "carefully constructed" scheme of statutory performing rights in Part II of the Copyright, Designs and Patents Act 1988.  I cannot see how there can be a conflict between such statutory rights and any additional rights which may exist under the common law. One might as well say that the law of contract is inconsistent because it allows for the possibility of a performer bargaining for greater rights than he would have under the statute.

126.    Secondly, Mr Price submitted that under the law of New York Mr Thorpe owed no obligation to keep the information confidential. The Statement of Facts and Issues records that under New York law "there would have been no inhibition upon Mr Thorpe publishing the photographs which he had taken". We are not told the basis of this statement. The judge found that Mr Thorpe must have been "at least a trespasser" by the law of New York.  It may be that, under the First Amendment, he was entitled to publish in New York notwithstanding the circumstances in which the photographs were obtained. But that does not mean that he or anyone deriving title from him is entitled to publish in England. There is nothing to suggest that an obligation of confidence cannot be imposed in New York, even though it may be overridden by a constitutional right to freedom of expression. But the question of whether that obligation of confidence can entitle the beneficiary to restrain publication in England is a matter of English law.

127.    I would therefore allow the appeal of *OK!* and restore the order of the judge. Mr Price submitted that the award of damages should not be allowed in full because, on the evidence, a substantial part of the loss was caused by the publication of the unauthorized photographs in national daily newspapers rather than in *Hello!*  But the judge considered this point in his supplemental judgment on damages and came to the conclusion that the full losses were "sufficiently consequential upon the breach and sufficiently foreseeable as to make *Hello!* liable for them in the ordinary way" (paragraph 48). Further, in paragraph 53 he said that —

> "I do not regard the newspaper publications of the pictures as so remote a consequence of Hello!'s publication as not to be laid at Hello!'s door and plainly the newspaper publications would not have occurred as they did but for Hello!'s publication of the unauthorized photographs."

128.    In the light of these findings of fact I would not disturb the judge's award.

129.    In view of my conclusion that *OK!* was entitled to sue for breach of an obligation of confidentiality to itself, it is a little artificial to discuss the alternative claim on the footing that the  obligation was owed solely to the Douglases.   I would have considerable difficulty in reconciling such a hypothetical claim with *RCA Corporation v Pollard* [1983]  Ch 135 and *Isaac Oren v Red Box Toy Factory Ltd* [1999]  FSR 785.  Neither Mr Thorpe nor *Hello!* did anything to interfere with the liberty of the Douglases to deal with *OK!* or perform their obligations under their contract. All they did was to make *OK!'s* contractual rights less profitable than they would otherwise have been.

130.    On the other hand, I should make it clear that in my opinion such a claim should not have failed for the reasons given by the judge and the Court of Appeal, namely that *Hello!* did not intend to cause loss to *OK!.*

131.    Their conclusion was based upon the evidence of Senor Sanchez Junor, the controlling shareholder of *Hello!'s* Spanish holding company, who had made the decision to publish.  The judge set out this evidence at paragraphs 245-249 of his judgment, from which I shall quote extracts.  First, there was his written evidence:

> "I want to state categorically that there was never an intention to cause damage to any of the claimants…because we have always treated them in Hello! with deference and sympathy, in accordance with the magazine style. In our 60-year history we

have never tried to damage anyone. Therefore, we would not want to do it to people whom we have always treated fairly and objectively in our reports portraying them in the best possible light. With respect to OK! we took it for granted that, without a doubt, they would have a great editorial success, as they had a great exclusive and consequently, the magazine would be sold under excellent conditions as was the case. Our main purpose was to inform our readers about an event which had been publicised all over the media for weeks before the wedding, which shows that this wedding was of interest for the United Kingdom. We did not wish to disappoint our readers. It was never our aim or intention to damage the third claimant, our prime motivation was only to give our readers information on the wedding of two celebrities, about whom, without doubt, our readers expected to read in Hello!..."

132.    Then there was his oral evidence, summarized by the judge:

"Senor Sanchez Junco disavowed having acted in revenge against the Douglases for his not getting the exclusive he so wished; rather he wanted, despite losing the exclusive, to publish an edition that would interest his readers, the event being one which had captured the imagination of the public. His act, he said, was not of revenge but of salvage. He denied having the intention of spoiling OK!'s sales adding … 'my motive was never to spoil the exclusive of OK!. I repeat, I wanted to defend as far as I could my publication … My priority was to save my publication after having, in the light of a very important big loss, and that is that of the exclusive, and I didn't think of the possible damage that I could inflict on Hello! or the Douglases…'"

133.    The judge concluded:

"I…accept the evidence [Senor Sanchez Junco gave on this subject.] Whilst I recognise that for a defendant to act out of self-interest does not, of itself, disprove that he had no intent to injure another, here I find on the evidence that there was no intent to injure by unlawful means because there was no intent to injure at all."

134.    Thus the position of Senor Sanchez Junco was that he wished to defend his publication against the damage it might suffer on account of having lost the exclusive.  But that, it seems to me, is precisely the position of every competitor who steps over the line and uses unlawful means. The injury which

he inflicted on *OK!* in order to achieve the end of keeping up his sales was simply the other side of the same coin. His position was no different from Mr Gye saying that he had no wish to injure Mr Lumley and had the greatest respect for Her Majesty's Theatre but his intention was to improve attendance at his own theatre, or the master of the *Othello* saying that his intention was to buy more palm oil. Lord Sumner made this point pungently in *Sorrell v Smith* [1925] AC 700, 742:

> "How any definite line is to be drawn between acts, whose real purpose is to advance the defendants' interests, and acts, whose real purpose is to injure the plaintiff in his trade, is a thing which I feel at present beyond my power. When the whole object of the defendants' action is to capture the plaintiff's business, their gain must be his loss. How stands the matter then? The difference disappears."

The injury to *OK!* was the means of attaining Senor Sanchez Junor's desired end and not merely a foreseeable consequence of having done so.

135.   The analysis of intention by the Court of Appeal in my opinion illustrates the danger of giving a wide meaning to the concept of unlawful means and then attempting to restrict the ambit of the tort by giving a narrow meaning to the concept of intention.  The effect is to enable virtually anyone who really has used unlawful means against a third party in order to injure the plaintiff to say that he intended only to enrich himself, or protect himself from loss.  The way to keep the tort within reasonable bounds is not to extend the concept of unlawful means beyond what was contemplated in *Allen v Flood*, rather than to give an artificially narrow meaning to the concept of intention.

136.   I would therefore have held that *Hello!* had the necessary intention to cause loss but not that they interfered by unlawful means with the actions of the Douglases.

## LORD NICHOLLS OF BIRKENHEAD

My Lords,

137.   Before your Lordships' House are three appeals.  They were heard consecutively because the legal issues overlap.  The first appeal, *OBG Ltd v Allan* [2005] QB 762, concerns a claim by a company in liquidation for damages in respect of losses sustained by the company through acts done by administrative receivers whose appointment was later held to be invalid.  The

causes of action relied upon are conversion and wrongful interference with contractual relations.

138.    The second appeal, *Douglas v Hello! Ltd* [2006] QB 125, concerns the publication of photographs taken surreptitiously at a celebrity wedding held in private.  The causes of action relied upon are breach of confidence and unlawful interference with economic interests.   In the third appeal, *Mainstream Properties Ltd v Young* [2005] IRLR 964, the cause of action is wrongful interference with contractual relations.  The context is breaches by directors of their obligations to their company.

139.    Counsel's submissions were wide-ranging.  In particular the House is called upon to consider the ingredients of the tort of interference with a business by unlawful means and the tort of inducing breach of contract.  These are much vexed subjects.   Nearly 350 reported decisions and academic writings were placed before the House.  There are many areas of uncertainty. Judicial observations are not always consistent, and academic consensus is noticeably absent.  In the words of one commentator, the law is in a 'terrible mess'.  So the House faces a daunting task.  For good measure your Lordships have also to review the scope of the tort of conversion.

140.    I shall consider first the ingredients of the relevant economic torts.

*Interference with the claimant's business by unlawful means*

141.    I start with the tort comprising interference with a trade or business by unlawful means or, more shortly, the tort of unlawful interference.  The gist of this tort is intentionally damaging another's business by unlawful means. Intention is an essential ingredient.  The tort is not one of strict liability for harm inflicted on another's business, nor is it a tort based on negligence.  The defendant must have intended to inflict the harm of which complaint is made. That is the starting point.  I shall have to return to this point later.

142.    But intent to harm is not enough. Intentional harm of another's business is not of itself tortious.  Competition between businesses regularly involves each business taking steps to promote itself at the expense of the other.  One retail business may reduce its prices to customers with a view to diverting trade to itself and away from a competitor shop.   Far from prohibiting such conduct, the common law seeks to encourage and protect it. The common law recognises the economic advantages of competition.

*Unlawful means*

143.   This is not to say that in this field of economic rivalry anything goes. Business people are not free to promote their own businesses at the expense of others by whatever means they may choose.  There are limits.  The common law has long recognised that some forms of conduct, intentionally damaging other traders, are not acceptable.  A well-known passage from the judgment of Bowen LJ in the Court of Appeal in *Mogul Steamship Co Ltd v McGregor, Gow, & Co* (1889) 23 QBD 598, 614, merits repetition:

> 'What, then, are the limitations which the law imposes on a trader in the conduct of his business as between himself and other traders?  There seem to be no burdens or restrictions in law upon a trader which arise merely from the fact that he is a trader, and which are not equally laid on all other subjects of the Crown.  His right to trade freely is a right which the law recognises and encourages, but it is one which places him at no special disadvantage as compared with others.   No man, whether trader or not, can, however, justify damaging another in his commercial business by fraud or misrepresentation. Intimidation, obstruction, and molestation are forbidden; so is the intentional procurement of a violation of individual rights, contractual or other, assuming always that there is no just cause for it.  …  But the defendants have been guilty of none of these acts.  They have done nothing more against the plaintiffs than pursue to the bitter end a war of competition waged in the interest of their own trade.  To the argument that a competition so pursued ceases to have a just cause or excuse when there is ill-will or a personal intention to harm, it is sufficient to reply …  that there was here no personal intention to do any other or greater harm to the plaintiffs than such as was necessarily involved in the desire to attract to the defendants' ships the entire tea freights of the ports, a portion of which would otherwise have fallen to the plaintiffs' share.'

144.   A similar approach has been adopted in cases involving labour disputes. In *Allen v Flood* [1898] AC 1, 164, Lord Shand likened the labour dispute in that case to one of 'competition in labour', which he said 'is in all essentials analogous to competition in trade, and to which the same principles must apply'.  Lord Lindley adopted the same stance in another trade union case, *Quinn v Leathem* [1901] AC 495, 532-535.  Lord Lindley approved Bowen LJ's observations quoted above.  He said the underlying principles are that an act 'otherwise lawful', although harmful, does not become actionable because it is done simply with intent to annoy or harm.  But 'all wrongful acts' done intentionally to damage a particular individual and actually damaging him are remediable.

145.   Since then the common law of England has adhered to the view that 'unlawful' conduct is a prerequisite of liability under the tort of unlawful interference with trade.  In the American case of *Tuttle v Buck* 119 NW 946 (1909) the court held a rich banker liable for spitefully driving the claimant barber out of business by opening a rival barber's shop and undercutting him. That is not the law in England.  In this country intentionally causing damage without using unlawful means is not of itself actionable.

146.   The English approach has not lacked critics.  On the 'unlawful conduct' approach the tort is parasitic on conduct defined as unlawful otherwise than because it amounts to a wrong to the claimant.  This, it is said, is inherently unsatisfactory.  It is inherently unsatisfactory because it means that a tort concerned with the regulation of trade is geared to commission of illegalities which were created for altogether different reasons: see J D Heydon, 'Economic Torts', 2nd ed, (1978), page 124.  A wrong designed for some other purpose is being used as the criterion for deciding whether an act done with an intention to harm is acceptable.  This ingredient 'imposes an arbitrary and illogical limit on the development of a rational principle to explain this part of the law': Salmond & Heuston, 'Law of Torts', 21st ed (1996), page 346.  It 'can produce capricious results in which the distinction between permissible and impermissible…comes to turn on fictitious and, from a practical viewpoint, even irrelevant factors': Professor Fleming, 'The Law of Torts', 9th ed, (1998), page 761. In *J T Stratford & Son Ltd v Lindley* [1965] AC 269, 330, Viscount Radcliffe expressed unhappiness about this aspect of English law.  He said the trade dispute in that case should be resolved 'according to its substance, without the comparatively accidental issue whether breaches of contract are looked for and involved.'

147.   These criticisms have force.  The contrary, pragmatic view is that in this difficult and uncertain area of the law there is perhaps something to be said for having an objective element of unlawfulness as the boundary of liability.  A defendant is not liable under this tort unless he has resorted to 'unlawful' means to achieve his end.  Tony Weir, a staunch supporter of this approach, says this requirement is 'entirely correct, sensible and practical': 'Economic Torts', (1997), page 3.

148.   I do not propose to enter upon the pros and cons of this particular debate.  Your Lordships are not writing on a clean slate.  English courts have long recognised they are not best equipped to regulate competitive practices at large.  Parliament is better placed to decide what interests need protection and by what means.  Fry LJ said that 'to draw a line between fair and unfair competition, between what is reasonable and unreasonable, passes the powers of the courts': *Mogul Steamship Co Ltd v McGregor* (1889) 23 QBD 598, 625-626.  Since then Parliament has intervened on many occasions. The courts have taken, as their foothold, conduct which is unlawful.  In English law it is now well established that 'unlawful means' is an essential ingredient of this

45

tort.  This goes back to the decision in *Allen v Flood* [1898] AC 1.  I shall proceed on this footing.

149.    Although the need for 'unlawful means' is well established, the same cannot be said about the content of this expression.  There is some controversy about the scope of this expression in this context.

150.    One view is that this concept comprises, quite simply, all acts which a person is not permitted to do.  The distinction is between 'doing what you have a legal right to do and doing what you have no legal right to do': Lord Reid in *Rookes v Barnard* [1964] AC 1129, 1168-1169.  So understood, the concept of 'unlawful means' stretches far and wide.  It covers common law torts, statutory torts, crimes, breaches of contract, breaches of trust and equitable obligations, breaches of confidence, and so on.

151.    Another view is that in this context 'unlawful means' comprise only civil wrongs.  Thus in *Allen v Flood* itself Lord Watson described illegal means as 'means which in themselves are in the nature of civil wrongs': [1898] AC 1, 97-98.  A variant on this view is even more restricted in its scope: 'unlawful means' are limited to torts and breaches of contract.

152.    The principal criticism of the first, wider view is that it 'tortifies' criminal conduct.  The principal criticism of the second, narrower view is that it would be surprising if criminal conduct were excluded from the category of 'unlawful' means in this context.  In the classical 'three-party' form of this tort the defendant seeks to injure the claimant's business through the instrumentality of a third party.  By this means, as Lord Lindley said, the claimant is 'wrongfully and intentionally struck at through others, and is thereby damnified': *Quinn v Leathem* [1901] AC 495, 535.  It would be very odd if in such a case the law were to afford the claimant a remedy where the defendant committed or threatened to commit a tort or breach of contract against the third party but not if he committed or threatened to commit a crime against him.  In seeking to distinguish between acceptable and unacceptable conduct it would be passing strange that a breach of contract should be proscribed but not a crime.  In *Rookes v Barnard* [1964] AC 1129, 1206-7, Lord Devlin noted it was 'of course' accepted that a threat to commit a crime was an unlawful threat and continued:

> 'It cannot be said that every form of coercion is wrong. A dividing line must be drawn and the natural line runs between what is lawful and unlawful as against the party threatened.'

46

153.   These different views are founded on different perceptions of the rationale underlying the unlawful interference tort.   On the wider interpretation of 'unlawful means' the rationale is that by this tort the law seeks to curb clearly excessive conduct.   The law seeks to provide a remedy for intentional economic harm caused by unacceptable means.   The law regards all unlawful means as unacceptable in this context.

154.   On the narrower interpretation this tort has a much more limited role. On this interpretation the function of the tort of unlawful interference is a modest one.   Its function is to provide a claimant with a remedy where intentional harm is inflicted indirectly as distinct from directly.   If a defendant intentionally harms a claimant directly by committing an actionable wrong against him, the usual remedies are available to the claimant.   The unlawful interference tort affords a claimant a like remedy if the defendant intentionally damages him by committing an actionable wrong against a third party.   The defendant's civil liability is expanded thus far, but no further, in respect of damage intentionally caused by his conduct.

155.   In my view the former is the true rationale of this tort.   The second interpretation represents a radical departure from the purpose for which this tort has been developed.   If adopted, this interpretation would bring about an unjustified and unfortunate curtailment of the scope of this tort.

156.   On either interpretation complications may arise in the application of this tort in certain types of cases, notably where the civil rights of a third party infringed by the defendant are statute-based.   The existence of these perceived complications is not a pointer in favour of either interpretation.

157.   Take the case of a patent.   A manufacturer seeks to steal a march on his rival by employing a novel, patented process.   In order to sell his product more cheaply, he does so without paying any licence fee to the owner of the patent. By means of this patent infringement he undercuts his law-abiding rival.   He has damaged his rival's business by an unlawful means.   But this conduct, however reprehensible, cannot afford the rival manufacturer a cause of action for damages for interference with trade by unlawful means.   Parliament has specified the nature and extent of the remedies available for infringement of patents.   Remedial relief for infringement of a patent is available to patentees and exclusive licensees.   It would be inconsistent with the statutory scheme if the common law tort were to afford a remedy more widely.

158.   Thus in *Oren v Red Box Toy Factory Ltd* [1999] FSR 785, 800, para 42, Jacob J said in the context of a claim for unlawful interference with contractual relations:

'the right to sue under intellectual property rights created and governed by statute [is] inherently governed by the statute concerned. Parliament in various intellectual property statutes has, in some cases, created a right to sue, and in others not. In the case of the [Copyright, Designs and Patents Act 1988] it expressly re-conferred the right on a copyright exclusive licensee, conferred the right on an exclusive licensee under the new form of property called an unregistered design right .. but did not create an independent right to sue on a registered design exclusive licensee. It is not for the courts to invent that which Parliament did not create'.

159.   The difficulties here are more apparent than real. The answer lies in keeping firmly in mind that, in these three-party situations, the function of the tort is to provide a remedy where the claimant is harmed through the *instrumentality* of a third party. That would not be so in the patent example.

160.   Similarly with the oft quoted instance of a courier service gaining an unfair and illicit advantage over its rival by offering a speedier service because its motorcyclists frequently exceed speed limits and ignore traffic lights. The unlawful interference tort would not apply in such a case. The couriers' criminal conduct is not an offence committed against the rival company in any realistic sense of that expression.

161.   Nor am I persuaded that the effect of the broader interpretation of 'unlawful means' is to impose civil liability on a defendant simply because he reached his victim through an agent rather than directly. I am far from satisfied that, in a two-party situation, the courts would decline to give relief to a claimant whose economic interests had been deliberately injured by a crime committed against him by the defendant.

162.   For these reasons I accept the approach of Lord Reid and Lord Devlin and prefer the wider interpretation of 'unlawful means'. In this context the expression 'unlawful means' embraces all acts a defendant is not permitted to do, whether by the civil law or the criminal law.

163.   I add a brief observation on the decision of the House in *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173. There the House held that Shell and BP's alleged criminal breaches of the sanctions orders against Southern Rhodesia did not afford a civil remedy to Lonrho. That decision does not assist either way on the point now under consideration. The House was not considering the scope of the unlawful interference tort. In that case there was no allegation that Shell and BP's alleged acts in contravention of the sanctions orders were done to injure Lonrho. The case proceeded on the

footing that this essential ingredient of the unlawful interference tort was not present.

*Intent to injure*

164.    I turn next, and more shortly, to the other key ingredient of this tort: the defendant's intention to harm the claimant.  A defendant may intend to harm the claimant's business either as an end in itself or as a means to an end. A defendant may intend to harm the claimant as an end in itself where, for instance, he has a grudge against the claimant.  More usually a defendant intentionally inflicts harm on a claimant's business as a means to an end.  He inflicts damage as the means whereby to protect or promote his own economic interests.

165.    Intentional harm inflicted against a claimant in either of these circumstances satisfies the mental ingredient of this tort.  This is so even if the defendant does not wish to harm the claimant, in the sense that he would prefer that the claimant were not standing in his way.

166.    Lesser states of mind do not suffice.  A high degree of blameworthiness is called for, because intention serves as the factor which justifies imposing liability on the defendant for loss caused by a wrong otherwise not actionable by the claimant against the defendant. The defendant's conduct in relation to the loss must be deliberate. In particular, a defendant's foresight that his unlawful conduct may or will probably damage the claimant cannot be equated with intention for this purpose.  The defendant must *intend* to injure *the claimant*.   This intent must be a cause of the defendant's conduct, in the words of Cooke J in *Van Camp Chocolates Ltd v Aulsebrooks Ltd* [1984] 1 NZLR 354, 360.  The majority of the Court of Appeal fell into error on this point in the interlocutory case of *Miller v Bassey* [1994] EMLR 44.  Miss Bassey did not breach her recording contract with the intention of thereby injuring any of the plaintiffs.

167.    I add one explanatory gloss to the above.  Take a case where a defendant seeks to advance his own business by pursuing a course of conduct which he knows will, in the very nature of things, necessarily be injurious to the claimant.  In other words, a case where loss to the claimant is the obverse side of the coin from gain to the defendant.  The defendant's gain and the claimant's loss are, to the defendant's knowledge, inseparably linked.  The defendant cannot obtain the one without bringing about the other.  If the defendant goes ahead in such a case in order to obtain the gain he seeks, his state of mind will satisfy the mental ingredient of the unlawful interference tort.  This accords with the approach adopted by Lord Sumner in *Sorrell v Smith* [1925] AC 700, 742:

> 'When the whole object of the defendants' action is to
> capture the plaintiff's business, their gain must be his loss.
> How stands the matter then?  The difference disappears.  The
> defendant's success is the plaintiff's extinction, and they cannot
> seek the one without ensuing the other.'

*The tort of inducing a breach of contract*

168.    The other tort requiring consideration is the tort of inducing a breach of
contract.   This tort is known by various names, reflecting differing views
about its scope.  At its inception in 1853 this tort was concerned with a simple
tripartite situation of a non-party to a contract inducing a contracting party to
break her contract.  Did the other party to the contract have a cause of action
against the non-party?

169.    The facts in *Lumley v Gye* 2 E & B 216 are familiar to every law
student.  The well-known opera singer Johanna Wagner had contracted with
Mr Lumley to perform exclusively at the Queen's Theatre.  Mr Gye, the owner
of Her Majesty's Theatre, 'enticed and procured' Miss Wagner to break her
contract.  The action came before the court on a plea of demurrer.  The
question was whether the counts disclosed a cause of action against Mr Gye.
The court, by a majority, held they did.

170.    The reasoning of the judges differed in its generality.   It was
established law that a person who knowingly procured a servant to leave his
master's service committed an actionable wrong.  Crompton J saw no reason
to confine this principle to contracts for services of any particular description.
Erle J reasoned more widely.   He said, at page 232, that the principle
underlying the master and servant cases is that procurement of the violation of
a right is a cause of action:

> 'It is clear that the procurement of the violation of a
> right is a cause of action in all instances where the violation is
> an actionable wrong, as in violations of a right to property,
> whether real or personal, or to personal security: *he who
> procures the wrong is a joint wrongdoer*, and may be sued,
> either alone or jointly with the agent, in the appropriate action
> for the wrong complained of.'  (emphasis added)

This principle, of liability for procurement of a wrong, applies to a breach of
contract as well as an actionable wrong: page 233.   Wightman J expressed
himself similarly, at page 238:

> 'It was undoubtedly prima facie an unlawful act on the part of Miss Wagner to break her contract, and therefore a tortious act of the defendant [knowingly] *to procure her to do so*.' (emphasis added)

171.    This 'procurement' analysis commended itself to Lord Watson in *Allen v Flood* [1898] AC 1.  Lord Watson approved Erle J's reasoning as quoted above, and continued, at pages 106-107:

> 'These statements embody an intelligible and a salutary principle, and they contain a full explanation of the law upon which the case [*Lumley v Gye*] was decided.  He who wilfully induces another to do an unlawful act which, but for his persuasion, would or might never have been committed, is rightly held responsible for the wrong which he procured.'

172.    Thus understood, the rationale and the ingredients of the 'inducement' tort differ from those of the 'unlawful interference' tort.  With the inducement tort the defendant is responsible for the third party's breach of contract which he procured.  In that circumstance this tort provides a claimant with an additional cause of action.  The third party who breached his contract is liable for breach of contract.  The person who persuaded him to break his contract is also liable, in his case in tort.  Hence this tort is an example of civil liability which is secondary in the sense that it is secondary, or supplemental, to that of the third party who committed a breach of his contract.  It is a form of accessory liability.

173.    This form of liability is to be contrasted with the tort of unlawful interference.  This is a 'stand-alone' tort of wide scope, imposing primary liability on a defendant for his own conduct, irrespective of whether on the facts anyone else may also be liable, either in contract or in tort.  On this I agree with Philip Sales and Daniel Stilitz in their stimulating article 'Intentional Infliction of Harm by Unlawful Means', (1999) 115 LQR 411, 433.

*Preventing performance of a contract: 'interfering with contractual relations'*

174.    I must move now to more troubled waters.  In *Quinn v Leathem* [1901] AC 495 the House upheld the decision in *Lumley v Gye*.  In doing so their Lordships expressed the principle underlying that decision in broad terms.  Lord Macnaghten, at page 510, said that *Lumley v Gye* was rightly decided, not on the ground of malicious intention, but:

'… on the ground that a violation of legal right committed knowingly is a cause of action, and that it is a violation of legal right *to interfere with contractual relations* recognised by law if there be no sufficient justification for the interference.' (emphasis added)

Lord Lindley said the 'principle which underlies the decision [in *Lumley v Gye*] reaches all wrongful acts done intentionally to damage a particular individual and actually damaging him': page 535.

175.   These broad, indeed, sweeping affirmations made no mention of the need for inducement of breach of contract in *Lumley v Gye* cases. Lord Macnaghten spoke quite generally of 'interfering with contractual relations' as a violation of legal right. Lord Lindley expressed the underlying rationale in even wider terms. On the face of these observations the *Lumley v Gye* tort is not confined to cases where the defendant *induced* a contracting party to break his contract. These observations could be taken to suggest that the *Lumley v Gye* tort covers also cases where the defendant with intent to damage the claimant *prevented* a party to a contract from performing his contractual obligations.

176.   In *GWK Ltd v Dunlop Rubber Co Ltd* (1926) 42 TLR 376 Lord Hewart CJ applied these statements in a 'prevention' case. GWK, a car manufacturer, agreed with a tyre manufacturer Associated Rubber Manufacturers ('ARM'), that the latter's tyres would be fitted on all GWK cars exhibited for sale. Two of GWK's cars were exhibited at the Glasgow motor show. On the eve of the show Dunlop wrongfully removed ARM's tyres from the cars and replaced them with its own Dunlop tyres.

177.   Clearly, Dunlop did not induce GWK to break its contract with ARM. Equally plainly, Dunlop was liable to ARM for unlawful interference with its business. Dunlop intended to damage ARM by unlawful means, namely, by trespass to the goods of GWK. But Lord Hewart followed a different route. He gave effect to the broad observations of Lord Macnaghten and Lord Lindley. Dunlop had knowingly committed a violation of ARM's legal rights by interfering without justification with the contractual relations existing between ARM and GWK and had done so with intent to damage ARM.

178.   With hindsight it is evident that application of the *Lumley v Gye* tort to a 'prevention' case was unfortunate. There is a crucial difference between cases where the defendant induces a contracting party not to perform his contractual obligations and cases where the defendant prevents a contracting party from carrying out his contractual obligations. In inducement cases the very act of joining with the contracting party and inducing him to break his contract is sufficient to found liability as an accessory. In prevention cases the

defendant does not join with the contracting party in a wrong (breach of contract) committed by the latter. There is no question of accessory liability. In prevention cases the defendant acts independently of the contracting party. The defendant's liability is a 'stand-alone' liability. Consistently with this, tortious liability does not arise in prevention cases unless, as was the position in *GWK*, the preventative means used were independently unlawful.

179.    Jenkins LJ made this point in *D C Thomson & Co Ltd v Deakin* [1952] Ch 646, 693:

> '… acts of a third party *lawful in themselves* do not constitute an actionable interference with contractual rights merely because they bring about a breach of contract, even if they were done with the object and intention of bringing about such breach'. (emphasis added)

Evershed MR was of the same view. Suppose, he said, a defendant buys up all the commodities of a particular character with the object of preventing performance of a contract whereby the claimant would receive a supply of those commodities. The defendant would not act tortiously in such a case: page 680.

180.    Given this difference between prevention and inducement, it is confusing and misleading to treat prevention cases as part and parcel of the same tort as inducement cases. The rationale is not the same, nor are the ingredients. But the rationale and ingredients of liability in prevention cases are the same as those of the tort of interference with a business by unlawful means. Prevention cases should be recognised for what they are: straightforward examples of the latter tort, rather than as exemplifying a wider version of *Lumley v Gye* labelled 'interference with contractual relations'.

*A step too far*

181.    A regrettable consequence of treating 'preventing performance' as an extension of the *Lumley v Gye* tort has been to widen the ambit of this tort in an unprincipled fashion. It has meant that a defendant who intentionally harmed a plaintiff may be liable even though he did *not* use unlawful means *nor* did he induce a party to break his contract. A defendant may be held liable for intentional harm even though he did not cross the Rubicon by doing something he had no legal right to do. He is liable for intentional harm effected by lawful means.

182.    This step was taken by the Court of Appeal in the well known case of *Torquay Hotel Co Ltd v Cousins* [1969] 2 Ch 106.  A trade union and its officials blacked supplies of oil to the Imperial Hotel in Torquay.  This prevented the oil company Esso from performing its contractual obligation to supply oil to the hotel.  The Court of Appeal held this was actionable at the suit of the hotel.

183.    In reaching this conclusion Lord Denning MR said Lord Macnaghten, in the passage quoted above from *Quinn v Leathem* [1901] AC 495, 510, extended the principle of *Lumley v Gye*.  The time has come, Lord Denning stated, to extend the principle further, to cover deliberate and direct interference with the performance of a contract without causing any breach.  The interference must be 'direct'.  Unlawful means was an ingredient of liability if, but only if, the interference was 'indirect', as in Evershed MR's example of cornering the market in a commodity.  In the instant case the interference was direct.  So liability arose irrespective of whether the means used by the defendants to prevent performance of Esso's supply contract was lawful or not.

184.    The court went further in another respect.  The court held that the tort applied even though the interference did not give rise to a breach of contract.  Esso's supply contract included a force majeure clause.  This mattered not.  What mattered was that Esso was prevented or hindered from performing its contractual obligations.   This view of the law was approved by your Lordships' House in *Merkur Island Shipping Corpn v Laughton* [1983] AC 570, 608, per Lord Diplock.

185.    With the very greatest respect I have difficulty with Lord Denning's extension of *Lumley v Gye*.  The effect of this extension is that a person who directly prevents performance of a contract by wholly lawful means, and thereby intentionally inflicts damage on the claimant, is liable to the claimant.  No reason was given, and none is discernible, for this fundamental extension of the law.  Why should a defendant, acting wholly *lawfully*, be liable in such a case, although the use of *unlawful* means is a prerequisite of liability if he intentionally inflicts damage in any other way?

186.    Nor is the basis of the distinction between direct and indirect interference apparent.  One would suppose the outcome on liability would be the same whether a person sought to achieve his end by direct or indirect means.  It would be remarkable if this were not so.

187.    This extension of the *Lumley v Gye* tort must be going too far.  To hold a defendant liable where the intentional harm is inflicted by lawful means runs counter to the limit on liability long established in English law.  So long as this general limit is maintained in respect of other forms of interference with a

claimant's business, and Lord Denning did not suggest this should be changed, the extension in liability proposed by him and seemingly approved by Lord Diplock is irrational.  Despite the high authority of these cases, I have to say that on this occasion these distinguished judges fell into error.  They were led astray by the width of Lord Macnaghten's observations made in 1901, long before the unlawful interference tort became shaped.  The jurisprudence of the economic torts had not then been thought through.

188.   For these reasons this extension of the inducement tort of *Lumley v Gye* cannot stand consistently with the economic torts having a coherent framework.  This extension is productive of obscurity and, hence, uncertainty.  This, in turn, as Lord Diplock himself once said, is destructive of the rule of law: see *Merkur Island Shipping Corpn v Laughton* [1983] AC 570, 612.

189.   I feel bound to say therefore that the ambit of the *Lumley v Gye* tort should properly be confined to inducing a breach of contract.  The unlawful interference tort requires intentional harm effected by unlawful means, and there is no in-between hybrid tort of 'interfering with contractual relations'.  In so far as authorities suggest or decide otherwise they should not now be followed.  I leave open the question of how far the *Lumley v Gye* principle applies equally to inducing a breach of other actionable obligations such as statutory duties or equitable or fiduciary obligations.

190.   On this footing the 'force majeure' point seems largely to disappear.  It can hardly arise in inducement cases.  An exemption clause can scarcely apply to a contracting party who chooses to default.  Nor would the existence of an exemption clause have any obvious relevance in unlawful interference cases.  If a defendant prevents performance of a contract by unlawful means, the existence of an exemption clause will be neither here nor there.  The question will always be: how much loss did this interference cause to the claimant?

*Inducing a breach of contract: the mental element*

191.   I turn next to the mental ingredient of the *Lumley v Gye* tort.  The mental ingredient is an intention by the defendant to procure or persuade ('induce') the third party to break his contract with the claimant.  The defendant is made responsible for the third party's breach because of his intentional causative participation in that breach.  Causative participation is not enough.  A stranger to a contract may know nothing of the contract.  Quite unknowingly and unintentionally he may procure a breach of the contract by offering an inconsistent deal to a contracting party which persuades the latter to default on his contractual obligations.  The stranger is not liable in such a case.  Nor is he liable if he acts carelessly.  He owes no duty of care to the victim of the breach of contract.  Negligent interference is not actionable.

192.   The additional, necessary factor is the defendant's intent.  He is liable if he intended to persuade the contracting party to breach the contract. Intentional interference presupposes knowledge of the contract.  With that knowledge the defendant proceeded to induce the other contracting party to act in a way the defendant knew was a breach of that party's obligations under the contract. If the defendant deliberately turned a blind-eye and proceeded regardless he may be treated as having intended the consequence he brought about. A desire to injure the claimant is not an essential ingredient of this tort.

193.   For completeness I mention, but without elaboration, that a defence of justification may be available to a defendant in inducement tort cases.  A defendant may, for instance, interfere with another's contract in order to protect an equal or superior right of his own, as in *Edwin Hill and Partners, First National Finance Corpn Plc* [1989] 1 WLR 225.

*A bird's-eye view*

194.   It may be helpful to pause and take an overall look at where this leaves the law.  The effect of the views expressed above is to draw a sharp distinction between two economic torts.  One tort imposes primary liability for intentional and unlawful interference with economic interests.  The other tort imposes accessory liability for inducing a third party to commit an actionable wrong, notably a breach of contract, but possibly some other actionable civil wrongs as well.

195.   This overall framework, it is to be hoped, should assist in the more coherent development of the economic torts.  On this I am comforted by noting that this twofold structure substantially accords with the views of at least some commentators, including Hazel Carty 'An Analysis of the Economic Torts'(2001), pages 271-276, and Ken Oliphant, 62 MLR 320, 322.

*Mainstream v Young*

196.   Against that legal background I turn at last to the three appeals, starting with Mainstream Properties Ltd v Young.

197.   Mainstream was a residential property development company concentrating on the Derbyshire area.  The defendant Mr Young was a director of the company and the defendant Mr Broad a manager.  They were the company's two most senior employees.  In late 2000 and early 2001 Mr Young and Mr Broad appropriated to themselves the opportunity to develop a site at Findern.  This was in breach of the contractual and fiduciary duties they owed to Mainstream.  They developed the site as a joint venture

with the defendant Mr De Winter.  Mr De Winter provided the necessary finance.  Without his assistance the other two could not have proceeded with the development.

198.    Mainstream sued all three of them.  The claims against Mr Young and Mr Broad succeeded.  The company's claim against Mr De Winter was that he induced the other two to break their contracts of employment; in other words, a straightforward *Lumley v Gye* claim.  The judge, Judge Norris QC, dismissed this claim.  Mainstream appealed, and the Court of Appeal, comprising Sedley and Arden LJJ and Aikens J, dismissed Mainstream's appeal: [2005] EWCA Civ 861.  Before the House is a further appeal by Mainstream.

199.    The relevant findings of the trial judge were these.  Mr De Winter knew Mr Young and Mr Broad had contracts of employment, although not their precise terms.  He knew sufficient to spot the conflict problem.  He raised this issue with the others.  In the light of what they told him Mr De Winter genuinely believed their participation in the Findern venture would not occasion a conflict between their duty and their interest.  Accordingly Mainstream failed to establish that Mr De Winter intended to procure a breach of the others' employment contracts.

200.    These are factual findings, which were not disturbed by the Court of Appeal.  On these findings the appeal must fail.  The burden of proving Mr De Winter intended to persuade Mr Young and Mr Broad to break their contracts lay on Mainstream.  Mainstream failed to discharge this onus.

201.    Mr Randall QC sought to avoid the difficulty posed by the judge's findings by drawing attention to Mr De Winter's written statements.  These showed that Mr Broad told Mr De Winter that Mainstream was not interested in buying the land at Findern.  Mr De Winter believed what he was told.  On this basis he believed the joint venture would not entail a breach by the others of their contracts with Mainstream.  This, submitted counsel, was not good enough.  The matters on which Mr De Winter relied did not, as a matter of law, leave Mr Broad and Mr Young free to compete with Mainstream over the development of the Findern land while still working as full-time executives of the company in that area.  Mr De Winter was relying on his own, erroneous, legal conclusion.  He was not entitled to escape liability by relying on his own mistaken assessment of the legal position.

202.    I cannot accept this.  An honest belief by the defendant that the outcome sought by him will not involve a breach of contract is inconsistent with him intending to induce a breach of contract.  He is not to be held responsible for the third party's breach of contract in such a case.  It matters not that his belief is mistaken in law.  Nor does it matter that his belief is muddle-headed and illogical, as was the position in *British Industrial Plastics*

*Ltd v Ferguson* [1940] 1 All ER 479.  As Lord Devlin said in *Rookes v Barnard* [1964] 1129, 1212, the defendant must know of the contract 'and of the fact that the act induced will be a breach of it'.  Counsel referred the House to several authorities where a contrary view seems to have been expressed; for instance, *Metropolitan Borough of Solihull v National Union of Teachers* [1985] IRLR 211, 213, paras 7-10, and *Welsh Development Agency v Export Finance Co Ltd* [1992] BCLC 148, 179.  If and in so far as observations in those cases depart from the principle outlined above they were wrong.

203.    I would dismiss Mainstream's appeal.

*OBG v Allan*

204.    OBG Ltd carried on a substantial business as a civil engineering contractor, specialising in laying and maintaining underground pipes.  An associated company provided plant and transport.  For present purposes they can be treated as a single entity.

205.    In 1992 OBG had the misfortune to fall out with its main customer North West Water Ltd.  OBG's cash flow dried up and it became unable to pay its debts.  In June 1992 one of its subcontractors Raymond Centriline Ltd appointed joint administrative receivers under a floating charge assigned to Centriline by OBG's bankers.  It later turned out that this appointment was invalid because at the date of the assignment OBG did not owe any money to the bank under the charge.  But at the time Centriline and the receivers, acting in good faith, believed the appointment was valid.

206.    The receivers went into possession of OBG's property and took control of its business on 9 June 1992.  They did what receivers do in these circumstances.  They dismissed employees, terminated contracts, disposed of assets and settled claims.  Work ceased on the sites on 12 June.  One week later OBG went into creditors' voluntary liquidation.

207.    North West Water treated the appointment of the receivers as an event of default, entitling it to determine its contracts with OBG.  Disputes arose.  In November 1992 the receivers agreed to accept £400,000 in settlement.  OBG's contracts with other customers were completed on the instructions of the receivers.

208.    Meanwhile the liquidators were questioning the validity of the receivers' appointment.  In October 1995 OBG, acting by its liquidators, started these proceedings claiming a declaration that the appointment was invalid and consequential relief including damages.  In August 1997 the

settlement negotiated by the receivers with North West Water was finally signed, with the concurrence of the liquidators.

209.    In January 2001 Judge Maddocks held that the receivers' appointment was invalid.  He directed an assessment of damages.  OBG advanced claims for damages for trespass over and conversion of its land and chattels and all its other assets; alternatively, unlawful interference with contractual relations in respect of its contracts.  OBG based its damages claims on the value of these assets on the date they were wrongfully taken over by the receivers, that is, 9 June 1992.

210.    The judge rejected OBG's claim for conversion of its contractual rights.  The tort of conversion is confined to tangible property.  The judge upheld the claim based on interference with contractual relations.  In reaching the latter conclusion the judge relied upon the passage from the speech of Lord Macnaghten in *Quinn v Leathem* [1901] AC 495, 510, which I set out above when considering the 'prevention of performance' aberration.

211.    As to quantum, there was no difficulty in assessing the value of the land or the value of the plant and equipment.  Before the judge the factual dispute centred on the value of OBG's contracts with North West Water ('the NWW contracts') and its contracts with other customers ('the non-NWW contracts').  Valuation of these contracts called for an assessment, as at 9 June 1992, of the amount these contracts could reasonably have been expected to yield to OBG had the receivers not been appointed.  The judge assessed this amount at £1,400,000 for the NWW contracts and £420,000 for the non-NWW contracts.

212.    This amount contrasted with the sums realised by the receivers for these items: £400,000 paid to the receivers pursuant to the settlement they negotiated with North West Water, and £353,000 in respect of the non-NWW contracts.    The judge gave reasons why the values he attributed to the contracts could not be equated with the amounts actually realised by the receivers.  He also held that, although the liquidators joined in the North West Water settlement document, there was no question of estoppel, acquiescence or ratification.  This was throughout a hostile receivership.  The receivers were not affected in their conduct of the receivership by anything done or not done by the liquidators.  The liquidators never accepted the validity of the receivers' appointment, nor were the liquidators in a position to re-negotiate the settlement reached by the receivers with North West Water.  None of these matters was in issue before your Lordships.

213.    The outcome was that Judge Maddocks ordered the receivers to pay £1,854,000 to OBG plus interest.  This amount comprised £244,000 in respect of the land, plant and equipment, and £1,910,000 in respect of OBG's

contracts and other debtors and cash at bank.  The judge deducted £300,000 in respect of estimated liquidation costs OBG would have incurred in any event.

214.   The Court of Appeal, comprising Peter Gibson, Mance and Carnwath LJJ, allowed an appeal by the receivers on the interference with contractual relations claim and dismissed a cross-appeal by OBG on the conversion claim: [2005] QB 762.  The Court of Appeal deleted from the judge's order all the amounts awarded by him save those for land, plant and equipment.  This reduced the amount of the damages from £1,854,000 to £244,000.

215.   The effect of the Court of Appeal's order was that OBG received nothing for the loss of its debts and other contractual rights.  Valued altogether at nearly £2 million, these disallowed items represented almost 90 per cent of OBG's assets.  But in respect of the receivers' misappropriation of these substantial items OBG received no recompense at all.

216.   That was the effect of the order of the Court of Appeal.  But I should note that the receivers have not sought to leave OBG in this position.  They accept they are liable to account for their net realisations.  This means, in financial terms, that the continuing dispute concerns the difference of £1,067,000 between the judge's assessment of the value of the NWW and non-NWW contracts and the amounts actually realised by the receivers for these assets.

217.   Peter Gibson LJ said he reached his conclusion on the legal issues with regret.  The wrongful taking of control of intangible assets by an invalidly appointed receiver leading to loss which but for the receivership would have been avoided ought to have consequences in law.  Carnwath LJ's 'initial instinct' was that the receivers should be strictly liable for all the consequences of their unlawful misappropriation of OBG's business, by analogy with the long-established principles applied to unlawful receiverships under the law of trespass and conversion.  But he agreed that course was not open to the Court of Appeal.  Mance LJ dissented on the interference with contractual relations claim.  On this ground he would have upheld the judge's order.

*The economic torts*

218.   I agree with the majority in the Court of Appeal that OBG's claim based on the economic torts fails.  I can state my reasons very shortly, because they will be apparent from the views I have already expressed on the ingredients of these torts.  The receivers did not intend to 'induce' OBG to breach of any of its contracts.  The receivers honestly believed they were entitled to act on behalf of OBG in exercise of their powers as administrative

receivers.  So the tort of inducing a breach of contract does not avail OBG.  Nor does the tort of interference with a business by unlawful means assist OBG.  The receivers did not have any intent to injure OBG.

219.    OBG's claim based on the tort of conversion, a tort of strict liability, is an altogether different matter.  To that I now turn.

*Conversion*

220.    In this case the receivers, acting in good faith but without any lawful right, took over OBG's business and assets.  They sold the company's land, its plant and its equipment.  They wound down its outstanding contracts and negotiated a deal with its biggest customer.  The receivers are liable for their unauthorised dealings with the company's land and chattels.  That is not in dispute.  But, it is said, they are not liable for their unauthorised dealings with the company's debts and other contractual rights.

221.    This prompts the question: why not?  The receivers took over the entirety of the company's business and assets.  Why should they be liable strictly in respect of their unauthorised dealings with some parts of the company's property but not others?  This distinction makes no sense.  It lacks any rhyme or reason.

222.    The distinction, it is said, follows from the limited scope of the tort of conversion.  The tort of conversion provides a remedy in damages for the misappropriation of chattels, but not for the misappropriation of intangibles.  Conversion applies to choses in possession, not choses in action, to use the historic labels.

223.    There can be no better place to start consideration of this subject than to remember Sir John Salmond's famous words:

> 'Forms of action are dead, but their ghosts still haunt the precincts of the law.  In their life they were powers of evil, and even in death they have not wholly ceased from troubling.  In earlier days they filled the law with formalism and fiction, confusion and complexity, and though most of the mischief which they did has been buried with them, some portion of it remains inherent in the law of the present day.  Thus if we open a book on the law of torts, howsoever modern and rationalized, we can still hear the echoes of the old controversies … and we are still called upon to observe distinctions and subtleties that have no substance or justification in them, but are nothing more

than an evil inheritance from the days when forms of action and of pleading held the legal system in their clutches.

In no branch of the law is this more obvious than in that which relates to the different classes of wrongs which may be committed with respect to chattels.  In particular the law of trover and conversion is a region still darkened with the mists of legal formalism, through which no man will find his way by the light of nature …'

Salmond was writing in the Law Quarterly Review at the beginning of the last century: 'Observations on Trover and Conversion', (1905) 81 LQR 43.  But his observations still have a ring of truth in this area of the law.

224.   The cause of action, formerly known as trover but now known as conversion, was founded on a fiction.   The standardised plea was that the plaintiff possessed certain goods, that he casually lost them, that the defendant found them, and that the defendant did not return them but instead 'converted them to his own use'.  The defendant was not permitted to deny the losing and finding, and so the only issues were the plaintiff's right to possession and the conversion itself.  In due course this became the standard remedy for the unauthorised assumption of the powers of the true owner.  Any chattel could be lost and found, and so it could be converted.  But land could not be lost and found, nor could intangible property.  And so originally the rule was that intangibles could not be converted.

225.   With the expansion of commerce and the increase in dealings with intangible property this rule, described by Professor Prosser as a 'hoary limitation', had to be relaxed.   The law provided, in respect of the misappropriation of intangibles, no remedy equivalent to that provided by conversion for the misappropriation of tangibles.  So the courts resorted to another legal fiction.   They held that in appropriate cases a document embodying or recording a debt or obligation should be treated as having the same value as the debt or obligation.

226.   As would be expected, the reach of this useful tool gradually expanded.   Now it is not confined to documents of title and negotiable instruments.  It includes insurance policies, guarantees, share certificates and much else.  In Clerk & Lindsell the principle is said to extend to 'any document which is specially prepared in the ordinary course of business as evidence of a debt or obligation': Clerk & Lindsell on Torts, 19th edition, (2006), para 17-35.

227.   In the past some unconvincing efforts were made to justify this extension as a particular application of the ordinary principles of damages.  Now it is openly recognised that this extension involves a legal fiction: see, for

instance, Pill LJ and Potter LJ in *Smith v Lloyds TSB Group plc* [2001] QB 541, 551, 557, and Mance LJ in the present case [2005] QB 762, 784, para 76.

228.   Legal fictions, of their nature, conceal what is going on.  They are a pretence.   They represent an unacknowledged departure from existing principle.  By resorting to the fiction of equating the value of a document as a chattel or piece of paper with the value of the rights embodied or recorded on it the courts concealed the reality.   The reality is that English law does sometimes provide a remedy for the misappropriation, or conversion, of intangible rights.  To that extent the tort of conversion has already jumped the gap between tangibles and intangibles.  It did so a long time ago.

229.   This prompts a further question: why should this extension of the tort of conversion be confined to cases where the intangible rights are specially recorded in a document?  I would like to think that, as a mature legal system, English law has outgrown the need for legal fictions.  There was a time when John Doe and Richard Roe were popular characters.  They had to be parties to some forms of action.  When they were in their prime their names appeared again and again in the law reports.  English law has moved on.  John Doe and Richard Roe are no more.  So here, if there is to be a limit to the types of intangibles which attract a remedy in conversion, this limit should be capable of being articulated and justified openly, not by reference to fiction piled upon fiction.

230.   Rationally the dividing line cannot be the existence or not of a piece of paper.  The existence of a document is essentially irrelevant.  Intangible rights can be misappropriated even if they are not recorded in a document.   In principle an intangible right not recorded in writing may merit protection just as much as a right which is recorded in this way.

231.   In practice misappropriation is more likely to occur with a right embodied in a document such as a cheque which passes through several hands in the ordinary course of business.  But that is no reason for withholding protection in other cases.  This is especially so today when information is increasingly stored and communicated, and transactions are effected, by electronic means.

232.   The better approach today is to discard the fictional significance of a piece of paper.  Instead one should seek to identify the common characteristic of the intangible rights in respect of whose misappropriation English law, as a matter of reality, already provides the remedy of conversion.  The common characteristic, it seems to me, is that the rights protected in this way are contractual rights.  No principled reason is apparent for attempting, for this purpose, to distinguish between different kinds of contractual rights.

233.    The time has surely come to recognise this and, additionally, to recognise that the tort of conversion applies to contractual rights irrespective of whether they are embodied or recorded in writing.  I would so hold.  This would be a modest but principled extension of the scope of the tort of conversion.  It would rid the law of an artificial limitation derived from the limited scope of an enabling legal fiction.

234.    This step would not run counter to any legislation. Parliament has not enacted any general relieving provision from strict liability for conversion. Parliament has enacted specific relieving provision in respect of particular types of dealings with goods, for instance, the Factors Acts, and particular types of dealings with intangibles, for instance, the Cheques Act. Abolishing the need for a piece of paper would not cut across any legislative scheme.

235.    The receivers placed reliance on the Torts (Interference with Goods) Act 1977. This Act excludes 'things in action' from the scope of 'conversion of goods' as defined in that Act.  This definition accords with the existing law by seemingly embracing the fiction that pieces of paper are deemed to be worth the value of the rights embodied or recorded in them.  But Parliament cannot be taken to have intended to preclude the courts from developing the common law tort of conversion if this becomes necessary to achieve justice.

236.    The receivers also drew attention to section 234(3) of the Insolvency Act 1986.  This provision protects administrative receivers and liquidators, in the absence of negligence, from liability if they seize or dispose of property which is not the property of the company.  'Property' includes things in action: section 436.  In *Welsh Development Agency v Export Finance Co Ltd* [1992] BCLC 148 the Court of Appeal held that 'property' in section 234(3) does not include intangibles because they cannot be 'seized'.  So, the argument runs, this is a legislative recognition that protection was not needed in respect of intangibles.  I do not agree.  The difficulty I have with this submission lies in the Court of Appeal's restrictive interpretation of 'property'.  Contrary to the decision of the Court of Appeal, I see no reason to suppose Parliament intended to exclude the wrongful disposal of contractual rights from the scope of this relieving provision.

237.    Whether the law on conversion should extend beyond contractual rights and embrace other forms of intangibles is not a matter to be pursued on this occasion.  This further step has been taken elsewhere in some parts of the common law world.  But other forms of intangible rights, such as intellectual property, raise problems of their own.  These problems are best considered when they arise.

238.    Accordingly I would hold that in the present case the receivers committed the tort of conversion by their wrongful misappropriation of OBG's

debts and OBG's contractual rights against North West Water and other contractors.

239.   Mr Mitchell QC submitted that the tort of conversion should not be extended.  OBG has a good remedy, which it has chosen not to pursue, against the other parties to OBG's contracts.  By accepting that the receivers gave a good discharge to OBG's debtors and contractors despite the invalidity of the receivers' appointment, OBG accepted that the receivers acted as OBG's agents.  OBG's remedy against the receivers lay, not in conversion, but in suing the receivers for breach of their fiduciary duties.

240.   I cannot accept this.  OBG acting by its liquidators could hardly be expected to pursue the company's debtors and contractors for non-payment, on the ground that the receivers were not able to give them a good receipt.  That would be utterly unreasonable.  OBG's failure to take this course cannot be treated as a waiver of the receivers' torts.  OBG cannot thereby be taken to have accepted that the receivers were acting as agents of the company.  In the case of North West Water OBG joined in the settlement document.  But, here again, as already noted, the judge rejected the suggested defences of estoppel, acquiescence and waiver.

241.   I would allow this appeal and restore the order of Judge Maddocks.

*Douglas v Hello! Ltd*

242.   In the third appeal the dispute is between two magazines, OK and Hello (for ease of reading I will omit the exclamation marks).  OK and Hello are keen rivals in the celebrity magazine market.  On 18 November 2000 Mr Michael Douglas and Miss Catherine Zeta-Jones, well known film stars, were married at the Plaza Hotel, New York.  The Douglases exercised tight control over their wedding photographs.  They took steps to ensure no one was present except for 350 invited guests, authorised photographers, authorised hotel staff, security personnel and the like.  They also made arrangements to see that, apart from the authorised photographers, nobody took any photographs.  Despite the enormous media interest, this was, as the judge put it, a private wedding.

243.   In order to satisfy the media demand for photographs and reduce the risk of unauthorised and intrusive photographs the Douglases entered into an agreement with OK on 10 November 2000.  In outline the agreement provided that the Douglases transferred to OK the world wide exclusive right to publish, and authorise others to publish, wedding photographs approved by the Douglases.  In return OK paid the Douglases £1million.  The Douglases were to hire photographers, and do their best to ensure no other photographers or

media had access to the wedding and that no guests or anyone else took photographs. Any rights not specifically granted to OK were reserved to the Douglases.

244. So this was a private wedding, subject to this: many photographs, approved by the Douglases, were to be made publicly available at once.

245. The best laid plans can go astray. A photographer called Robert Thorpe somehow, by deceit or subterfuge, infiltrated the wedding and the reception. Surreptitiously he took some indifferent photographs. Early the next day these photographs were offered on the market and sent electronically to Hello's picture editor Ms Neal in London. They were then sent on from London to Madrid for Senor Sanchez Junco, Hello's editor- in-chief, to decide whether to buy them. The upshot was that Hello agreed to pay £125,000 for the exclusive right to publish six photographs in the United Kingdom, France and Spain.

246. Hello then prepared the photographs and accompanying text for publication in issue 639. On Monday 20 November the Douglases obtained an ex parte injunction restraining publication. This was discharged by the Court of Appeal on Thursday 23 November. Edition 639 of Hello containing the six unauthorised photographs went on sale on the following day, Friday 24 November, on the same day as issue 241 of OK which included OK's coverage of the wedding. OK had hurriedly brought forward this publication. Hello's sales figures for issue 639, about 523,000, were some 150,000 above average.

*The proceedings*

247. In the proceedings the Douglases and Northern and Shell plc, the publisher of OK, claimed damages for breach of confidence. OK also claimed damages for interference with its business by unlawful means.

248. In a comprehensive judgment Lindsay J held that Hello did not, by its publication of the unauthorised pictures, commit the tort of inducing a breach of contract. The Douglases did not break their contract. They fulfilled their contractual obligation to do the best they could to exclude the media and the public from the wedding. Nor did Hello commit the tort of interfering with OK's business by unlawful means. Hello did not intend to injure OK. But Hello was liable to the Douglases and OK for breach of confidence: [2003] All ER 996. In a supplemental judgment the judge awarded damages of £1,047,756, divisible as to £14,600 to the Douglases and the balance to OK: [2004] EMLR 2.

66

249.   The Court of Appeal, comprising Lord Phillips of Worth Matravers MR, and Clarke and Neuberger LJJ, upheld the judge's decision on the Douglases' breach of confidence claim and on OK's claims based on economic torts.  The court reversed the judge's decision on OK's breach of confidence claim: [2006] QB 125.  The overall outcome was that the Douglases' breach of confidence claim succeeded but OK's claims wholly failed.

250.   OK appealed to your Lordships' House.  Hello did not appeal against the decision in favour of the Douglases.

*Misuse of private information*

251.   Photographs are much the best way of conveying an impression of how everybody looked at a wedding.  Photographs make one a spectator at the wedding.  Information communicated in other ways, in sketches or descriptive writing or by word of mouth, cannot be so complete or accurate.  The Douglases and OK claim that, save to the extent OK published authorised photographs, photographic information about their wedding was private.  Publication of this information without the Douglases' approval was misuse of this information.

252.   Mr and Mrs Douglas sought to keep this information private primarily to protect their 'image'.  Film directors take into account the public perception of actors and actresses when casting for films.  Miss Zeta-Jones said the 'hard reality of the film industry is that preserving my image, particularly as a woman, is vital to my career'.  Mr Douglas said his name and likeness are valuable assets to him.  It is important for him, for professional reasons, to protect his name and likeness and prevent unauthorised use of either.

253.   Given the understandable importance to Mr and Mrs Douglas of their public image, it is necessary first to mention and put on one side certain points in this regard.  The identity of this couple made their wedding an eminently newsworthy event.  By publishing pictures of the wedding Hello was exploiting that fact. In principle that was unexceptionable.  Publication of wedding photographs in Hello was not, *of itself,* improper exploitation of the reputation, name or likeness of the Douglases such as may be protected in some circumstances in the United States of America: see Corpus Juris Secundum, vol 77, (2006), pp 591-592, para 51.  Nor did Hello's publication of pictures of this event constitute 'character merchandising' or, still less, a case of 'false endorsement' as discussed by Laddie J in *Irvine v Talksport Ltd* [2001] 1 WLR 2355.  Thus it is unnecessary to consider how far English law has developed, or should develop, in these fields.

254.   Nor is it necessary to consider further the legal foundation for the Douglases' claim.  This is not an issue on this appeal.  Your Lordships are concerned only with OK's claim.  OK's claim is based solely on breach of confidence.

*Confidential information*

255.   As the law has developed breach of confidence, or misuse of confidential information, now covers two distinct causes of action, protecting two different interests: privacy, and secret ('confidential') information.  It is important to keep these two distinct.  In some instances information may qualify for protection both on grounds of privacy and confidentiality.  In other instances information may be in the public domain, and not qualify for protection as confidential, and yet qualify for protection on the grounds of privacy.  Privacy can be invaded by further publication of information or photographs already disclosed to the public.  Conversely, and obviously, a trade secret may be protected as confidential information even though no question of personal privacy is involved.  This distinction was recognised by the Law Commission in its report on Breach of Confidence (1981) Cmnd 388, pages 5-6.

256.   OK's claim is that Hello committed a breach of confidence by publishing a confidential secret.  OK's interest was wholly commercial, in maximising the financial advantage flowing from having an exclusive right to publish the authorised pictures.  Accordingly, as my noble and learned friend Lord Walker of Gestingthorpe says, OK's claim has to be based on a right to short-term confidentiality for a commercial secret.

257.   So the first step is to identify the 'secret'.  The secret information cannot lie in the differences between the unapproved photographs and the approved photographs.  The secret cannot lie there, because the six unapproved photographs contained nothing not included in the approved photographs.  That is common ground.  This being so, the inevitable differences, in expression and posture and so on, cannot constitute 'confidential' information for the purposes of this equitable principle.  The expression of the bride in one wedding photograph compared with her expression in another is insufficiently significant to call for legal protection.  It has not been suggested that the unapproved photographs were embarrassing in any way, or that they were detrimental to the Douglases' image.  Accordingly, once the approved pictures were published, albeit simultaneously, publication of the unapproved pictures was not a breach of confidence.

258.   OK sought to avoid this difficulty by defining the commercial secret in wider terms.  The secret comprised photographic information about the entire wedding as an event, and not just the particular wedding photographs OK was

permitted to publish.  Publication of the approved photographs did not destroy the confidentiality of the remainder of the information.

259.    Let me assume, without deciding, that this generic class of information was confidential at the outset.  Even so, this formulation of the commercial secret leads nowhere, for the same reason as applies to the narrower formulation of the secret: the unapproved pictures contained nothing not included in the approved pictures, and the approved photographs were published at much the same time as the unapproved photographs.

260.    For these reasons I am unable to accept OK's claim based on confidentiality.

*Unlawful interference with business*

261.    I turn finally to OK's claim based on the tort of intentionally causing loss by unlawful means.  This is a 'two party' situation. There is no question of Hello injuring OK through an intermediary. Thus the first question is whether the harm caused to OK by Hello's publication of the unapproved photographs was effected by unlawful means. In my view this claim fails at this point. I have rejected OK's claim based on breach of confidence. The only other conduct which may constitute unlawful means is Rupert Thorpe's trespass at the wedding. But he was not Hello's agent.  The background was that Hello's bid of £1 million for the exclusive right to the wedding photographs was rejected by the Douglases.  Thereafter, before the wedding, Hello indicated to paparazzi that it would pay well for photographs.  Hello knew the reputation of the paparazzi for being able to intrude.  By its actions Hello was encouraging the paparazzi to do just that.  The six photographs themselves plainly indicated they were taken covertly.  'Yet', the judge said, 'these defendants firmly kept their eyes shut lest they might see what they undeniably knew would have become apparent to them'. Even so, I do not see how Hello can be held liable for the photographer's trespass.

262.    This being so, OK's case does not get off the ground. Hello did not use unlawful means. I would dismiss this appeal.

**LORD WALKER OF GESTINGTHORPE**

My Lords,

*The economic torts*

263.   I have had the privilege of reading in draft the opinions of my noble and learned friends Lord Nicholls of Birkenhead and Lord Hoffmann, both of which cast welcome light on the obscurities of the so-called economic torts. In relation to these torts there is (as I see it) a large measure of agreement between my noble and learned friends, though with some differences in emphasis, and some more substantial differences.

264.   Both my noble and learned friends agree that the "unified theory" of the economic torts, attractive though it is, must be rejected.  The tort of intentionally inducing a breach of contract is essentially different from inflicting harm by unlawful means, although in some factual situations they may overlap.  The majority decision of the Court of Appeal in *Millar v Bassey* [1994] EMLR 44 was mistaken.  The decision of this House in *Merkur Island Shipping Corporation v Laughton* [1983] AC 570 should not be followed, so far as it holds that inducing an actual breach of contract is not a necessary ingredient of the *Lumley v Gye* tort (*Lumley v Gye* (1853) 2 E&B 216).  On these points Lord Nicholls and Lord Hoffmann are at one, and I respectfully concur in their reasoning and conclusions.

265.   I must however set out briefly my views on those points on the economic torts on which my noble and learned friends seem to differ; and on the tort of conversion, on which they certainly differ.  I must also set out the reasons why, in respectful disagreement with the majority, I would for my part dismiss the appeal in *Douglas v Hello! Ltd*.

266.   On the economic torts, the most important difference is in the identification of the control mechanism needed in order to stop the notion of unlawful means getting out of hand—for example, a pizza delivery business which obtains more business, to the detriment of its competitors, because its drivers regularly exceed the speed limit and jump red lights.  Lord Hoffmann sees the rationale of the unlawful means tort as encapsulated in Lord Lindley's reference (in *Quinn v Leatham* [1901] AC 495, 535) to interference with "a person's liberty or right to deal with others."  In his view acts against a third party count as unlawful means only if they are (or would be if they caused loss) actionable at the suit of the third party.

267.   Lord Hoffmann does not question the correctness of the decisions of the Court of Appeal in *RCA Corporation v Pollard* [1983] Ch 135 or of Jacob J in *Isaac Roen v Red Box Toy Factory Ltd* [1999] FSR 785, which show that a bootlegger's activities, although actionable by the owner of the intellectual property rights in question, are not actionable (by statute or at common law) by a contractual licensee entitled to exploit those rights, even if the licensee's profits are demonstrably reduced by the unlawful activities.  As Oliver LJ said in *RCA Corporation v Pollard* [1983] Ch 135, 153,

> "the defendant's conduct involves no interference with the contractual relationships of the plaintiffs but merely potentially reduces the profits which they make as the result of the performance by Mr Presley's executors of their contractual obligations."

268.   Lord Nicholls also accepts the correctness of *Isaac Oren v Red Box Toy Factory Ltd* (and also, I infer, the correctness of *RCA Corporation v Pollard*).  He proposes a wider test of unlawful means relying on the notion of instrumentality as the appropriate control mechanism.

269.   Faced with these alternative views I am naturally hesitant.  I would respectfully suggest that neither is likely to be the last word on this difficult and important area of the law.  The test of instrumentality does not fit happily with cases like *RCA Corporation v Pollard,* since there is no doubt that the bootlegger's acts were the direct cause of the plaintiff's economic loss.  The control mechanism must be found, it seems to me, in the nature of the disruption caused, as between the third party and the claimant, by the defendant's wrong (and not in the closeness of the causal connection between the defendant's wrong and the claimant's loss).

270.   I do not, for my part, see Lord Hoffmann's proposed test as a narrow or rigid one.  On the contrary, that test (set out in para 51 of his opinion) of whether the defendant's wrong interferes with the freedom of a third party to deal with the claimant, if taken out of context, might be regarded as so flexible as to be of limited utility.  But in practice it does not lack context.  The authorities demonstrate its application in relation to a wide variety of economic relationships.  I would favour a fairly cautious incremental approach to its extension to any category not found in the existing authorities.

*Conversion*

271.   Lord Nicholls makes a powerful case for extending the tort of conversion so as to cover the appropriation of choses in action.  But in my opinion his proposals would involve too drastic a reshaping of this area of the

law of tort.  The reshaping would be inconsistent with the basis on which Parliament enacted the Torts (Interference with Goods) Act 1977, after long consideration by the Law Revision Committee.  It would have far-reaching consequences which this House is not in a position to explore or assess fully. This is an area in which reform must come from Parliament, after further consideration by the Law Commission.  In any case the confused facts of the *OBG* appeal (in which the liquidators eventually concurred in the settlement with NWW) makes it a singularly unsuitable case for a major change in the law.

*Privacy and confidence: Introduction*

272.    I now turn to breach of confidence. This House has quite recently reaffirmed that English law knows no common law tort of invasion of privacy: *Wainwright v Home Office* [2004] 2 AC 406.  But the law of confidentiality has been, and is being developed in such a way as to protect private information.  The process of development is referred to in the speech of my noble and learned friend Lord Hoffmann in *Wainwright v Home Office* [2004] 2 AC 406, paras 28 to 30 and in all the speeches in *Campbell v MGN Ltd* [2004]  2 AC 457 (Lord Nicholls of Birkenhead at paras 11-22, Lord Hoffmann at paras 43-52, Lord Hope of Craighead at paras 85-86 and 105-113, Baroness Hale of Richmond at paras 132-141 and Lord Carswell at paras 166-167).  The most important single step in the course of the law's recent development has been the speech of Lord Goff of Chieveley in *Attorney-General v Guardian Newspapers Ltd (No 2)* [1990] 1 AC 109, 280 (his speech was not in terms concurred in by the other members of the Appellate Committee but Lord Goff's exposition of the law has commanded general acceptance).  In an important passage at pp281-282 Lord Goff stated a broad general principle of confidence subject to three limiting principles:  (1) "the principle of confidentiality only applies to information to the extent that it is confidential;" (2) "it applies neither to useless information, nor to trivia;" and (3) the public interest protecting confidence "may be outweighed by some other countervailing public interest which favours disclosure." (It was on the application of this third principle to a borderline factual situation that this House was divided in *Campbell v MGN Ltd*).

273.    The first issue in this appeal raises questions as to whether and how far the law of confidence should be developed further.  The most important of these questions, to my mind, are (i) whether claimants can simultaneously assert rights of confidence for the protection of both personal privacy and short-term commercial secrecy (until profitable publication in the mass media of an "exclusive" which waives personal privacy on a selective basis); and (ii) what special rules apply to the publication of photographs of individual claimants.

274.   It is unnecessary, by way of introduction, to go again over the ground covered in *Wainwright v Home Office* and *Campbell v MGN Ltd.*  But it is perhaps worth noting that there is not a complete jurisprudential void between *Prince Albert v Strange* (1849) 2 De G & Sm 652 and the cases which can be seen as the beginning of the modern line of authority (*Duchess of Argyle v Duke of Argyle* [1967] Ch 302, *Coco v Clark (Engineers) Ltd* [1969] RPC 41 and *Fraser v Evans* [1969]  1 QB 349).  The cases cited in the three last-mentioned decisions show a continuous, if hardly abundant, stream of authority.  *Philip v Pennell* [1907] 2 Ch 577 is of some interest as it shows the court addressing the distinction between intellectual property rights in the form of a communication and confidentiality in its substance.   It was concerned with letters written by James M'Neill Whistler (who had died in 1903).  The letters were lawfully in the hands of two authors who had been commissioned to write a biography of Whistler, but his executrix applied for an injunction to restrain both publication of the letters and dissemination of information contained in them.  The judgment of Kekewich J harked back to the great controversy as to whether at common law there was any copyright in published works (see *Millar v Taylor* (1769)  4 Burr 2303, which, with its background and sequels, is well described in Laddie, Prescott and Vitoria, The Modern Law of Copyright and Designs, 3rd ed (2000) paras 3.2-3.7). Kekewich J rightly distinguished between property in the letters as tangible property; copyright in the linguistic contents of the letters as literary compositions; and the more debatable right to restrain misuse of confidential information contained in the letters.  On the last point he remarked (at p587):

> "It cannot be said that the confidence runs with the letters."

275.   That observation still holds good in that information, even if it is confidential, cannot properly be regarded as a form of property.  Its practical significance has been overtaken by *Attorney-General v Guardian Newspapers Ltd (No 2).*  Kekewich J's judgment is also of interest as an early recognition, or at least a hint, that a celebrity's private life may be a saleable commodity (at p589):

> "It is a recognised duty of every man, and more especially of a successful man in any profession, to make his life and experience useful to others, and it would be inconsistent with this to hold that a writer of letters must be presumed to have intended that those letters should not be used at some time or other, on a proper occasion and in a proper manner, towards that end."

This may be compared with Sedley LJ's view (expressed in the present case when the Court of Appeal gave its reasons for discharging the injunction, [2001] QB 967, para 140) that Mr Douglas and his bride

> "had sold most of the privacy which they now seek to protect to [OK!] for a handsome sum."

I start with some sympathy for what I take to be Sedley LJ's instinctive feeling that it is not obvious why a claimant should be able to invoke the law's protection for the confidentiality of his or her private life (this claim being based on the high principle of respect for human autonomy and dignity) and also to invoke its protection for the commercial confidentiality of the same or similar material, as a trade secret, until it is to be disclosed for profit at a time of his or her own choosing.

276.    In order to investigate that problem it is necessary to enquire more closely into what is happening, in legal terms, when a court makes an order for the protection of confidential information.  If the person disclosing the information is in contractual relations with the claimant, the most natural claim will be for breach of an express or implied term in the contract.  That was the basis for the decision in *Pollard v Photographic Co* (1888)  40 Ch D 345 (the case of the commercial photographer who was commissioned to take photographs of the Pollard family, and started selling prints of Mrs Pollard as a Christmas card).  Where there is no contractual tie the cause of action is the equitable jurisdiction to restrain (or if it cannot be restrained, to award compensation or an account of profits for) breach of confidence.  This jurisdiction does not depend on treating confidential information as property, although it is often referred to, loosely or metaphorically, in those terms.  Professor Finn (as he then was) has written (Fiduciary Obligations (1977) para 293):

> "Perhaps the most sterile of the debates which have arisen around the subject of information received in confidence is whether or not such information should be classified as property."

There is also a valuable discussion of the whole topic in Toulson & Phipps, Confidentiality (1996) paras 2-12 to 2-18.

277.    Before your Lordships, Mr Millett QC (for the appellant OK!) strongly disclaimed any reliance on confidential information as property, referring to the speech of Lord Upjohn in *Phipps v Boardman* [1967]  2 AC 46, 127-128, as well as to Toulson & Phipps.  He did so advisedly, since although clause 2 of the contract between the Douglases and OK! was expressed as a transfer of exclusive rights to publish (and licence republication of) approved photographs, that way of putting his case (if otherwise sound) would not catch the publication of different, pirated photographs.  Mr Millett relied instead on pictorial information about the wedding as an abstract, generic concept in which the Douglases enjoyed rights of confidentiality, and in which OK!

became entitled, by contract rather than by assignment, to concurrent rights of confidentiality.  This approach was noted (but not accepted) by the Court of Appeal in this case, [2006] QB 125, para 138:

> "If we are wrong in our conclusions that OK! had no right of commercial confidence in the information portrayed by Hello!'s photographs, this can only be on the basis that the photographs published by Hello! fell within the generic class of commercially confidential information to which OK! were party and which OK! were entitled to protect."

278.    The authorised photographs taken at the wedding (and later selected and approved by Mr and Mrs Douglas) gave a lot of information, so far as still photographs could, about the event: what the bride wore, how she and the groom conducted themselves towards each other, what the wedding cake looked like, and so on.  The unauthorised photographs disclosed the same sort of information (aptly summed up by Sedley LJ, [2001] QB 967 at para 328, as "the simple information: 'this is what the wedding and the happy couple looked like'").  They disclosed it in a different and by most standards obviously inferior manner (though the informality of the unposed and sometimes unfocused images has a certain appeal).  Mr and Mrs Douglas would have been most unlikely to have selected any of the unauthorised pictures for publication, but it has not been suggested that they disclosed anything embarrassing (such as a fleeting moment of disharmony between the happy couple).  The information which they impart is, on the way Mr Millett put his case, essentially the same, and entitled to protection as confidential information.

*The judgments below*

279.    There are four sets of reported judgments in the case: the reasons of the Court of Appeal (Brooke, Sedley and Keene LJJ), given on 21 December 2000 [2001] QB 967, for lifting the injunction by its order of 23 November 2000; the judgment of Lindsay J on liability given on 11 April 2003 and reported as *Douglas v Hello! Ltd (No. 5)* [2003] 3 All ER 996;  the judgment of Lindsay J on quantum, given on 31 July 2003 and reported as *Douglas v Hello! Ltd (No. 6)* [2004] EMLR 2; and the judgment of the Court of Appeal (Lord Phillips of Worth Matravers, Clarke and Neuberger LJJ) now under appeal, given on 18 May 2005 and reported as *Douglas v Hello! Ltd (No. 3)* [2006] QB 125.  I need not comment on Lindsay J's judgment on quantum, but the other judgments call for mention.

280.    The first decision of the Court of Appeal was interlocutory in nature and (as Brooke LJ noted in para 62 of his judgment) it was reached after oral submissions prepared and made under severe time constraints.  It is therefore

not surprising that this Court of Appeal decision concentrated on the alleged invasion of the privacy of the individual claimants as the claim for which an award of damages was least likely to be an adequate remedy.  Nevertheless all three members of the Court noted that the wedding was not an ordinary private occasion.  Brooke LJ stated (para 95):

> "So far as privacy is concerned, the case of the first and second claimants is not a particularly strong one.  They did not choose to have a private wedding, attended by a few members of their families and a few friends, in the normal sense of the words 'private wedding'.  There is nothing in the Court's papers to belie the suggestion at p88 of the disputed issue 639 of 'Hello!' that they invited 250 guests, and the trappings of privacy in this context are identical with the trappings of confidentiality to which I have alluded earlier in this judgment."

I have already set out what Sedley LJ said at para 140 (he developed the point in paras 141 and 142).  Keene LJ observed (para 169):

> "In the present case, it is of considerable relevance that very widespread publicity was to be given in any event to the wedding very soon afterwards by way of photographs in 'OK!' magazine.  The occasion thereby lost much of its private nature.  The claimants were by their security measures and by their agreements with the service companies seeking not so much to protect the privacy of the first two claimants but rather to control the form of publicity which ensued."

281.  Lindsay J ([2003] 3 All ER 996) made a thorough survey of the developing law of confidentiality.  He noted (para 186) the effect of the Human Rights Act 1998 and referred to Council of Europe Resolution 1165, quoted by the Court of Appeal in *A v B Plc* [2003] QB 195, para 11(xii)) that,

> ". . . people's private lives have become a highly lucrative commodity for certain sectors of the media.  The victims are essentially public figures, since details of their private lives serve as a stimulus to sales."

Lindsay J went on to hold (paras 196 and 197):

> ". . . that the claimants had here a valuable trade asset, a commodity the value of which depended, in part at least, upon

76

its content at first being kept secret and then of its being made public in ways controlled by Miss Zeta-Jones and Mr Douglas for the benefit of them and of the third claimant.  I quite see that such an approach may lead to a distinction between the circumstances in which equity affords protection to those who seek to manage their publicity as part of their trade or profession and whose private life is a valuable commodity and those whose is not but I am untroubled by that; the law which protects individual confidences and a law of privacy may protect the latter class and provide no reason to diminish protection for the former.  So far as concerns OK!, the right to exclusivity of photographic coverage of the wedding was, in contrast with the nature of the confidence as to the first and second claimants, even more plainly a right in the nature of a trade secret.

I thus regard photographic representation of the wedding reception as having had the quality of confidence about it.  Of course, the general appearance of both Mr Douglas and Miss Zeta-Jones was no secret; what they looked like was well known to the public.  But that does not deny the quality of commercial confidentiality to what they looked like on the exceptional occasion of their wedding.”

The judge did not to my mind fully explain why he was not troubled by the thought that the persons whom the Council of Europe termed “the victims” were themselves cashing in their “valuable trade asset” in a manner and at a time of their own choosing.

282.    The Court of Appeal dealt with this part of the case in a judgment of the Court [2006] QB 125, paras 122-137.  It observed (para 128) that Lindsay J treated information about the wedding “rather as if it were property” when he referred to its being shared between co-owners.  Whether or not there is force in that observation (it is in practice quite difficult to address the subject of confidential information without slipping into metaphorical language literally appropriate only to property rights) it is clear that that is not how OK!’s case is now put.  In fact much of Mr Millett’s criticism of the Court of Appeal was for having fallen into precisely the same error—treating confidential information as an item of property—as that for which the Court of Appeal had criticised the judge.

283.    The heart of the Court of Appeal’s reasoning on this part of the case is in para 136:

“On analysis, OK!’s complaint is not that Hello! published images which they had been given the exclusive right to publish, but that Hello! published other images, which no one

> with knowledge of their confidentiality had any right to publish. The claimants themselves argued that 'the unauthorised photographs were taken at different moments to the authorised ones, showed different and informal incidents at the reception, and were naturally much less posed.' These photographs invaded the area of privacy which the Douglases had chosen to retain. It was the Douglases, not OK!, who had the right to protect this area of privacy or confidentiality. Clause 10 of the OK! contract expressly provided that any rights not expressly granted to OK! were retained by the Douglases."

Whereas the judge saw the arrangement as a sharing of confidentiality in photographic information about the wedding, the Court of Appeal analysed it as the retention (by Mr and Mrs Douglas alone) of part of that information (that is, all except the information in the authorised photographs published by OK!).

*The scope of breach of confidence*

284.   Expressed in these terms, both competing submissions seem to me to be on the way to becoming so abstract as to risk losing touch with reality. Reality was, if I may respectfully say so, restored when on the third day of the hearing my noble and learned friend Lord Nicholls of Birkenhead observed,

> "It is not the same, is it, because obviously a picture of the bride looking nice is different from a picture of the bride caught at an unfortunate moment."

The Douglases were content to have wedding photos published, for a handsome fee, so long as they had strict control over the selection of the pictures. This was reflected in the evidence of Miss Zeta-Jones herself, quoted by Lindsay J [2003] 3 All ER 996, para 195:

> "Both Michael and I are in the business of 'name and likeness.' Any photographs of us that are published are important to us, not just personally but professionally as well. People go to see movies specifically because either Michael or I are in them and they have expectations, among other things, of the way we will look. Those expectations are created to a significant degree by the images they see of us in the media. Directors take into account the public's perception of actors and actresses when casting for films. The hard reality of the film industry is that

preserving my image, particularly as a woman, is vital to my career."

285.   In short, the confidentiality which the Douglases claimed, and which OK! also claims, is of a specialised commercial character, far removed from the sort of intrusion on the privacy of a seriously ill patient which the Court of Appeal considered (but felt unable to remedy) in *Kaye v Robertson* [1991] FSR 62.  Their claims come close to claims to a "character right" protecting a celebrity's name and image such as has consistently been rejected in English law: see the *Elvis Presley trademarks* case [1999] RPC 567, 580-582, 597-598, and also Brooke LJ in the interlocutory appeal in this case, [2001] QB 967, paras 74 and 75.   The present limits of the law of passing off as a protection of a celebrity complaining of "false endorsement" were thoroughly reviewed by Laddie J in *Irvine v Talksport* [2002]  1 WLR 2355.

286.   Both Lindsay J and the Court of Appeal referred to the decision of the High Court of Australia in *Australian Broadcasting Corporation v Lenah Game Meats Pty Ltd* (2001)  208 CLR 199, a case concerned with the public interest defence to unauthorised and clandestine filming in an abbatoir.  Your Lordships were not referred to the earlier case in the High Court, discussed in the *Australian Broadcasting Corporation* case, of *Victoria Park Racing and Recreation Grounds Co Ltd v Taylor* (1937)  58 CLR 479.  In that case the defendant built a platform on his land, which bordered the plaintiff's racecourse, and allowed race commentaries to be broadcast from it.  The plaintiff failed in a claim for an injunction.  The claim was put primarily in the law of nuisance, but confidence and copyright (in the board displaying the numbers of starters and winners) was also relied on.  Latham CJ said (at pp 496-7):

> "I find difficulty in attaching any precise meaning to the phrase 'property in a spectacle.'  A 'spectacle' cannot be 'owned' in any ordinary sense of that word.  Even if there were any legal principle which prevented one person from gaining an advantage for himself or causing damage to another by describing a spectacle produced by that other person, the rights of the latter person could be described as property only in an metaphorical sense.   Any appropriateness in the metaphor would depend upon the existence of the legal principle.  The principle cannot itself be based upon such a metaphor."

287.   In this case the claimants did not claim any quasi-proprietorial rights in the spectacle of the wedding.   They claimed non-proprietorial rights of confidence in wedding photographs as a generic class, regardless of who owned the copyright in those photographs.  English law has (especially in the decision of this House in *Campbell v MGN Ltd* [2004] 2 AC 457) recognised

that there may be something special about photographs, but I think that it is necessary to see how far this approach has gone.

288.   In *Campbell* some of your Lordships mentioned the familiar saying that "a picture is worth a thousand words." My noble and learned friend Lord Hoffmann was rather less enthusiastic about the saying, observing (para 72):

> "In my opinion a photograph is in principle information no different from any other information. It *may* be a more vivid form of information than the written word ('a picture is worth a thousand words'). [emphasis supplied]."

Photographs are in a special position in that if a photograph is a blatant and obviously unjustifiable invasion of personal privacy, its publication by the perpetrator will not give him a "public domain" defence for further publication: see the Court of Appeal's judgment [2006] QB 125, paras 84-90, citing *Theakston v MGN Ltd* [2002] EMLR 398, para 68 (Ouseley LJ) and *D v L* [2004] EMLR 1, para 23 (Waller LJ). Photographs are also regarded (despite the ample opportunities for manipulation which modern technology affords) as providing powerful corroboration of written reports of conduct which the person photographed might wish to deny. But this is not that sort of case. The world was not in doubt that the Douglases did get married at the Plaza Hotel in New York on 18 November 2000; and the photographs published by Hello! may have been un-posed and un-focused, but none of them was even faintly embarrassing.

289.   Your Lordships were referred to two interlocutory decisions at first instance in which injunctions were granted to restrain publication of unauthorised photographs of scenes which were claimed to be entitled to commercial confidentiality. In *Shelley Films Ltd v Rex Features Ltd* [1994] EMLR 134, a photographer had found his way onto a film set where "Mary Shelley's Frankenstein" was being filmed. It was a high-budget film with several big stars. There was a conflict of evidence as to whether the photographer evaded security guards and ignored notices forbidding photography. The claim was put primarily as a breach of copyright in costumes and prosthetic features (especially those of Robert de Niro, the "sharp featured man" who was to be hanged and brought back to life by Frankenstein). The judge accepted that there was an arguable case on copyright infringement but also considered breach of confidence, and found that the claimant had an arguable case there also. He seems to have accepted counsel's submission that there was a legitimate interest in the confidentiality of making this film of Mary Shelley's gothic tale, especially (at p139):

> ". . . that Robert de Niro's appearance, mainly as 'the creature' but also as 'the sharp featured man' should be kept secret so as to maintain the interest of the public in one of the essential elements of the film, namely, the appearance of Dr Frankenstein's creation."

That was, in the context of a serious film with a $40m budget, not a trivial matter.

290.   The other case is *Creation Records Ltd v News Group Newspapers Ltd.* [1997] EMLR 444, in which a photographer had taken pictures (again, with a conflict of evidence as to the circumstances) of a photo shoot for a poster for a forthcoming Oasis album.  The poster was to show a white Rolls Royce apparently emerging from a swimming pool, with the members of the group and various other unrelated objects also in the picture.  The most striking feature of the case, to my mind, is the lengths to which the record company's counsel went in seeking to establish an arguable case as to the infringement of some recognised intellectual property right.  He argued that the Rolls Royce, the group members and the other objects were (i) a dramatic work or (ii) a sculpture or (iii) a collage or (iv) a work of artistic craftsmanship.  So the barrel of intellectual property rights was thoroughly scraped before the judge came to the claim for breach of confidence, which he regarded as arguable.  The judge said at pp454-455,

> "Mr Garnett argues that, despite all of that, no arguable case is made out for breach of confidence, or indeed for the existence of confidentiality, and says correctly that merely because a well-known person tries to stop people taking photographs of him or her it does not follow that any picture taken in evasion or defiance of those attempts is in breach of confidentiality. That seems to me to be a perfectly sound proposition but very far from this case."

The judge went on to stress the evidence as to restrictions on intrusion.

291.   In the Oasis case the defendants seem not to have relied on Lord Goff's second limiting principle (in *Attorney-General v Guardian Newspapers Ltd No. 2* [1990] 1 AC 109, 282), that the law of confidence does not protect trivia.  Photographs of a white Rolls Royce in a swimming pool may be thought to be a fairly trivial trade secret.  The argument that information is trivial or anodyne carries much less weight in a case concerned with facts about an individual's private life which he or she reasonably expects to be kept confidential: *McKennitt v Ash* [2006] EMLR 10, para 58 (Eady J).

*Conclusions on breach of confidence*

292.    In *Attorney General v Guardian Newspapers Ltd (No 2)* [1990]  1  AC 109 the law took an important step forward with the holding that an actual, deliberate confiding of private information is not necessary to establishing a cause of action for breach of confidence.  But there would be some danger of that principled and progressive step turning into an uncontrolled and unprincipled explosion if we were to disregard Lord Goff's three limiting factors, of which the first ("the principle of confidentiality only applies to information to the extent that it is confidential") and the second ("it applies neither to useless information, nor to trivia") are potentially relevant to this appeal.  Uncontrolled growth of the law of confidence  would also tend to bring incoherence into the law of intellectual property.

293.    Although the position is different in other jurisdictions, under English law it is not possible for a celebrity to claim a monopoly in his or her image, as if it were a trademark or brand.  Nor can anyone (whether celebrity or nonentity) complain simply of being photographed.  There must be something more: either that the photographs are genuinely embarrassing (*Theakston v MGN Ltd* [2002]  EMLR 398) or that their publication involves a misuse of official powers (*Hellewell v Chief Constable of Derbyshire* [1995]  4 All ER 473) or that they disclose something which merits temporary protection as a commercial secret (*Shelley Films Ltd v Rex Features Ltd* [1994]  EMLR 134, in which a photograph of Robert De Niro in the guise of Frankenstein's creature would no doubt have been worth a thousand words of description).

294.    There was nothing embarrassing or offensive about the Hello! photographs of the wedding, apart from the fact that Mr and Mrs Douglas did not want them to be taken, and indeed were contractually bound to do their best to see that they were not taken.    The fact that stringent security arrangements were in place cannot by itself invest the wedding reception with the quality of confidentiality, if it did not otherwise attract it: see the observations of Lloyd J in  *Creation Records Ltd v News Group Newspapers Ltd* [1997]  EMLR 444, 454-455, which I have already quoted.

295.    There is no cross-appeal by Hello! against the Court of Appeal's dismissal of its appeal challenging the judge's award to the  individual claimants, Mr and Mrs Douglas.    That issue is not therefore before your Lordships, and I should not be taken as expressing the view that the judge and the Court of Appeal were wrong about the modest awards of damages made in their favour.  Mr and Mrs Douglas had both a personal and a commercial interest in the matter, even if the two sat uneasily together.  But the interest of OK! was wholly commercial, and its case on breach of confidence must stand or fall on the ground of a right to short-term confidentiality for a trade secret.

296.    In *Gilbert v Star Newspaper Co Ltd* (1894)  11 TLR 4, W S Gilbert obtained protection for the plot of his forthcoming comic opera, but only until its first night, and in the *Shelley Films* case it was recognised that the injunction could not continue after the film was released.  In this case, by contrast, the wedding was over before any photographs were published, and the Hello! photographs and the first batch of OK! photographs were published almost simultaneously.  OK! had no intellectual property rights in the Hello! photographs, or in the "spectacle" of the wedding (compare the Australian *Victoria Park* case and the risible arguments advanced in  *Creation Records Ltd v News Group Newspapers Ltd*).  The appellant's reliance on a generic class of photographic information about the wedding is ingenious, but I share the view of the Court of Appeal that it is unsound.  OK! no more had a monopoly in any possible photograph of the spectacle than it had in the spectacle itself, or in any other event of which it hoped to carry exclusive coverage.

297.    I have already noted that neither Lord Nicholls nor Lord Hoffmann regards *RCA Corporation v Pollard* [1983]  Ch 135 and *Isaac Oren v Red Box Toy Factory Ltd* [1999]   FSR 785 (both unsuccessful claims by exclusive licensees) as having been wrongly decided.  It would in my opinion be anomalous if the principle in  *RCA Corporation v Pollard* and *Isaac Oren v Red Box Toy Factory Ltd* were limited to exclusive licences of copyright or other intellectual property rights protected by an exhaustive statutory code, and were not applied to the analogous case of OK!'s exclusive contractual licence in respect of what might loosely be called quasi-copyright (not protected by statute).  In respectful disagreement with Lord Hoffmann I think it would go some way to creating an unorthodox and exorbitant form of intellectual property.

298.    My Lords, my respectful dissent from the views of the majority arises not from any distaste for the modern celebrity world but from my perception (shared, no doubt, by all of us) of the need for consistent and rational development of the law of confidentiality.  My initial inclination was to conclude that Hello! was liable to pay damages to OK! under the "unlawful means" tort.   But in my opinion it would be impossible to reach that conclusion without either overturning *RCA Corporation v Pollard* or distinguishing it on unsatisfactory grounds.  An exclusive licensee of real intellectual property rights suffers economic loss as a direct result of a bootlegger's activities, but has no cause of action against him because his exclusive licence remains intact as a matter of law.  One reason for the decision was the Court of Appeal's conclusion that there was an exhaustive statutory code.  But another, simpler reason was that the exclusive licence was not destroyed; it was simply made less valuable.  The fact that it was no longer truly exclusive did not alter that conclusion.

299.    Can the licensee's lack of a remedy under the "unlawful means" tort be made good by relying on the law of confidence, even in a case where there is

no separate element of unlawful means?  The answer must be (in a case where personal privacy is not an issue) that the law of confidence can be invoked only if the information in question meets the law's requirements for the protection of information that is, in the eyes of the law, confidential.  Lord Hoffmann suggests, in an appeal to economic realities, that if OK! thought that it was worth paying £1m for its "exclusive" contractual right (and Hello! was willing to pay the same price) then there is no reason why there should not be an obligation of confidentiality.  But the confidentiality of any information must depend on its nature, not on its market value.

300.    For instance, a newspaper or television company might be willing to pay a large sum to the promoter of some important sporting event for the "exclusive" right to all motion pictures and photographs of the event, and it might go to great lengths to publicise its exclusive right (partly to attract custom, and partly in the hope of engaging the law of confidence).  If the event (for instance, figure-skating or show-jumping) was held in a relatively small indoor venue, with tight security, the hoped-for exclusivity might actually be achieved.  If the event was a motor rally or a marathon foot-race held on public roads it would be unachievable (although the newspaper or television company might still make a worthwhile profit).  But in neither case, in my opinion, should the law of confidentiality afford the protection of exclusivity in a spectacle (the term used by the High Court of Australia in *Victoria Park Racing and Recreation Grounds Co Ltd v Taylor* (1937)  58 CLR 479).  That would stretch the law of confidence from its proper function (in this commercial context, the protection of trade secrets) and would in effect confer on the exclusive licensee a form of property right which the courts have (in cases like *RCA Corporation v Pollard*) rightly withheld from exclusive licensees of established intellectual property rights.

301.    I would therefore dismiss all three appeals.

## BARONESS HALE OF RICHMOND

My Lords,

302.    I have read your lordships' opinions with admiration. On many issues, in particular the general shape of the economic torts, there is complete agreement. On three issues, there is disagreement. On two of these, I agree with the conclusions and reasoning of my noble and learned friend, Lord Hoffmann: these are "what should count as unlawful means" in the tort of causing economic loss by unlawful means and "what should count as a secret" in the law of breach of confidence. On the third issue, the application of the tort of conversion to contractual rights of action, I agree with the conclusions and reasoning of my noble and learned friend, Lord Nicholls of Birkenhead.

303.   On the first two issues, Lord Hoffmann's view is shared by a majority. The least said by the rest of us who take the same view, therefore, the better. There should be no doubt, and no room for argument, about what has been decided and why. Any perceived inconsistency between what I say and what he says is to be resolved in favour of the latter. Indeed, there would be much to be said for our adopting the practice of other supreme courts in having a single majority opinion to which all have contributed and all can subscribe without further qualification or explanation. There would be less grist to the advocates' and academics' mills, but future litigants might thank us for that.

304.   On the third issue, on the other hand, Lord Nicholls and I are in the minority. I can do less harm, therefore, by contributing my own twopenn'orth to the debate. Once again, however, any perceived inconsistency between what I say and what he says is to be resolved in his favour. As my noble and learned friend, Lord Walker of Gestingthorpe, acknowledges, Lord Nicholls makes a powerful case. Peter Gibson LJ reached the conclusion that such a development was not open to him "with regret": see [2005] QB 762, at 778, para 58. Carnwath LJ's "initial instinct" was also "that the receivers should be strictly liable for all the consequences of their unlawful appropriation of the business, by analogy with the long-established principles applied to unlawful receiverships under the law of trespass and conversion": *ibid*, 799, para 115.

305.   For those of us who share that general view, the question is whether this is simply the development of established principles of the common law to meet the demands of the modern world or whether it is a more radical step which should be left to Parliament. The great strength of the common law is that the judges are free to develop it on a case by case basis as new factual situations arise. There comes a point when, as Scrutton LJ once said, "If there is no authority for this it is time that we made one": see *Ellerman Lines Ltd v Read* [1928] 2 KB 144, 152. But on what basis do the judges decide to make authority where there was none before? Or to modify or adapt such authority as there is? There is no easy answer to this. Whatever we do must be consistent with the underlying principles and policy of the law. It must not overstep that indefinable line between the development and elaboration of existing principles and the making of brand new law which is unquestionably the province of Parliament. It must work with, rather than against, the grain of legal policy. It must go forward when the law is going forward and draw back when the law is drawing back.

306.   That is why I have no difficulty with the first two issues. The underlying rationale of both the *Lumley v Gye* 2 E & B 216 and the unlawful means torts is the same: the defendant is deliberately striking at his target through a third party. But the means used to strike must be unlawful: see *Allen v Flood* [1898] AC 1. They may either be a wrong committed by the third party against the target or be a wrong committed by the defendant against the third party. But the rules governing each are different: in particular, the

intention is different and the damage procured is different. Nevertheless, the common thread is striking through a third party who might otherwise be doing business with your target, whether by buying his goods, hiring his barges or working for him or whatever. The refinement proposed by my noble and learned friend, Lord Hoffmann, is entirely consistent with the underlying principles to be deduced from the decided cases. It is also consistent with legal policy to limit rather than to encourage the expansion of liability in this area. In the modern age, Parliament has shown itself more than ready to legislate to draw the line between fair and unfair trade competition or between fair and unfair trade union activity. This can involve major economic and social questions which are often politically sensitive and require more complicated answers than the courts can devise. Such things are better left to Parliament. The common law need do no more than draw the lines that it might be expected to draw: procuring an actionable wrong between the third party and the target or committing an actionable (in the sense explained by Lord Hoffmann at para 49 above) wrong against the third party inhibiting his freedom to trade with the target.  I too have found the discussion by my former colleague, Hazel Carty, in *An Analysis of the Economic Torts*, chapter 5, most helpful.

307.   Commercial confidentiality is a different matter. It is moving forward rather than drawing back. The law took a big leap forward with the *Spycatcher* case (*Attorney-General v Guardian Newspapers Ltd* [1990] 1 AC 109). It was, incidentally, a leap which would have been impossible had the Law Commission's Report on *Breach of Confidence* (1981, Law Com No 110) been implemented by statute. Rather as *Lumley v Gye* had expanded liability for breach of contract beyond the contract breaker to the person who persuaded him to break his contract, *Spycatcher* expanded liability for failing to keep a secret beyond the person to whom it had originally been confided to the person who knowingly took advantage of the secret. There are some secrets which the law will not protect. They may be so trivial or useless that the law should not concern itself with them. There may be a public interest in disclosure greater than the private interest in secrecy. But we have not been given any principled reason why photographic images of this wedding should not be protected. They were undoubtedly a secret unless and until *OK!* chose to publish the images authorised by the Douglases. *Hello!* did its best to break what it knew was a secret. There may not have been an entirely identical case before but it is consistent with existing principles to apply them to this case, as the judge did. I confess to having some difficulty in understanding what this has to do with the law of intellectual property. Parliament has devised ways in which an author, inventor or creator can continue to profit from his creativity long after the product has passed into the public domain. Although in both cases the subject matter can be called information, one set of remedies is about rewarding its creator, the other about keeping it quiet. Parliament has intervened in the former but not the latter.

308.   Conversion is another area of judge made law, of much greater antiquity than the other two, and hence it has undergone even more

momentous developments than they have done. The common law, as is well known, lacked any general proprietary remedy equivalent to the Roman law *vindicatio*. It provided three separate remedies for wrongfully taking away, keeping, or disposing of another's goods: trespass, detinue and trover or conversion. Conversion had distinct procedural advantages over the other two and rapidly extended its boundaries to cover much the same ground as they did: see J W Salmond, "Observations on Trover and Conversion" (1905) 81 LQR 43, at 47. The contrivances used to achieve this desirable end led to many technicalities and controversies which continued to plague the law long after the reason for them had gone: *ibid*, at 43. But of one thing there could be no doubt: although nominally tortious, conversion had become the remedy to protect the ownership of goods: see *Kuwait Airways Corporation v Iraqi Airways Co (Nos 4 and 5)* [2002] 2 AC 883, per Lord Nicholls of Birkenhead at 1092, para 77. It follows that fault is irrelevant: "An honest but mistaken claim of right on the part of the defendant is just as much a conversion as a fraudulent purpose to retain another's property is": Salmond, *loc cit*, at 49. The remedy is either the value of what has been lost or (following the Torts (Interference with Goods) Act 1977) the return of the goods.

309.    In a logical world, there would be such a proprietary remedy for the usurpation of all forms of property. The relevant question should be, not "is there a proprietary remedy?", but "is what has been usurped property?" Rights of action were not seen as property in the 15th and 16th centuries when the tort of conversion was first developing. The essential feature of property is that it has an existence independent of a particular person: it can be bought and sold, given and received, bequeathed and inherited, pledged or seized to secure debts, acquired (in the olden days) by a husband on marrying its owner. So great was the medieval fear of maintenance that the law took a very long time to recognise any right of action (even a reversionary right to tangible property) as having this quality: see W S Holdsworth, "The History of the Treatment of *Choses in Action* by the Common Law" (1920) 33 Harvard Law Review 997. But it is noteworthy that, when new forms of chose in action which could be assigned were developed during the 17th and 18th centuries, the remedy of conversion was adapted to accommodate them: it did so by pretending that the document or other token representing or evidencing the obligation had the same value as the obligation itself.

310.    The point was well made by Park CJ, in the Supreme Court of Errors in the State of Connecticut, in *Ayres v French* (1874) 41 Conn R 142, 150:

> "There is really no difference in any important respect between [a share of stock] and other kinds of personal property. A man purchases a share of stock and pays one hundred dollars for it. He afterwards purchases a horse, and pays the same price. The one was bought in the market as readily as the other and can be sold and delivered as readily. The one can be pledged as collateral security as easily as the other; as easily attached to

> secure a debt; and its value as easily estimated. The one
> enriches a man as much as the other, and fills as important a
> place in the inventory of his estate."

Once the law recognises something as property, the law should extend a
proprietary remedy to protect it. Our law is prepared, according to Clerk &
Lindsell, to apply the remedy of conversion to "any document which is
specially prepared in the ordinary course of business as evidence of a debt or
obligation": see *Clerk & Lindsell on Torts*, 19th ed, (2006), para 17-35. The
reliance on a document or some other tangible token of the existence of the
obligation may be understandable as a relic of the history, but it is not
principled. It is at once too wide and too narrow. There may be a document
evidencing an obligation of a purely personal kind, which ought not to attract a
proprietary remedy. On the other hand, there are many debts and some other
obligations which can now be readily assigned, attached, form part of an
insolvent estate, and enjoy all the other characteristics of property, but which
are not represented by a specific document. It is not surprising that the law has
not yet taken the logical step of applying the same principle to them, because
it is much more difficult wrongly to deprive someone of his rights of action
than it is to deprive him of his wallet or his coat. But, to my mind, it is no
greater step for the law to do this than it is for the law to recognise that
photographs of the Douglas wedding enjoy the same protection as more
conventional trade secrets. It is not only entirely consistent with principle. It is
inconsistent with principle not to do so.

311.     The facts of the *OBG* case make the point more clearly than I could
ever do. The defendants took control over all the company's assets. They
entered the company's premises and changed the locks. They took charge of
all its plant and machinery and other chattels. They had no right to do so. No-
one disputes that they are strictly liable in trespass to land and conversion no
matter how bona fide their belief that they were entitled to do this. They also
took charge of the company's business and closed it down. The judge found
that the company was doomed, so that there was no goodwill to be attached to
disposing of it as a going concern. But among the company's assets were the
debts and other contractual liabilities it was owed. The judge found that the
defendants obtained less for these assets than would have been obtained in an
orderly winding up.  This is not improbable. The receivers' obligations and
priorities were different from those of the company, its other creditors and
shareholders. They might well result in lower realisations than the company
might have achieved for itself. Accepting, as we must, the judge's findings on
this, it makes no sense that the defendants should be strictly liable for what
was lost on the tangible assets but not for what was lost on the intangibles.

312.     There could, of course, be an objection to extending the scope of an
invalidly appointed receiver's liability if Parliament had considered that
receivers should be granted relief from liability in trespass to land or
conversion of goods and had enacted that relief in terms which could not be

applied to the conversion of contractual rights. But Parliament has not done so. Parliament's failure to act is not a reason to make the extension proposed: it merely negates a possible objection to doing so.

313.    Nor do I see the Torts (Interference with Goods) Act 1977 as an obstacle. The Law Reform Committee, whose 18th Report (1971, Cmnd 4774) preceded the 1977 Act, were specifically asked to consider the torts relating to interference with chattels. It was in that context that they recommended a new tort of wrongful interference with chattels from which other forms of property, including land, money and choses in action would expressly be excluded (para 29). They were not asked to consider, and did not consider, whether the tort of conversion should be applied to intangible property. Indeed, they excluded from their consideration its application to the infringement of copyright by the Copyright Act 1956 (para 4). Furthermore, while recommending a new tort, the Committee deliberately did not recommend a complete codification of the common law of conversion; rather, they recommended that it should be retained save insofar as modified by their proposals (para 32). In the event, Parliament did not even enact a new tort. It merely enacted a new label identifying the torts, including "conversion of goods", to which the new rules would apply. Those new rules were of very limited scope. None of them is inconsistent with applying the common law tort to contractual choses in action (or indeed to other forms of intangible property, but we are not concerned with these).

314.    The Committee did consider the measure of damages applicable to the conversion of "tokens". By this they meant "any article (usually, but not necessarily, a document) of small inherent value which constitutes or evidences some right in its possessor as respects property or other benefits" (para 90). There was some doubt about whether the rule applicable to negotiable and quasi-negotiable instruments applied to such things and the Committee were of the view that arguably it already did and certainly it should (consistently with the view now taken by *Clerk & Lindsell*, *op cit*, para 17-35). They recommended that the measure of damages in conversion should always be the true loss suffered by reason of the defendant's acts (para 91). That view was adopted in the decision of this House in *Kuwait Airways Corporation v Iraqi Airways Co (Nos 4 and 5)* [2002] 2 AC 883, 1090, para 68. In that case, the effect was to limit the damages which would otherwise be payable but the principle is the same. It means that the law of conversion has already been adapted by the courts in a significant respect which is consistent with its application to contractual rights of action: cf V D Ricks, "The Conversion of Intangible Property: Bursting the Ancient Trover Bottle with New Wine" [1991] Brigham Young University Law Review 1681, where this was seen as the major problem in the current US developments.

315.    Reforming the common law by statute is not an easy task (the difficulties are vividly described in R Oerton, *A Lament for the Law Commission*, 1987, Countrywide Press). One of the difficulties is that the

common law is constantly developing. The state of the law when the reforms are originally proposed may be different from the state of the law if and when they are eventually enacted. Indeed, the law may continue to move on even after the reforms have been enacted. The law reformer will rarely wish to preclude such organic development unless (unlike the 1977 Act) the reform is intended to be a complete codification. It is quite possible that a later development in the common law will take away the case for a reform which has been enacted on the basis of what the law was previously thought to be. A recent example of this is *Bakewell Management Ltd v Brandwood* [2004] UKHL 14; [2004] 2 AC 519. But that will not deter the courts from developing the law unless it is clearly inconsistent with what Parliament has enacted, which this is not. I do not, therefore, see the 1977 Act as any obstacle to the incremental development of the common law of conversion.

316.   If, however, a majority of your lordships would prefer to leave the matter to Parliament, then I very much hope that the Law Commission can be persuaded to include it in their 10th programme of law reform. The Commission would be bound to consider developments in other common law jurisdictions. There are Canadian authorities which look at it from the point of view of invalid receivership. They establish, at the very least, that where a receiver wrongfully takes control and a business fails as a result, then the value of the company's intangible assets is included in the measure of damages: *McLachlan v Canadian Imperial Bank of Commerce* (1987) 13 BCLR (2d) 300; approved on appeal (1989) 57 DLR (4th) 687; *Bradshaw Construction Ltd v Bank of Nova Scotia* [1993] 1 WWR 596; and *Royal Bank of Canada v W Got & Associates Electric Ltd* (1994) 150 AR 93, confirmed on appeal by the Alberta Court of Appeal (1997) 196 AR 241 and by the Supreme Court of Canada [1999] 3 SCR 408.

317.   In the United States, the Second Restatement of the Law (American Law Institute, 1965) merely refers to "documents in which intangible rights are merged", but the Commentary, at p 242, observes:

> "It is at present the prevailing view that there can be no conversion of an ordinary debt not represented by a document, or of such intangible rights as the goodwill of a business or the names of customers. The process of extension has not, however, necessarily terminated; and nothing that is said in this Section is intended to indicate that in a proper case liability for intentional interference with some other kind of intangible rights may not be found."

Even before then, some seeds of such a development had been sown: see "Conversion of Choses in Action" (1941) 10 Fordham Law Review 415. Since then a few States have extended the tort beyond contractual obligations to intangibles such as computer records and data: see most recently, *Thyroff v*

*Nationwide Mutual Insurance Company et al*, New York State Court of Appeals, 22 March 2007. These raise far more formidable questions than the one with which we are concerned: it is questionable whether the subject matter has sufficient proprietary quality to attract a proprietary remedy. But they certainly point to a problem with our present reliance on tangible tokens: the reason why (if it be the case) an e-ticket cannot be converted is that it is non-assignable, not that it exists in cyber-space rather than on paper. We do not have to venture into these difficult issues to resolve the present case in favour of OBG. The Law Commission, however, would almost certainly have to do so. Such questions are already rearing their heads in Australia as well as the United States: see *Telecom Vanuatu Ltd v Optus Networks Pty Ltd* [2005] NSWSC 951; *Hoath and Another v Connect Internet Services Pty Ltd and Others* [2006] NSWSC 158. I would quite understand it if the Commission were to consider this a more suitable topic for the case by case development of the common law than for comprehensive statutory reform. I regret that by this decision we appear to be ruling that out.

318.   For these reasons, I would allow the appeals in the cases of OBG and OK! but, in agreement with all your lordships, I would dismiss the appeal in the Mainstream case.


## LORD BROWN OF EATON-UNDER-HEYWOOD

My Lords,

319.   I have had the privilege of reading in draft the opinions of my noble and learned friends, Lord Nicholls of Birkenhead, Lord Hoffman and Lord Walker of Gestingthorpe.  All three agree on many of the issues arising in these appeals and where that is so I too agree.  Where, however, they disagree—notably with regard to (i) the precise nature and ambit of the economic tort of causing loss by unlawful means, (ii) whether the tort of conversion should be extended to cover the appropriation of choses in action, and (iii) OK's claim based on confidentiality—I have come in the end to accept in each instance the reasoning and conclusions of Lord Hoffmann.  I add only the following brief observations.

*Causing loss by unlawful means*

320.   As Lord Hoffmann explains, any liability for this tort is primary (unlike the accessory liability which arises under the principle in *Lumley v Gye* 2 E & B 216 where the defendant induces a contracting party to commit an actionable wrong against the claimant) and it arises where the defendant, generally to advance his own purposes, intentionally injures the claimant's

economic interests by unlawfully interfering with a third party's freedom to deal with him. In this tort there is no question of the third party's conduct (which *ex hypothesi* will have been inhibited or obstructed by the defendant's actions) being unlawful vis-a-vis the claimant; if it were, the case would be one of *Lumley v Gye* secondary liability. Rather the unlawfulness is that of the defendant towards the third party and the defendant's conduct must be such as would be actionable at the suit of the third party had he suffered loss. To define and circumscribe the tort in this way seems to be not only faithful to its origins as described by Lord Lindley in *Quinn v Leatham* [1901] AC 495, 535, and consistent with the great bulk of authority which has considered the tort over the ensuing century, but also to confine it to manageable and readily comprehensible limits. This whole area of economic tort has been plagued by uncertainty for far too long. Your Lordships now have the opportunity to give it a coherent shape. This surely is an opportunity to be taken.

*Conversion*

321.   In common with Lord Hoffmann and Lord Walker I too would regard the expansion of the tort of conversion to cover the appropriation of things in action, as proposed by Lord Nicholls, to involve too radical and fundamental a change in the hitherto accepted nature of this tort (see particularly the Torts (Interference with Goods) Act 1977) to be properly capable of achievement under the guise of a development of the common law. Lord Nicholls suggests that this would represent merely "a modest but principled extension of the scope of the tort". I see it rather differently—as no less than the proposed severance of any link whatever between the tort of conversion and the wrongful taking of physical possession of property (whether a chattel or document) having a real and ascertainable value. Indeed, I respectfully question whether such a proposed development in the law ought in any event to be welcomed. I recognise, of course, that the tort has long since been extended to encompass a variety of documents, not merely documents of title and negotiable instruments but also any business document which in fact evidences some debt or obligation. But to my mind there remains a logical distinction between the wrongful taking of a document of this character and the wrongful assertion of a right to a chose in action which properly belongs to someone else. One (the document) has a determinable value as at the date of its seizure. The other, as so clearly demonstrated by this very case (OBG), does not. It is one thing for the law to impose strict liability for the wrongful taking of a valuable document; quite a different thing now to create strict liability for, as here, wrongly (though not knowingly so) assuming the right to advance someone else's claim.

322.   As Lord Hoffmann points out, there is really no explanation in OBG's case for the trial judge's conclusion that causes of action in respect of the terminated North West Water contracts which were finally settled in November 1993 for £400,000 had in June 1992 been worth three and a half times that sum: £1,400,000. Certainly there is no suggestion that the receivers

here acted incompetently in negotiating the settlement, still less that the supposed value of these contracts in June 1992 was in fact then realisable in that sum.  As Lord Walker observes, this is "a singularly unsuitable case for a major change in the law".

*Confidentiality*

323.    The facts giving rise to the claim by OK! against Hello! are sufficiently summarised by Lord Hoffmann at paras 108-109 and by Lord Nicholls at paras 242-246 (and are to be found in altogether greater detail in the judgments below).  Nobody disputes that the Douglases were perfectly entitled, quite irrespective of any right of privacy, to sell the exclusive right to publish photographs of their wedding, and nobody doubts that the right was worth the £1m which OK! paid for it.  Indeed Hello! had earlier made an unsuccessful bid for the same right in the same sum.  It is no less plain that in publishing as they did the rogue photographs deceitfully taken by an infiltrator at the wedding, Hello! not only lent themselves to this outwitting of the strenuous efforts made by the Douglases to safeguard OK!'s exclusive but intentionally destroyed the very right itself.

324.    The loss of their exclusive right cost OK! £1m; that was the judge's assessment of damages here and there are no good grounds for impugning it.  Hello!, however, contend that vis-à-vis OK! they committed no actionable wrong: all is fair in love and war and so too, they submit, between publishers of celebrity magazines.  Spike your competitor's exclusive if you can and use whatever means you must.

325.    If the law were indeed to sanction such an approach I for my part would regret it.  Having paid £1m for an exclusive right it seems to me that OK! ought to be in a position to protect that right and to look to the law for redress were a third party intentionally to destroy it.  Like Lord Hoffmann, I would uphold OK!'s claim, as Lindsay J did at first instance, on the ground of breach of confidence.

326.    What is the information to which the confidence here attached?  Plainly the information as to how the wedding looked—the photographic images which bring the event to life and make the viewer a virtual spectator at it.  How can one doubt that this was commercially confidential information or, if one prefers, a trade secret?  It was, after all, secret information for which OK! had been prepared to pay £1 million, in the expectation, obviously, that it was to remain secret until they chose to make use of it.  And that is certainly how it would also have been perceived by Hello! (who had themselves hoped to acquire and exploit the secret in the same way).

327.   Like Lord Hoffmann I find the Court of Appeal's criticism of the judge at para 136 of their judgment unpersuasive.   I cannot agree that OK!'s complaint, properly analysed, is not about Hello!'s breach of their exclusive right to publish authorised photographs but rather that Hello! published images which no one had a right to publish and about which only the Douglases had a right to complain.   This to my mind entirely overlooks that the Douglases had granted OK! the exclusive right to publish any photographic images of the wedding and had undertaken to do their best to ensure that no photographs were taken by anyone else so that nobody else would be in a position to defeat their exclusive right.

328.   Assume, for example, that the Douglases were themselves magazine publishers and had wished to market the visual images of their wedding as an exclusive in their own magazine.   Could it then be suggested that they had no right to complain against Hello! for behaving as they did here?   Surely not.   Or assume that the contract had stipulated that if other photographs of the wedding came to be published, the £1m paid by OK! (or, say, £½m) would be repayable.   Would not the Douglases have been entitled to claim that loss against Hello! on the ground of breach of confidence?   Why then not OK! too?

329.   The one hesitation I must own to having had with regard to the claim for breach of confidence concerns the situation which arises upon publication by OK! of the authorised photographs in pursuance of their exclusive right.   At that moment, it may be suggested, the secret is out, the world now knows what the wedding looks like, and no commercial confidence remains to be protected.   The answer, however, I am persuaded is this.   The secret consists no less of each and every visual image of the wedding than of the wedding as a whole.   Assume, for example, that OK! had chosen to publish photographs of the bride and groom in one issue, the guests in the next, and the presents later still.   The confidence would, I think, continue throughout and I see no reason why at some point bootlegged photographs should suddenly become acceptable on the grounds that the look of the wedding was now in the public domain so that no confidentiality in its photographic image remained to be protected.

*Conclusion*

330.   It follows from all this that I too would dismiss the appeals respectively by OBG and by Mainstream Properties but allow the appeal by OK! on the ground of breach of confidence, reinstating Lindsay J's damages award accordingly.